PUEBLO INTERNATIONAL, INC. y OTROS, demandantes y apelados, *v.* HÉCTOR RIVERA CRUZ y OTROS, demandados y apelantes.

*Número:* CE-86-430      *Resuelto:* 23 de noviembre de 1988

*Rafael Ortiz Carrión, Procurador General,* y *Lorenzo Vilanova Alfonso, Procurador General Auxiliar,* abogados de los apelantes; *Carlos M. Rivera Vicente, Iván Garau Díaz* y *Galvín Aldarondo Girald,* de *Cancio, Nadal & Rivera,* abogados de la interventora y apelante, Asociación de Mayoristas Importadores y Distribuidores de Alimentos de Puerto Rico; *Carlos M. Ortiz Velázquez,* abogado del interventor y apelante, Comité Pro Ley de Cierre; *Ramón Claudio Ortiz,* abogado del interventor, Centro Unido de Detallistas de Puerto Rico; *Rubén T. Nigaglioni,* de *Ledesma, Palou & Miranda,* y *Samuel T. Céspedes, Manuel A. Guzmán* y *Ramón Coto Ojeda,* de *McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz-Suria,* abogados del apelado Pueblo International, Inc.; *Carmen Rita Vélez Borrás,* abogada de la apelada ISAACAR, Inc.; *Marisa Brugueras,* abogada de la Liga de Mujeres Votantes, Inc., *amicus curiae.*

## SENTENCIA

Visto el Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, preceptivo de que ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el Tribunal, por estar igualmente dividido, se *revoca* la sentencia del Tribunal Superior, Sala de San Juan, que declaró inconstitucional los Arts. 553–556 del Código Penal de Puerto Rico, conocidos o denominados en conjunto como Ley de Cierre, 33 L.P.R.A. secs. 2201–2203.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. Los Jueces Asociados Señores Negrón García, Rebollo López y Hernández Denton emitieron opiniones concurrentes. El Juez Presidente Señor Pons Núñez emitió opinión disidente, a la cual se unen los Jueces Asociados Señores Ortiz y Alonso Alonso. La Juez Asociada Señora Naveira de Rodón quiere hacer constar que, luego de intervenir en este caso, advino a su conocimiento que un pariente suyo dentro del segundo grado de consanguinidad tiene interés *directo* en el asunto del cual trata el presente caso. Debido a estas circunstancias, ha decidido que es su deber y obligación inhibirse de intervenir en el mismo.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

Versa esta apelación sobre la constitucionalidad de la controversial Ley de Cierre, materia por demás sensiblemente volátil que, con diversos grados de intensidad y variables perspectivas de solución, ha generado múltiples conflictos que inciden en una gama de valores individuales y comunitarios.

Se impone una breve explicación de la sentencia de este Foro que, por empate en la votación —debido a la inhibición de uno de sus miembros— *revoca* el decreto de inconstitucionalidad del Tribunal Superior, Sala de San Juan (Hon. Abner Limardo, Juez). De ordinario, en cualquier otro tipo de caso, ese empate confirmaría la decisión de instancia. No es así frente a pronunciamientos de inconstitucionalidad. En esencia, ello responde a la limitación dispuesta en el Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, de que para prevalecer tales reclamos se exige mayoría absoluta. La norma no es

nueva y nunca la hemos pasado por alto. *Pueblo v. Torres Lozada*, 106 D.P.R. 588 (1977). Como dijimos en *P.I.P. v. E.L.A.*, 109 D.P.R. 685, 697 (1980) —opinión concurrente— la misma "es de excepción y de rigurosa aplicación a este foro".

Sobre este extremo, no podemos pasar por alto las expresiones finales del disenso del Juez Presidente Señor Pons Núñez, pág. 817. Las mismas comunican la errónea impresión pública de que los responsables —de lo que él denomina "incertidumbre" y "perplejidad" en el estado de derecho— somos los Jueces que hemos sostenido la constitucionalidad del estatuto. Y todo por haber suscrito tres (3) opiniones concurrentes que, si bien son separadas, coinciden en cuanto a lo esencial: tipo de escrutinio de revisión judicial aplicable y el grado de deferencia a que es acreedora la Asamblea Legislativa en materia de legislación económico-social. Frente a las mismas, eleva a categoría de virtud el endoso, sin opinión escrita, de dos (2) Jueces Asociados a su disenso, mientras penaliza a aquellos que de modo distinto plasman los fundamentos que animan su conciencia judicial. En un ejercicio matemático expansivo —de "dividido y no igualmente dividido"— devalúa la regla constitucional de mayoría absoluta. Confesamos, nos ha sido difícil comprender la juridicidad de ese argumento, que inexplicablemente ignora el principio elemental de que las leyes se presumen constitucionales.

Como dijimos en *P.I.P. v. E.L.A.*, supra, págs. 697–698, "[a]nte estos claros antecedentes resulta forzada y errónea la interpretación abogando que un empate en este foro confirma un decreto de inconstitucionalidad de un tribunal de instancia. Equivaldría a sostener la inconstitucionalidad de una ley sin concurrir el voto de 'una mayoría del número total de los jueces de que est[á] compuesto' este Tribunal. Sin necesidad de esforzarnos en buscar apoyo en otras jurisdicciones, el legajo de la Convención Constituyente refleja indubitadamente que dicho curso de acción sería conflictivo

con la letra y espíritu de la Sec. 4, Art. V, antes citada. Por sabia que sea la regla general sobre empate, por ilógica que en algunas de sus fases pudiera estimarse la aplicación de la norma de mayoría absoluta, en este terreno el jurisprudente ha de comprender que ninguna costumbre, tradición, o ficción puede ir en contra o ignorar el mandato expreso de la Constitución".

Aclarada la razón de ser de este peculiar curso decisorio, expongamos los fundamentos que animan nuestra conciencia jurídica. Estamos convencidos de que una adjudicación en contrario hubiese socavado peligrosamente los cimientos en que se apuntala el poder fundamental del Estado para legítimamente velar el interés público a través de legislación económico-social. Un decreto de inconstitucionalidad fundado en el reclamo de Pueblo International, Inc. y otros establecimientos comerciales a *unas monedas extras*, no era ni puede ser suficiente para inclinar la balanza de la justicia. Implicaría la polarización indebida por el Poder Judicial de los valores comunitarios que la Asamblea Legislativa equilibró. Hubiese prevalecido el afán de lucro comercial y el consumerismo desmedido sobre los más trascendentales valores de nuestra sociedad: la unidad familiar, la protección, libertad e intimidad de los obreros y la preservación de un día de descanso común colectivo.

Después de todo, la opinión pública, como realidad inserta en el tejido social, es materia que usualmente corresponde canalizar y atender a la Asamblea Legislativa. Cuando las personas inconformes —naturales o jurídicas— tocan a las puertas del Poder Judicial a cuestionar una ley, la función de interpretarla conlleva separar sus raíces y ramas, la ficción de los hechos y la ignorancia de la sabiduría. "Pero el orden, el método por el cual la norma se interpreta con relación a todo el orden jurídico vigente, supone el conocimiento de este orden, *de muchos factores de la vida histórica de la comunidad* a la cual ese orden jurídico pertenece. *Determi-*

*nadas valoraciones, luchas de grupos sociales, la filosofía que informa un movimiento histórico, nociones discutidas desde el punto de vista económico, todo ha de ser considerado por el juez, que si lo ignora ha de confesar que la norma le resulta incomprensible.*" (Énfasis suplido.) A.V. Fernández, *Función Creadora del Juez*, Ed. Abeledo-Perrot, Buenos Aires, 1970, pág. 72.

## I

La sentencia aludida dictaminó la inconstitucionalidad de los Arts. 553–556 del Código Penal de Puerto Rico, conocidos o denominados en conjunto como Ley de Cierre, 33 L.P.R.A. secs. 2201–2203. Los apelantes[1] imputan a dicho foro los errores siguientes: (1) adoptar un escrutinio que no guarda la debida deferencia al juicio y a la sabiduría de la Asamblea Legislativa al examinar su validez a la luz de los planteamientos de igual protección de las leyes y el debido proceso sustantivo; (2) no utilizar el escrutinio mínimo —que es el criterio jurídico correcto en el ámbito de la reglamentación económica— y por el contrario adoptar uno que suscita problemas en cuanto a la legitimidad del ejercicio del poder de revisión judicial; (3) limitar exclusivamente la intención legislativa de la Ley de Cierre al solo propósito de proteger el descanso de los trabajadores y no considerar otros, tales como la protección del mediano y pequeño comerciante, la designación del domingo como determinado día comunitario de descanso, desalentar circunstancias monopolísticas, y velar por la integridad física del trabajador, la unidad familiar

---

[1] A saber, el Secretario de Justicia, el Superintendente de la Policía, el Director de la Oficina de Asuntos Monopolísticos del Departamento de Justicia de Puerto Rico (todos representados por el Procurador General), la Asociación de Mayoristas, Importadores y Detallistas de Alimentos de Puerto Rico, Inc. (M.I.D.A.); el Centro Unido de Detallistas de Puerto Rico y el Comité Pro Ley de Cierre, en representación de empleados de varios de los principales centros comerciales (Plaza Las Américas, Plaza Carolina y Plaza Río Hondo).

y la calidad de vida; (4) errar en la apreciación de la prueba y en la formulación de las determinaciones de hecho; (5) negarse a certificar como *clase* al Comité Pro Ley de Cierre en violación de la Regla 20 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y al principio constitucional del debido procedimiento de ley, y (6) certificar como clase a la demandante apelada Pueblo International, Inc., corporación que se dedica a la venta al por menor de comestibles y otros artículos.

Expongamos sus antecedentes, trasfondo fáctico procesal y marco conceptual.

## II

El debate en torno a la validez de la Ley de Cierre no es nuevo. Sólo han cambiado los protagonistas. Desde el comienzo del siglo fue objeto de ataque y su constitucionalidad refrendada en *El Pueblo v. García & García*, 22 D.P.R. 817 (1915), y en *García v. Municipio de Humacao*, 57 D.P.R. 532 (1940). Salvo ínfimas instancias, por varias décadas su observancia y acatamiento fue constante. Durante este período sufrió algunas enmiendas introducidas para atender situaciones peculiares y fomentar la economía. Sin embargo, la actividad económica, el afán de lucro, el progreso material y el consumerismo desmedido alteraron esa estabilidad. Desde el fin de la pasada década algunos grandes comercios comenzaron a abrir sus puertas al público durante los domingos y días feriados a pesar de su prohibición. Por diversas razones, que no es necesario exponer ni discutir, el Estado no procuraba su ejecución al pie de la letra. Aun así, luego de varios pleitos, los esfuerzos gubernamentales culminaron en que mediante Sentencia de 30 de junio de 1982, en *The Grand Union Co. v. Giménez Muñoz*, (Casos Núms. O-81-32, O-80-677 y O-80-705), decretáramos nuevamente su validez.

El reposo fue efímero. Continuaron las exigencias de los intereses económicos. En 1983 la Asamblea Legislativa actuó e introdujo las últimas enmiendas al estatuto para aten-

der la pluralidad de reclamos y atemperarlo a la realidad prevaleciente. A juicio de algunas empresas, ello no fue suficiente, pues les afectaban sus ganancias. Demandaban su abrogación total y optaron por abrir. Otros establecimientos se unieron a la apertura dominical y días feriados para contrarrestar la ventaja competitiva. El ciclo de inobservancias continuó y se generalizó. Se suscitaron nuevas instancias judiciales. El 25 de septiembre de 1985 el Tribunal Superior archivó sin perjuicio un pleito entre Pueblo International, Inc. y el Estado (Caso Núm. 80–6454) al entender que las enmiendas introducidas a la ley lo convertían en no justiciable y, además, porque aún no se había promulgado el Reglamento sobre Zonas Turísticas.

Pocos meses después cambió la actitud gubernamental. El 9 de marzo de 1986, miembros de la Policía de Puerto Rico, Negociado de Investigaciones Especiales (N.I.E.) y del Departamento de Justicia requirieron personalmente a funcionarios de Pueblo International, Inc. e ISAACAR, Inc. —esta última, corporación dedicada a la venta de productos al por mayor y al detal— que inmediatamente descontinuaran la práctica de abrir los domingos. Fueron apercibidos de que velarían el fiel cumplimiento de la ley.

Después de estos incidentes, por varios domingos Pueblo International, Inc. se abstuvo de abrir al público sus establecimientos. Sin embargo, el 3 de abril logró que el Tribunal Superior, Sala de San Juan —sin celebración de vista previa— hiciera efectiva la Sentencia de 25 de septiembre de 1985 antes aludida y ordenara a los funcionarios del Estado a abstenerse de ponerla en vigor. El 25 de abril de 1986, a solicitud del Estado, expedimos auto de *certiorari* (CE-86-209), dejamos sin efecto dicha orden e instruimos al tribunal de origen que, previa audiencia a todas las partes, resolviera conforme a derecho. *Pueblo Int'l., Inc. v. Srio. de Justicia,* 117 D.P.R. 230 (1986). Oportunamente, el 21 de mayo de 1986 dicho foro resolvió que no procedía poner en vigor la Senten-

cia de 25 de septiembre de 1985 por el fundamento de que desde el 17 de abril de 1986 se había promulgado el Reglamento sobre Zonas Turísticas.

Este dictamen puso fin momentáneamente a la controversia.[2] Las reacciones no se hicieron esperar. El 23 de mayo de 1986 Pueblo International, Inc. presentó el caso que nos ocupa sobre sentencia declaratoria e *injunction* permanente. Figuran como demandantes dicha entidad y seis (6) de sus empleados en su capacidad personal. Pueblo International, Inc. comparece por sí y en representación de otros establecimientos comerciales similares opositores. Su acción fue certificada como de clase al amparo de la Regla 20 de Procedimiento Civil, *supra*. En apoyo de ese reclamo intervino ISAACAR, Inc. y también como *amicus curiae* la Liga de Mujeres Votantes, Inc. Todos impugnaron la Ley de Cierre por el fundamento de que infringe sus derechos bajo nuestra Constitución y la federal al privarles de la igual protección de las leyes y del debido proceso. Como remedios interlocutorios, solicitaron *injunction* preliminar y entredicho provisional con miras a prohibir su ejecución y la del Reglamento sobre Competencia Justa Núm. VII, promulgado bajo la legislación monopolística vigente.

Inicialmente fueron demandados el Secretario de Justicia, Lcdo. Héctor Rivera Cruz, el Superintendente de la Policía, Lcdo. Carlos J. López Feliciano, y el Director de la Oficina de Asuntos Monopolísticos del Departamento de Justicia, Lcdo. Federico Cedó Alzamora. Después, como interventores favorecedores de la ley, se unieron la Asociación de Mayoristas, Importadores y Detallistas de Alimentos de Puerto Rico, Inc. (M.I.D.A.), el Centro Unido de Detallistas de

---

[2] Todas las alegaciones y escritos presentados en dicho caso fueron sin perjuicio de que pudieran formularse en cualquier otra causa ante un tribunal competente.

Puerto Rico, en representación de pequeños y medianos detallistas, y el Comité Pro Ley de Cierre, en representación de empleados de varios de los principales centros comerciales del área metropolitana. Este último comité no logró que su acción fuera certificada como de *clase* en la que se acumularan todos los trabajadores que endosan el estatuto.

Por estipulación, las vistas de entredicho provisional e *injunction* preliminar se convirtieron en el juicio en su fondo. Las partes presentaron abundante prueba testifical y pericial para sostener sus respectivas alegaciones.[3]

El 25 de junio de 1986 el ilustrado tribunal de instancia declaró inconstitucional y, por tanto, nula la Ley de Cierre. Además, expidió *injunction* permanente que ordenaba a los demandados cesar y desistir de ponerla en vigor.[4] Debemos revocar.

---

[3] Pueblo International, Inc. y los demandantes y apelados individuales presentaron los testimonios de Ivelisse Hernández Franchesi, Noel Silva Navarro, César Moya Quiñones, Lilia A. Morales Rivera, William Cristóbal Cuadrado, Luz E. Rivera Montesino, su Presidente Manuel I. Vallecillo y el economista José J. Villamil.

ISAACAR, Inc. presentó el testimonio de su presidente y único accionista Lucas Malavé.

M.I.D.A. presentó a su presidente José A. Martí, quien también es Gerente General de Supermercados Amigo, a Josué Rivera Cordero, Presidente de Supermercados Grande, a Rafael Reyes Santiago, al perito economista Parimal Choudhury y al perito sociólogo David Hernández Toledo.

Por el Centro Unido de Detallistas de Puerto Rico declararon Roberto Figueroa Reyes y la Lcda. Lillian Kortright Soler.

El Comité Pro Ley de Cierre presentó los testimonios de Félix Avilés Ortiz, Alicia Martínez, Mayra Hernández, Antonio J. Cruz Bonilla, Anselmo Lugo Reyes y Fortunato Eduardo Ortiz.

[4] "Se dicta [*injunction*] permanente y [se] ordena a los demandados Héctor Rivera Cruz en su carácter de Secretario de Justicia de Puerto Rico, a Carlos López Feliciano en su carácter de Superintendente de la Policía de Puerto Rico y a Federico Cedó Alzamora en su carácter de Director de la Oficina de Asuntos Monopolísticos del Departamento de Justicia de Puerto Rico, a sus agentes, empleados, representantes y cualquier persona que actúe bajo sus órdenes o representación, que cesen y desistan de poner en vigor de forma alguna dicha ley o cualquier reglamento para ponerla en vigor, contra la demandante Pueblo International, Inc., sus oficiales, directores, agentes[,] empleados o representantes o contra la clase representada en este procedimiento por Pueblo International,

III

La Ley de Cierre se aprobó en 1902 como un estatuto de naturaleza penal. Dispone que determinados establecimientos comerciales permanecerán cerrados al público durante los domingos y ciertos días feriados. Para adecuarla a las cambiantes condiciones socioeconómicas del país, ha sido enmendada en varias ocasiones; la última fue en 1983.(5)

Una adecuada reflexión sobre la constitucionalidad de esta ley exige bosquejar su trasfondo y evolución cronológica. Sólo de esta manera podemos judicialmente auscultar y precisar los legítimos propósitos legislativos que la inspiran, teñidos algunos de historicismo a la par que enraizados en un sano realismo de los diversos intereses en conflicto producto de las arritmias socioeconómicas de los tiempos en que vivimos.

Con esta ley ha ocurrido un fenómeno muy singular. En sus comienzos sirvió a unos objetivos, pero con el transcurso del tiempo el legislador la ha ido adecuando a las nuevas circunstancias y la ha dotado de un mayor alcance. Es decir,

---

Inc., compuesta por todos los establecimientos comerciales en Puerto Rico de ventas al por menor hasta ahora cubiertos y no exentos de la referida ley, que, por cualquier razón, deseen abrir los domingos y días feriados, sus oficiales, directores, agentes, empleados o representantes; además, se les proh[í]be de cualquier forma citar, denunciar, arrestar o comenzar proceso judicial alguno, civil o criminal, contra dicha entidad o contra cualquiera de los establecimientos comerciales de la clase por [é]sta representada que se indica, basado, directa o indirectamente en la Ley de Cierre o en cualquier reglamento para ponerla en vigor." Sentencia del Tribunal Superior, 25 de junio de 1986, págs. 1–2.

(5) Ley Núm. 100 de 4 de junio de 1983; Ley Núm. 7 de 26 de julio de 1979; Ley Núm. 100 de 23 de junio de 1977; Ley Núm. 147 de 3 de junio de 1976; Ley Núm. 265 de 30 de julio de 1974; Ley Núm. 121 de 29 de junio de 1971; Ley Núm. 105 de 24 de junio de 1971; Ley Núm. 83 de 24 de junio de 1971; Ley Núm. 90 de 18 de junio de 1968; Ley Núm. 113 de 27 de junio de 1964; Ley Núm. 103 de 26 de junio de 1962; Ley Núm. 142 de 21 de julio de 1960; Ley Núm. 78 de 13 de junio de 1953; Ley Núm. 250 de 9 de mayo de 1950; Ley Núm. 3 de 3 de diciembre de 1947; Ley Núm. 306 de 15 de mayo de 1938; Ley Núm. 54 de 28 de abril de 1930; Ley Núm. 18 de 20 de mayo de 1925; Ley Núm. 26 de 23 de noviembre de 1917; Ley Núm. 24 de 28 de marzo de 1914; Ley Núm. 131 de 9 de agosto de 1913, y Ley Núm. 57 de 13 de marzo de 1913.

que la experiencia histórica y la propia dinámica social contemporánea se ha encargado de ensanchar sus horizontes y perspectiva histórica en su doble dimensión diacrónica y sincrónica.

Sin lugar a dudas, las largas jornadas de trabajo a la que estaba sometida a principios del presente siglo la clase obrera puertorriqueña indujeron originalmente a la Legislatura a aprobar un estatuto que garantizara un período de descanso. Como medida de vanguardia social, la Ley de Cierre llenó esa laguna. Vino a ser el mecanismo coercitivo que obligó a los establecimientos comerciales e industriales a cerrar sus puertas durante determinadas horas, permitiendo así que sus empleados disfrutaran de su merecido reposo. Dicha ley eximió, sin embargo, a algunos lugares de recreo, venta de comida y medicinas, empresas de utilidad pública y cuasi pública y a algunos trabajos que era preciso realizar de emergencia.

Por el alto contenido socioeconómico de este estatuto, la Legislatura se vio precisada a alterarlo frecuentemente para atemperarlo a las nuevas exigencias históricas. Así, más tarde se excluyeron del ámbito de la ley al sector industrial, a los bancos, a los hipódromos, a las imprentas, a los teatros, a los lugares dedicados exclusivamente a recreo, a los establecimientos comerciales operados por sus dueños, cónyuges o hijos, y a los establecimientos comerciales ubicados en la zona turística del Viejo San Juan o en otras zonas designadas por la Junta de Planificación, etc.

Sucinta y científicamente evaluadas, las excepciones a la Ley de Cierre pueden agruparse en las siguientes grandes categorías: (1) servicios de emergencia; (2) empresas de utilidad pública y cuasi públicas; (3) lugares con propósitos recreativos que facilitan o permiten que se lleven a cabo tales actividades; (4) negocios que por su naturaleza no tienen empleados o son operados por sus propios dueños, esposa o

hijos; (5) negocios que requieren actividad continua, y (6) excepciones que obedecen a consideraciones económicas.

Estas excepciones y categorías nos ayudan a descubrir su verdadero sentido. En buena hermenéutica nos conduce a un escrutinio judicial a tono con los propósitos expresos e inmersos de la ley. Al acometer la tarea, salta a la vista la dificultad de que cuando se aprobaron sus distintas enmiendas, no siempre se expresaron con claridad todos sus motivos. Por esta razón es necesario evaluar las expresiones del legislador a lo largo de su amplio historial. No podemos limitarnos a descansar en las primeras expresiones de la Legislatura. Por el contrario, hay que examinarlas en su propia dinámica y darle el debido peso a las manifestaciones más recientes.

El sustrato de la tesis de los demandantes apelados, Pueblo International, Inc. *et al.* —acogida por el tribunal de instancia— es que el *único propósito* de la Ley de Cierre fue proveer un día de descanso a los trabajadores puertorriqueños. En su abono se cita la Exposición de Motivos de la Ley Núm. 78 de 13 de junio de 1953 y cierta casuística que la recoge. *Vélez v. Municipio de Toa Baja*, 109 D.P.R. 369, 377 (1980); *Marrero Cabrera v. Caribbean Refining Co.*, 93 D.P.R. 250, 318 (1966); *Parrondo v. L. Rodríguez & Co.*, 64 D.P.R. 438, 445 (1945); *El Pueblo v. García & García*, supra, págs. 820–821; *El Pueblo v. Gillies & Woodward*, 20 D.P.R. 500, 505 (1914). No tienen razón.

Sus horizontes son más espaciosos. En época más reciente, en un incidente de este mismo caso —*Pueblo Int'l, Inc. v. Srio. de Justicia*, 117 D.P.R. 754, 758 (1986)—[6] tuvimos la oportunidad de comenzar a definir y cualificar esta premisa. Allí sostuvimos que la Ley de Cierre "está cimentada en promover, hasta lo posible, la existencia del domingo

---

[6] Voto disidente del Juez Asociado Señor Negrón García, al que se unió el Juez Asociado Señor Hernández Denton.

como *determinado* día de descanso, y por ende, la integridad física del trabajador y *la unidad del núcleo familiar"*. (Énfasis suplido.) Es menester, pues, ampliar esta apreciación.

La designación del *domingo* como día *colectivo* de descanso es una conquista social de inmenso valor. Responde al concepto legislativo de que el ser humano —física, mental y espiritualmente— es acreedor a un merecido paréntesis de sosiego durante la jornada regular semanal. Sin límites, tendríamos que vivir una jornada diferente, en última instancia, a expensas de las necesidades y voluntad patronal. El calendario gregoriano usado por tradición —*Escalera v. Andino*, 76 D.P.R. 268, 271 (1954)— se quedaría en blanco, *sus días innominados*, reducido únicamente a la simple aritmética de contar los espacios de tiempo en días, semanas y meses. Cada persona estaría sujeta a un distinto ritmo semanal que difícilmente contribuiría a apartarse del trajín rutinario.

La Ley de Cierre —quién lo duda— ha contribuido por ochenta y seis (86) años a esa conquista. Por ella el *domingo* se impregnó en la sociedad con ese sabor particular a vida humana, familiar, religiosa y deportiva. Adquirió y confirmó la urgencia de darle un "¡Alto!" a nuestra rutina sofocante y fatigosa. *Acopló al núcleo familiar el calendario escolar de cientos de miles de niños y jóvenes.* En otras palabras —en virtud de toda una serie de actividades privadas y gubernamentales de lunes a viernes o sábado— en la acepción popular y generalizada, el domingo se invistió de una connotación refrescante que apunta hacia unas horas —las únicas— que hacen viable que la mayoría de los puertorriqueños, individual y colectivamente, pueda disponer de un descanso necesario después del cumplimiento obligatorio con su trabajo. La iglesia, la playa, el maratón, la visita familiar, la bicicletada, sencillamente la conversación reposada en el hogar, el disfrute de la música o la sintonía de la actividad deportiva favorita ocupa gozosamente nuestras horas y desocupa nues-

tro aliento para emprender al día siguiente el forzoso programa de nuestros compromisos.

Desde la panorámica laboral y sociológica, la ley es justa y necesaria. Atempera el desasosiego agobiante en que cada día más se ve inmerso el hombre de nuestro tiempo. Hoy más que nunca cumple con la necesidad humana de mitigar el ajetreo y el estruendo, y devolverle a la persona un poco del reposo que su dignidad reclama. Esta visión no es personalista. Se nutre de la visión valorativa y estimativa del legislador. En este sentido son convincentes e iluminadoras las expresiones del Senador Justo Méndez en ocasión del debate legislativo sobre la Ley Núm. 100 de 24 de junio de 1983, enmendatoria de la Ley de Cierre:

> La condición económica que puede señalarse como un elemento para permitir la apertura de los establecimientos comerciales el domingo. *Es un elemento que no puede permitirse que rija las normas de vida de un pueblo, porque si todo lo tuviéramos que medir en términos de ingreso y de egresos, de contabilidad económica la vida del hombre se iría reduciendo en sus horizontes espirituales y cada persona que se llama a trabajar un domingo en un establecimiento o en cualquier sitio, él se priva del disfrute que la sociedad ha señalado en términos de las áreas que se abran para ese disfrute.*
>
> *Si un pueblo se acostumbra el domingo* a ir los padres y los niños a volar chiringas los domingos en el Morro y ese es el hábito, esa es la *costumbre,* ese es el día que ellos tienen libre por disposición de las horas de trabajo que le requiere la Ley o que les permite la Ley y han hecho de tradición utilizar ese domingo para su recreación, para ir a la playa, para ir a volar chiringas en el Morro, para ir al juego de pelota. [¿]Por qué no se hacen los juegos de pelota o las actividades deportivas en otros días de la semana que no sea sábado o domingo? *Porque es cuando tien[e] el tiempo libre la sociedad puertorriqueña.*
>
> Esto podría ser el comienzo de desnaturalizar esas tradiciones y de crear una serie de conflictos entre las personas

que desean compartir ese domingo con su familia. *Porque las normas establecidas por las otras actividades del país se rigen a base de que el domingo es día feriado.* De que el trabajo se realiza de lunes a viernes o de lunes a sábado y entonces usted permite que un *sector de esa sociedad trabaje domingo.* Al uno permitirlo ya usted *está rompiendo* la *unidad familiar* en torno a estar juntos y a la recreación que pueden disfrutar las familias como unidad familiar. (Énfasis suplido.) XXXVII Diario de Sesiones de la Asamblea Legislativa (Senado), Núm. 38, pág. 3193 (1983).

Las palabras anteriores, por su cercanía temporal, son un elocuente y fiel reflejo de la percepción de la Legislatura sobre algunas de las finalidades actuales de la Ley de Cierre. Definitivamente el devenir histórico se ha encargado de conferirle unos fines más amplios, en concordancia con las nuevas exigencias de la sociedad puertorriqueña, a medida que se debate la calidad de vida y se ha hecho más patente su necesidad como valor de gran preeminencia.

Su propósito inicial se ensanchó. Hoy, entre sus otros objetivos legítimos, se encuentran el impedir que el proceso de descomposición familiar sea más acelerado,[7] detener el deterioro de la calidad de vida, desalentar el consumerismo mi-

---

[7] "Especialmente las agencias gubernamentales pregonan constantemente que la familia es la institución más importante de nuestra sociedad. No obstante, a[u]n el más somero examen de nuestra realidad, revelaría que el bienestar de la familia está subordinado a los requisitos de la empresa. Es a través del sueldo que devengan los cónyuges que se proveen las bases financieras para la formación de los matrimonios. *Son los empresarios los que deciden no sólo quiénes trabajan, sino a qué horas lo hacen y por cuánto dinero.* Controlan, por lo tanto, las circunstancias de la vida en familia. En muchos casos los cónyuges enfrentan largas jornadas de trabajo, bajo condiciones de alta competencia, en labores monótonas y repetitivas que resultan muy tediosas. Naturalmente esto repercute en el hogar, que recoge los despojos de una pareja que llega cansada e irritada y que ha estado ausente durante largas horas. Esas circunstancias no son las más propicias para promover una relación conyugal sana y gratificadora." (Énfasis suplido.) M. Muñoz Vázquez y E. Fernández Bauzó, *El divorcio en la sociedad puertorriqueña*, Río Piedras, Eds. Huracán, 1988, pág. 29.

mético desenfrenado(⁸) y evitar ciertas prácticas monopolísticas. La experiencia y la propia dinámica social se han encargado de ensanchar sus horizontes.

Otras manifestaciones recientes en el ámbito *económico* de la Asamblea Legislativa arrojan luz. Al respecto, la Comisión Conjunta de la Cámara de Representantes señaló:

Vuestras comisiones entienden que es recomendable mantener los comercios sujetos a la Ley de Cierre cerrados durante el domingo y disponer un horario más flexible para estos establecimientos durante ciertos días de la semana que permita que el consumidor realice sus compras durante un periodo más prolongado. Después de ponderar los argumentos presentados ante estas Comisiones, existe el convencimiento de que si se *liberaliza la ley en forma desmedida, los grandes establecimientos podrán beneficiarse como resultado de un aumento en sus operaciones.* Por otro lado, entendemos que para los comercios pequeños y medianos el horario extendido aumentará el costo de operación particularmente en los renglones de nómina, electricidad y seguridad. *Con toda probabilidad este aumento en el costo de operación no guardará proporción con el aumento en ventas, produciéndose un balance negativo y su posible desaparición.*

*De producirse estos efectos adversos, ello producirá un aumento en precios para el consumidor lo que agravará la situación de muchas familias puertorriqueñas, y en especial,*

---

(⁸) Una encuesta efectuada por Pueblo International, Inc. demostró que un 91.5% de sus consumidores rechazan la ley.

Sobre este particular, resulta interesante el examen del fenómeno adquisitivo. El desarrollo industrial de las pasadas décadas "[e]levó . . . las expectativas y las aspiraciones de las familias puertorriqueñas a niveles nunca antes soñados. Desgraciadamente, esto ocurre en el momento cuando la propaganda comercial en Puerto Rico aumentó sus tentáculos vía la proliferación de los medios masivos de comunicación. Muchas familias, sin experiencia en el manejo de dinero, que nunca antes habían tenido, sucumbieron al consumerismo excesivo, particularmente, a mi juicio, aquellas familias que se habían movido hacia las ciudades donde el impersonalismo imperante les hacía creer que la adquisición de bienes de consumo les daría [*status*] en el anonimato urbano y facilitaría su movilidad social. El consumerismo una vez comenzado es contagioso". I. Suliveres de Martínez, *La familia puertorriqueña y la desorganización social: ¿causa o efecto?*, Escuela de Trabajo Social, Universidad de Puerto Rico, 1983, pág. 4.

*la de aquellas más necesitadas.* Informe Conjunto de las Comisiones de Comercio e Industria de lo Jurídico Penal y de Asuntos del Consumidor de la Cámara de Representantes sobre el P. de la C. 678 de 5 de abril de 1983, pág. 7.(9)

Las expresiones anteriores reflejan una preocupación por la suerte que pudieran correr los pequeños y medianos comerciantes, así como los consumidores, de no estar protegidos por la Ley de Cierre. Alertan sobre las ventajas competitivas que disfrutarían los grandes establecimientos comerciales y del consiguiente desequilibrio económico que provocaría su derogación.(10)

Bajo esta perspectiva incidió el ilustrado tribunal de instancia al concluir que "[l]a protección a pequeños . . . comerciantes contra la competencia de los establecimientos mayores, como sostienen las partes que favorecen la vigencia de la Ley de Cierre en este caso, no *aparece como propósito de esta ley*". (Énfasis suplido.) Civil Núm. 86-2716(902) de 25 de junio de 1986, pág. 40. Como vimos anteriormente, las expresiones legislativas al respecto son meridianamente claras y merecen ser adjudicadas en su justo valor.

## IV

Superado el estrecho prisma que limita los propósitos del estatuto a la sola protección del trabajador puertorriqueño, nos vemos obligados a rechazar el intento de justificar su obsolescencia y virtual inconstitucionalidad, utilizando como fundamento y excusa la legislación laboral que rige en

---

(9) Este proyecto oportunamente se convirtió en la Ley Núm. 100 de 4 de junio de 1983 antes aludida.

(10) Aunque los estudios son limitados, insistentemente se ha señalado que de variarse la Ley de Cierre quedarían perjudicados fundamentalmente los supermercados intermedios. P.R. Latortue, *La opinión de los consumidores en torno a la Ley de Cierre,* 5 Rev. Cs. Comerciales 42–45.

Puerto Rico actualmente.([11]) *Dicha legislación atiende propósitos específicos de la clase trabajadora puertorriqueña que no se equiparan a los objetivos más amplios de la Ley de Cierre.*

No obstante, las objeciones de los demandantes e interventores apelados a su validez constitucional se fundan en las garantías del debido proceso de ley y de la igual protección de las leyes preceptuadas en nuestra Constitución y en la federal. Concentrémonos en las mismas.

Pueblo International, Inc., ISAACAR, Inc. y otros establecimientos opositores similares argumentan que el estatuto les viola el derecho constitucional —sin que esté razonablemente justificado— a disfrutar de su propiedad y a hacer negocios los días y las horas a su conveniencia. Alegan, a su vez, que la ley establece una clasificación arbitraria e injustificada, pues permite a otras personas y entidades comerciales similares lo que a ellos les prohíbe.

Ciertamente la exposición narrativa de la prueba refleja que Pueblo International, Inc. *et al.* venderían menos y, por ende, se reducirían sus ganancias económicas de no poder abrir los domingos y días feriados. *Indubitadamente se trata de un interés estrictamente económico que les impulsa a abrir en dichos días.* Sin embargo, esa propia prueba demostró que, mientras permanecieron cerrados, un alto por ciento de las ventas dominicales y de los días feriados se transfirieron al resto de la semana. Comparado con el volumen de ventas anuales, el impacto económico verdadero de no abrir los domingos es *mínimo*. Igual experiencia tuvieron los *Supermercados Amigo* que favorecen la ley.

Es menester aclarar, por vía de paréntesis, que la prueba de los demandantes y apelados Pueblo International, Inc.

---

([11]) Ley de Salario Mínimo, Ley Núm. 8 de 5 de abril de 1941 (29 L.P.R.A. sec. 245 y ss.); Ley Núm. 289 de 9 de abril de 1946 (29 L.P.R.A. secs. 295–298); Ley Núm. 379 de 15 de mayo de 1948 (29 L.P.R.A. secs. 273(c) y (d), y 274).

*et al.* descansó exclusivamente en el impacto *económico* de la Ley de Cierre sobre ellos. La prueba pericial de los demandados y apelantes sobre el *interés social y económico* del Estado no fue rebatida. Además, M.I.D.A., el Comité Pro Ley de Cierre y el Centro Unido de Detallistas de Puerto Rico, aportaron prueba tendente a demostrar lo esencial que es para la economía del país mantener vigente la ley en *protección del pequeño comerciante y de la libertad, vida familiar e intimidad del obrero.* Se desfiló prueba pericial no contradicha de que, *por tradición,. el domingo es un día de reunión familiar.* El sociólogo, David Hernández Toledo, aludió cómo la desintegración del núcleo familiar es uno de los múltiples factores que directamente contribuyen a los problemas sociales de delincuencia juvenil y de adicción a las drogas.

En cuanto a los demandantes individuales —jóvenes estudiantes, excepto uno— empleados todos de Pueblo International, Inc., plantean que la ley les priva de oportunidades de trabajo, limita sus ingresos y libertad para trabajar cuando lo estimen conveniente, además de crear categorías arbitrarias. Estos señalamientos de inconstitucionalidad nos obligan a discutir detenidamente los criterios jurídicos de revisión judicial disponibles bajo nuestro cuerpo doctrinario con una breve referencia inicial a la trayectoria federal análoga.

En Estados Unidos, el Tribunal Supremo federal no ha adoptado una teoría jurisprudencial *unitaria* para la interpretación de la cláusula de igual protección de las leyes. Dicho Foro ha seguido un enfoque de tres (3) niveles, a saber, el criterio de escrutinio estricto o examen minucioso (*strict scrutiny*), el criterio de racionalidad mínima[12] y el intermedio. Este desarrollo "es generalmente el producto de cam-

---

[12] También conocido como escrutinio *tradicional*, del *nexo racional* o escrutinio *deferencial*.

bios en la composición del Tribunal Supremo estadounidense y circunstancias hist[ó]rico[-]sociales propias de dicho país. Véase: [G.] Gunther, *The Supreme Court 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1 (1972)". *Hermina González v. Srio del Trabajo*, 107 D.P.R. 667, 678–679 (1978), opinión disidente del entonces Juez Presidente Señor Trías Monge.

En múltiples ocasiones hemos discutido estos distintos escrutinios. *Alicea v. Córdova*, 117 D.P.R. 676 (1986); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984); *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *León Rosario v. Torres*, 109 D.P.R. 804 (1980); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). *Alicea v. Córdova*, supra, págs. 687–688, compendia sus perfiles:

> Bajo el escrutinio deferencial o racional, las clasificaciones no se declaran inválidas a menos que no exista un interés legítimo del Estado en la clasificación cuestionada o que no pueda establecerse un nexo racional entre la clasificación y el interés estatal. *Hermina González* v. *Srio. del Trabajo*, supra, pág. 673. *Bajo éste, si puede concebirse cualquier situación de hechos que justifique la clasificación, la misma debe declararse válida.* El peso de la prueba para demostrar que no hay un interés legítimo del Estado o no hay nexo racional recae sobre la parte que cuestiona su validez. *Zachry International* v. *Tribunal Superior*, supra; *Vélez* v. *Srio. de Justicia*, supra. Dicho criterio es generalmente utilizado para determinar la constitucionalidad de la legislación de naturaleza económica-social. *Marina Ind., Inc.* v. *Brown Boveri Corp.*, supra; *Vélez* v. *Srio. de Justicia*, supra; *Vda. de Miranda* v. *Srio. de Hacienda*, 114 D.P.R. 11 (1983).
>
> El escrutinio estricto le exige "al estado demostrar la existencia de un interés público apremiante o de superior jerarquía (*compelling state interest*) que justifique la clasificación y que la misma promueva necesariamente la consecución de ese interés". *Zachry International* v. *Tribunal Superior*, supra, págs. 277–278. Dicho escrutinio será aplicado cuando la clasi-

ficación afecte derechos fundamentales o sea inherentemente sospechosa. (Énfasis suplido.)

Históricamente ubicado, el escrutinio *intermedio*, nuevo desarrollo de la Corte Burger, surgió a mediados de la década del setenta. "[E]s activado cuando la clasificación legislativa afecta 'intereses individuales importantes, aunque no necesariamente fundamentales, y el uso de criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos'. *León Rosario* v. *Torres*, supra, pág. 814. Dicho escrutinio es 'más riguroso que el criterio tradicional mínimo pero menos que el del escrutinio estricto'. *Hermina González* v. *Srio. del Trabajo*, supra, pág. 679. Bajo este escrutinio, para resistir el ataque constitucional la clasificación legislativa debe servir objetivos gubernamentales importantes y estar sustancialmente relacionada a la consecución de dichos objetivos. *Reed* v. *Reed*, 404 U.S. 71, 75 (1971); *Craig* v. *Boren*, 429 U.S. 190, 197 (1976)." *Alicea* v. *Córdova*, supra, pág. 687.

Consistentemente, al interpretar nuestra cláusula de igual protección, hemos incorporado dos (2) de estos tres (3) enfoques: el *estricto* y el de *racionalidad mínima*. Reiteradamente *nos hemos negado a adoptar el enfoque intermedio. Vélez* v. *Srio. de Justicia*, supra, pág. 538 esc. 2. Bajo esta óptica, hemos resuelto que aquellas clasificaciones que se someten a escrutinio intermedio en Estados Unidos, aquí serán consideradas bajo el *estricto. Zachry International v. Tribunal Superior*, supra; *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Ocasio* v. *Díaz*, 88 D.P.R. 676 (1963). En esta sombrilla quedan resguardadas las clasificaciones fundadas en sexo, raza, ciudadanía, origen nacional y nacimiento. Bajo nuestra Constitución, distinto a la federal, las mismas son inherentemente sospechosas y, por lo tanto, están sujetas a un estricto escrutinio judicial. *El caso de autos no justifica, pues, importar a nuestro aservo doctrinario el escurridizo y bicéfalo enfoque intermedio.*

Sobre este extremo, nos preocupa profundamente el significado y alcance que pueda tener el planteamiento en el disenso del Juez Presidente Señor Pons Núñez, referente a la negativa de este Tribunal a adoptar en su solución el escrutinio intermedio. A su entender, esta omisión coloca al Poder Judicial puertorriqueño —en materia de análisis constitucional— en una situación de desventaja frente a los tribunales federales. Se impone, pues, una breve reflexión. A fin de cuentas, la postura doctrinaria de escrutinio dual prevaleciente —estricto y de racionalidad mínima— responde a unas profundas razones históricas y jurídicas que no es posible ignorar. *Primero*, la utilización del escrutinio intermedio en Estados Unidos tiene su particular justificación. Allá, las situaciones que dieron lugar a su génesis respondieron a unas deficiencias de su propia Constitución en cuanto a la naturaleza de los derechos involucrados. Aquí, en Puerto Rico, por tratarse de derechos *fundamentales* consagrados en la Constitución, el examen bajo el escrutinio estricto es ineludible. *Segundo*, el argumento constituye una abstracción de nuestra escala valorativa constitucional. Esa gran diferencia nos impide seguir ciegamente los vaivenes que ha experimentado la trilogía de criterios de análisis constitucional en la esfera federal. *Tercero*, conlleva el riesgo de colocarnos en la precaria situación de *federalizar toda* interpretación de nuestra Ley Fundamental. Rechazamos ese síndrome. Y *cuarto*, esa propuesta choca frontalmente con su reclamo de "que no hay nada que impida que sigamos en Puerto Rico *un modelo distinto al norteamericano*, en atención a nuestra particular situación *social y cultural* y la hechura *liberal de nuestra Constitución*, siempre que ello no restrinja los derechos reconocidos bajo la Constitución federal". (Énfasis suplido.) Opinión disidente, págs. 798–799.

La igual protección de las leyes no implica que todos los ciudadanos tienen que ser tratados de igual manera. Ahora bien, todo trato desigual debe justificarse. En materia de reglamentación socioeconómica no se viola la cláusula de igual

protección de las leyes meramente porque las clasificaciones estatutarias sean *imperfectas*. Para resolver los profundos, complejos y dificultosos problemas que afectan el país es indispensable que el Estado tenga el poder de establecer clasificaciones socioeconómicas, aunque las líneas de demarcación no sean totalmente claras si las situaciones fácticas lo justifican. *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972).

Frente a esta panorámica, surgen otros valores cognoscibles. La Ley Fundamental proclama que ninguna persona será privada de su libertad o de su propiedad sin el debido proceso de ley. Esta garantía constitucional en ocasiones permite impugnar exitosamente el poder de reglamentación del Estado. Aclaramos, sin embargo, que el análisis bajo la cláusula del debido proceso es similar al de la igual protección de las leyes, salvo cuando se afectan derechos fundamentales o existan clasificaciones sospechosas. *Marina Ind., Inc. v. Brown Boveri Corp.*, supra; *Zachry International v. Tribunal Superior*, supra.

Básicamente, la garantía del debido proceso de ley exige que un estatuto de naturaleza socioeconómico no sea irrazonable, arbitrario, caprichoso y que el medio elegido tenga una relación racional con el interés que se persigue. *Salas v. Municipio de Moca*, 119 D.P.R. 625 (1987); *Morales v. Lizarribar*, 100 D.P.R. 717 (1972); *A. Roig, Sucrs. v. Junta Azucarera*, 77 D.P.R. 342 (1954). Al examinar cualquier señalamiento sobre la validez de un estatuto de este tipo estamos llamados a concederle gran deferencia a los Poderes Legislativo y Ejecutivo. Está plenamente asentada la idea de que esos poderes cuentan con la pericia suficiente para llevar a cabo un adecuado proceso de legislación y reglamentación. Por esta razón, el estatuto o reglamento, según sea el caso, se presume constitucional y el peso de la prueba recae sobre quien cuestiona su validez.

# V

En virtud de estas coordenadas, erró el tribunal de instancia al concluir, en cuanto a los estudiantes trabajadores, que la ley les vulneraba su derecho fundamental al trabajo. Al hacerlo, dicho foro aplicó el escrutinio estricto. Estimó que el Estado no había probado la existencia de un interés apremiante adelantado por esta legislación, como tampoco que no había disponible alternativa alguna menos drástica para lograr el fin perseguido.

Ciertamente el derecho al trabajo ocupa un alto rango en la constelación de valores constitucionales. Diversas disposiciones constitucionales así lo acreditan.(13) También nuestra

---

(13) Del alegato de Pueblo International, Inc. y de los propios demandantes y apelados individuales citamos:

". . . El derecho al trabajo, siendo consustancial a la naturaleza humana, permea la Constitución de Puerto Rico y comprende diversas áreas, entre otras: (i) el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella (Artículo II, Sección 16); (ii) el derecho a recibir igual paga por igual trabajo (Artículo II, Sección 16); (iii) el derecho a un salario mínimo razonable (Artículo II, Sección 16); (iv) protección contra riesgos para la salud o integridad personal en el trabajo o empleo (Artículo II, Sección 16); (v) el derecho a una jornada ordinaria que no exceda de ocho horas de trabajo (Artículo II, Sección 16); (vi) el derecho a organizarse y negociar colectivamente con su patrono para todo lo concerniente a su bienestar general (Artículo II, Sección 17); *véase, Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118, 124 (1963); (vii) el derecho a la huelga (Artículo II, Sección 18); (viii) el derecho a obtener trabajo (implícito en el Artículo II, Secciones 7 y 16); y (ix) el derecho a disfrutar de un nivel de vida adecuado (implícito en el Artículo II, Secciones 7 y 16).

"La naturaleza fundamental del derecho al trabajo se menciona repetidamente a través de varias secciones del *Diario de Sesiones de la Convención Constituyente*, como, por ejemplo:

"La sección 15 (hoy 16), *una de las secciones más importantes en este documento*, se refiere a los derechos del trabajo. . . . T. 2, a la página 1105. (Subrayado nuestro).

"En la sección 20 la Comisión se ha encarado con el problema que surge cuando, como en el caso nuestro, *existen ciertos derechos humanos de carácter fundamental, como el derecho al trabajo.* . . . T. 4, a las páginas 2530, 2577. (Subrayado nuestro).

"La Comisión subraya la alta dignidad del esfuerzo humano y destina esta sección al señalamiento de los derechos básicos del trabajador como tal. Coloca particular énfasis en aquel grueso de la clase trabajadora que por razón de espe-

jurisprudencia ha enriquecido celosamente ese derecho fundamental. *Hernández Cruz v. Sria. de Instrucción*, 117 D.P.R. 606 (1986); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414 (1985); *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791 (1973).

Ahora bien, hemos de resistir la tentación de sumergirnos en una solución esotérica al confrontar este planteamiento. Desde el punto de buena metodología técnico-jurídica, debemos comenzar por definir adecuadamente los contornos del derecho constitucional invocado, aquí el derecho fundamental al trabajo; después, examinar si a la luz de los hechos se viola o se interfiere sustancialmente con el mismo y detectar si esa infracción o interferencia es permisible, y por último, realizar el análisis correspondiente a la luz del escrutinio adecuado.

Siguiendo este enfoque, notamos que la principal debilidad del método seguido por el tribunal de instancia consistió precisamente en partir de la premisa de que a los demandantes y apelados individuales —estudiantes trabajadores— les asiste un derecho al trabajo quebrantado por la Ley de Cierre. La premisa es errónea, pues parte de la visión de que ese derecho, aunque fundamental, es *absoluto*. No toma en cuenta el alcance integral y verdadero de las disposiciones constitucionales pertinentes, así como nuestros pronunciamientos jurisprudenciales al respecto.(14) Expongamos someramente sus perfiles.

---

cial desvalimiento históricamente ha necesitado, aunque no siempre ha recibido, protección social. T. 4, a la página 2573." (Énfasis suplido.) Alegato de los demandantes apelados, págs. 49–50.

(14) La opinión disidente del Juez Presidente Señor Pons Núñez reconoce que el derecho al empleo "es una actividad de innegable proyección y aprecio en nuestro pueblo". Opinión disidente, pág. 800. Esta apreciación lleva a conferirle la categoría de derecho "importante, pero no fundamental" (íd., pág. 802), y a catalogar las clasificaciones como "sensitivas, pero no sospechosas . . .". Íd.,

El Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 327, "reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley".

Según el 4 Diario de Sesiones de la Convención Constituyente 2574 (1952), "[l]a primera cláusula subraya el carácter, libre y voluntario de todo trabajo. A nadie se puede imponer una tarea en contra de su voluntad; tampoco se pierde nunca el derecho a renunciar".

En torno a la garantía de paga extraordinaria por jornada de trabajo en exceso de ocho (8) horas, su propósito no es permitir al trabajador *exigir* una *jornada mayor de trabajo* para incrementar su remuneración. La paga adicional constituye un disuasivo al patrono con miras a evitar que le imponga al empleado una jornada en exceso de esas ocho (8)

---

pág. 802. A renglón seguido, se apunta que el criterio más adecuado para evaluar esta situación es el escrutinio *intermedio*. Íd., pág. 802. Bajo este razonamiento se crea un balance entre la importancia del interés y la deferencia a los demás poderes. Íd., pág. 803. A tal efecto, la opinión determina que desde 1941 el interés gubernamental por la Ley de Cierre ha dejado de ser *"importante"*, por existir legislación que atiende esos mismos propósitos. Íd., pág. 803. Finalmente, concluye que "[e]so hace de esta ley un instrumento irrazonable y hasta arbitrario, que no tolera el escrutinio intermedio bajo el debido proceso de ley y de la igual protección de las leyes". Íd., pág. 804.

El análisis de la opinión sufre de varias oscilaciones conceptuales. Por un lado, tiende a degradar el derecho al trabajo de "fundamental" a uno "de innegable proyección y aprecio", esto es, "importante", como único modo de forzadamente poder aplicar el análisis intermedio. Opinión disidente, págs. 799–801. Aparte de que cuestionamos esa clasificación, la creemos innecesaria en vista de su conclusión de que en las circunstancias de este caso no se ha violado el mismo. Además, se utiliza el escrutinio intermedio —que ha sido claramente rechazado por este Tribunal— para sostenerse que ni aun bajo el escrutinio deferente sería válida esta legislación. Íd., págs. 804 y 805.

horas. Directamente promueve el *descanso* postjornada diaria regular e indirectamente el empleo de otros cuando la necesidad patronal extraordinaria se convierte en un esquema operacional recurrente.

En cuanto al derecho de los obreros "a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar", dispuesto en el Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 329, su ámbito fue explicado por la Convención Constituyente, la cual señaló que representaba un conjunto de derechos cuyo eje central era "proveer al trabajador una manera eficaz y práctica para contratar con su patrono. El trabajador, *tomado por sí solo*, no está en posición económica de discutir de igual a igual con su patrono las condiciones de su empleo. El convenio colectivo[,] mediante representantes de su propia selección, brinda al trabajador individual un instrumento equiparador de fuerzas y de responsabilidad; en virtud de él los obreros quedan constituidos en una unidad y como tal unidad convienen colectivamente con su patrono". Diario de Sesiones, *supra*, pág. 2574. Este marco fundamental ha servido jurisprudencialmente para adjudicar hechos o circunstancias fronterizas. Una mirada a esa casuística nos permite desentrañar el problema teórico y hacer viable la solución jurídica correcta de la controversia de autos.

En *Ortiz Cruz v. Junta Hípica,* supra, salvaguardamos el derecho de un entrenador a *continuar en el disfrute de su empleo* bajo las cláusulas de igual protección de las leyes y del debido proceso de ley en su variante procesal. En *Amy v. Adm. Deporte Hípico,* supra —frente a la negativa del Administrador Hípico a concederle una licencia de jinete por éste alegadamente haber participado en actividades ilegales relacionadas con el hipismo en Estados Unidos— señalamos que "[e]l derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al

hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado". *Amy v. Adm. Deporte Hípico*, supra, pág. 421. La razón de decidir estuvo predicada al impacto de la pena impuesta —suspensión indefinida— como *único* medio de subsistencia.(15)

Y *Arroyo v. Rattan Specialties, Inc.*, supra, versaba sobre la permanencia de un trabajador cuyo empleo *dependía* de que se sometiera a la prueba de polígrafo que le era requerida por el patrono. Se conjugaron el derecho al trabajo con el derecho a la intimidad. Por último, más recientemente, en *Hernández Cruz v. Sria. de Instrucción*, supra, discutimos la legitimidad de un despido automático de una empleada del Estado por haber sido convicta de homicidio involuntario.

Estos cuatro (4) casos tienen como denominador común un elemento: el derecho al trabajo ante las actuaciones irrazonables de funcionarios públicos —excepto en *Arroyo v. Rattan Specialties, Inc.*, supra (recuérdese que el derecho a la intimidad se puede invocar frente a una persona privada)— *que privaron totalmente a los obreros de su trabajo.*

Contrario a esta casuística, el de autos no trata situaciones en las que se haya negado rotundamente el derecho al trabajo a unas personas. Sencillamente el Estado, vía la Legislatura, ha limitado su desempeño a unos días y horas de la

---

(15) Enfatizamos que Amy Angulo en "la vista declaró que no sabía realizar *ningún* otro oficio al de montar caballos. Durante cuatro (4) años ha permanecido privado de su *única* fuente principal de ingresos. De ordinario ello afecta a terceros inocentes, como los miembros del núcleo familiar, cédula vital de nuestra comunidad. La pena indefinida podría constituir y convertirse propiamente en un castigo cruel e inusitado, proscrito por la Constitución. *Espinosa v. Ramírez, Alcaide de Cárcel*, 72 D.P.R. 901 (1951)". (Énfasis suplido.) *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 422 (1985).

semana. Nada impide a los estudiantes empleados trabajar los seis (6) días restantes de la semana.[16]

Distinto a lo ocurrido en *Amy v. Adm. Deporte Hípico, supra,* a ellos no se les ha privado de su fuente principal de ingresos. Tampoco son personas que no sepan o no puedan realizar otro oficio. De hecho, son estudiantes que se están preparando para desempeñar oficios o profesiones diferentes a las que realizan en los supermercados Pueblo International, Inc.

La posición de Pueblo International, Inc. y estos estudiantes empleados parte de la hipótesis errónea de que el fundamental derecho al trabajo es absoluto. Hemos visto que no es así. El Estado puede válidamente legislar —como lo ha hecho con la Ley de Cierre— y reglamentar la actividad económica y social del país. Así existe, como ejemplo, legislación que limita el derecho al trabajo a menores de edad, quienes no reúnen unos requisitos de salud en el desempeño de prácticas ilícitas, y a individuos que no reúnen ciertas o particulares características o destrezas, etc.

La vigencia de la Ley de Cierre *no afecta* el derecho de los estudiantes empleados a una libre selección de su ocupación como tampoco a renunciarla. Sólo los restringe en cuanto al domingo y días feriados. Este aspecto merece aclararse, pues de lo contrario podría darse la falsa impresión de que el Estado no está facultado para imponer determinados requisitos a un individuo en la selección de un empleo. Después de todo, como indicáramos anteriormente, lo que persigue la garantía constitucional es que el trabajo tenga un carácter voluntario, esto es, terminar de una vez y para siempre con las funestas prácticas esclavistas del pasado o con la servidumbre involuntaria. Tampoco les impide organizarse y negociar colectivamente. Otra vez el Estado, en el ejercicio

---

[16] De acuerdo con la prueba presentada, éstos a la fecha de la presentación de la demanda, además del domingo, laboraban otros días de la semana.

de su poder de reglamentación, puede señalar límites al contenido de los asuntos a negociarse. Mientras subsista la Ley de Cierre, no está sujeto a negociación lo relacionado con los días y las horas que la ley ordena el cierre. Todo convenio colectivo "es la ley entre las partes, siempre y cuando no contravenga las leyes ni la Constitución". *Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118, 122 (1963).

"El derecho constitucional consagrado en el Art. II, Sec. 17 de la Carta de Derechos, preceptuando que los trabajadores podrán organizarse y negociar colectivamente con sus patronos '. . . por mediación de representantes de su propia y libre selección', y otros no son absolutos. '[L]os derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común.' 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 2576 (1961); *Pérez* v. *Autoridad Fuentes Fluviales*, 87 D.P.R. 118, 123–124 (1963). El Poder Legislativo puede imponer condiciones necesarias para el ejercicio razonable de tales derechos." *S.I.U. de P.R. v. Otis Elevator Co.*, 105 D.P.R. 832, 842–843 (1977).

Una observación adicional. Si justipreciamos los reclamos de los estudiantes empleados de Pueblo International, Inc. a base de un balance de intereses, aflora que *ellos no toman en cuenta los deseos de los demás trabajadores de los centros comerciales que se oponen a sus pretensiones*. Aunque no se les certificó como clase,[17] algunos comparecieron a defender la constitucionalidad de la Ley de Cierre. *La sentencia del tribunal de instancia da la impresión de que*

---

[17] Tenemos serias reservas sobre la certificación de la clase que se le concedió a la demandante apelada Pueblo International, Inc. y de la denegatoria a una petición similar del Comité Pro Ley de Cierre para que se acumularan todos los trabajadores que favorecen el estatuto. No obstante, por entender que es un error que no altera el resultado, nos abstenemos de discutirlo.

*existe un repudio generalizado a la ley en la clase trabaja-
dora, cuando es todo lo contrario.*(18)

Más importante aún, por ser el descanso consustancial
con el derecho al trabajo, la Ley de Cierre protege ese dere-
cho a los trabajadores regulares de las empresas comer-
ciales. Así, de prevalecer la contención de los estudiantes
—trabajadores a tiempo parcial y transitorios— nos encon-
tramos con *la paradójica situación de estar protegiendo
una minoría a base del sacrificio de la mayoría.*

No podemos aceptar la tesis de preeminencia del derecho
de los estudiantes trabajadores a obtener su sustento para
ganarse la vida sobre el derecho del descanso de la mayoría
de los trabajadores. *Primero*, la misma parte de la premisa
errónea de que a los estudiantes trabajadores se les niega
absolutamente su derecho al trabajo. Ya hemos demostrado
—y no es necesario repetir— que la Ley de Cierre sólo im-
pone restricciones en horas de determinados días, las cuales
son perfectamente válidas según el esquema legislativo vi-
gente y están fundadas en el poder de razón de Estado y la
doctrina de deferencia judicial. Y *segundo*, si bien adver-
timos que la Constitución tiene como fin velar por los dere-
chos de las minorías, ello no es su único y exclusivo propó-
sito. El derecho de las minorías para prevalecer frente a las
mayorías sólo se afecta cuando las mismas encuentran apoyo
en la propia Constitución, en la ley o en los reglamentos. *Esa
no es la situación de autos.*

Los efectos negativos de un decreto de inconstitucionali-
dad sobre el trabajador se extenderían sobre su calidad de
vida. Sin esta protección legal, cualquier patrono podría *exi-
gir, como condición de empleo,* que el empleado trabaje los

---

(18) Los resultados de una encuesta reflejan que tres (3) de cada cuatro (4)
empleados de supermercados y tiendas por departamentos rechazan la apertura
dominical. Dr. M.A. Ramírez Pérez, *Una visión laboral del·impacto de cambios
en la Ley de Cierre sobre el empleo,* 5 Rev. Cs. Comerciales 29–35.

domingos y días feriados. La negativa de éste a así laborar técnicamente —salvo la generosidad patronal o acuerdo de una unión— sería insubordinación, violación de las normas de la empresa o susceptible de ser considerada abandono de empleo. Como apunta la interventora apelante M.I.D.A., "cualquier patrono podría establecer que sus tiendas abrirán veinticuatro (24) horas al día y requerirle a los trabajadores que presten servicio en los turnos de la noche. *Esa es la práctica de Pueblo en el Estado de Florida* (véase página 20 de la Exposición Narrativa). Los empleados sólo podrán cobrar horas extras, cuando trabajen más de ocho (8) horas al día o de cuarenta (40) horas a la semana. Surge claramente del récord en el presente caso que la mayoría de los empleados de los demandantes son empleados a tiempo parcial que, como regla general, no trabajan más de cuatro (4) horas al día o veinte (20) horas a la semana. Bajo ese esquema nunca tendrían *derecho* al pago de horas extras. Se evade también la garantía de compensación mínima de cuarenta (40) horas a la semana establecido por el Decreto Mandatorio Número 8, según enmendado el 5 de mayo de 1986". (Énfasis suplido.) Alegato de la interventora apelante, págs. 10–11.

Recapitulando, el derecho al trabajo, en la forma que ha sido invocado por parte de los demandantes individuales, no encuentra apoyo constitucional ni jurisprudencial. La legislación impugnada, por ser de índole económica y social, limita nuestra intervención en el asunto. Hacerlo en estas circunstancias nos convertiría en *lochnerianos*[19] a destiempo.

---

[19] *Lochner v. New York*, 198 U.S. 45 (1905). Este famoso caso marcó un hito en la historia del derecho constitucional de Estados Unidos. El Tribunal Supremo entendió que tenía la obligación de proteger el sistema de libre empresa tal y como lo predica el concepto de *laissez faire*. Utilizó el debido proceso sustantivo, además de otras cláusulas de la Constitución, para anular legislación que intentaba regular la vida económica y social del país.

## VI

Conforme este prisma, es evidente que el escrutinio mínimo tradicional es el adecuado para examinar la alegación de menoscabo de los intereses aducidos por Pueblo International, Inc., ISAACAR, Inc. y otras empresas dueñas de establecimientos comerciales. Ello es consecuencia del cuerpo doctrinario jurisprudencial en materia económica. *Salas v. Municipio de Moca*, supra; *M. & B.S., Inc. v. Depto. de Agricultura*, supra; *Vélez v. Srio. de Justicia*, supra; *Marina Ind., Inc. v. Brown Boveri Corp.*, supra; *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980); *E.L.A. v. Márquez*, 93 D.P.R. 393 (1966).

Bajo este criterio de revisión judicial no se mantiene la decisión ni los fundamentos del tribunal de instancia. Como antes indicado, su premisa mayor es que el único propósito legítimo de la Ley de Cierre fue procurar el descanso de los trabajadores. En virtud de esa premisa concluyó que el estatuto no tenía razón de ser, pues a su entender la clasificación de establecimientos entre exentos y no exentos estaba carente de fundamento sustancial relacionado con dicho propósito, además de caprichosa y discriminatoria. Arribó a esa conclusión a la luz de los fundamentos siguientes: (1) para los trabajadores exentos no se concibe el domingo como un día de descanso; (2) por efecto de sus exclusiones, 'la ley sólo alcanza el 12.5% de la fuerza laboral; (3) las actividades del sector industrial son más agotadoras que las de venta de comestibles al detal; (4) la exención de los bancos es extraña a los propósitos de la ley, y (5) las excepciones son inconexas entre sí.

Aunque respetable, el análisis no es correcto ni completo. Hemos demostrado que la Ley de Cierre *tiene unos propósitos y efectos socioeconómicos más amplios* que simple-

---

Esta visión fue superada totalmente en jurisprudencia posterior. En estos aspectos, hoy día los tribunales prestan gran deferencia a las legislaturas.

mente proveer un día de descanso a la clase trabajadora. Esta vertiente nos permite descubrir la racionalidad del estatuto original y sus múltiples enmiendas, y concluir que la Asamblea Legislativa tuvo razones de suficiente peso para eximir algunas actividades o establecimientos comerciales e industriales de sus efectos. Las mismas caen dentro de las prerrogativas de la Legislatura según el estado de derecho vigente prevaleciente por años en esta jurisdicción. De la existencia de las excepciones sólo emerge la realidad de que no siempre ha sido posible proteger y mantener la institución del domingo como día de descanso familiar. Examinemos detenidamente los fundamentos del tribunal sentenciador.

*Primeramente*, parte de la fuerza laboral no goza de ese derecho por razón de unas excepciones fundadas en las necesidades, emergencias y otras actividades que hacen menester el servicio humano. La vida sigue un curso inexorable que no permite el aplazamiento de unos servicios que por inminencia o por costumbre demandan la presencia del trabajador en ese día. Tales son las áreas esenciales de salud, policía, electricidad, agua, comunicaciones, bomberos y otros, amén de todo lo concerniente al mundo del entretenimiento, precisamente más activo y operante en ese día en que la mayoría descansa. Los cines, los restaurantes y los parques de diversiones son sólo ejemplos de la red de actividad a la que se entrega un pueblo que demanda el servicio de quienes operan esa rama de proceder humano.

*Segundo*, merece especial atención el énfasis que incluye el foro de instancia en relación con la magnitud del sector no cubierto por la ley, utilizado como fundamento primario para su determinación final. Nos referimos a que sólo el 12.5% de la fuerza laboral está sujeta a la prohibición, lo cual a su juicio es inconstitucionalmente irrazonable. Como argumento, este por ciento representa una estadística fría que no reproduce fielmente la situación e inintencionalmente en-

mascara la realidad. El universo numérico es más amplio. Si con ojo perspicaz la examinamos, inmediatamente descubrimos que el 12.5% excluye los 263,000 trabajadores del sector público.[20] Esta cifra actualmente representa un segmento sustancial: el 33.1% de la fuerza trabajadora del país.[21] Aunque carecemos del desglose exacto de cuántos de estos empleados públicos no trabajan los fines de semana, tomamos conocimiento judicial de que la mayoría no lo hace. La regla general es que los empleados del gobierno estatal, los municipales, los de las corporaciones públicas y los del gobierno federal disfrutan del domingo como día de descanso, salvo aquellos que se desempeñan en servicios esenciales o de emergencia. Asimismo es de conocimiento general que muchos de los trabajadores de los establecimientos comerciales e industriales a los que no cobija la ley no trabajan durante los días y las horas reglamentadas por el estatuto. Si a estas cifras sumamos los 179,000 desempleados[22] que desafortunadamente hay en el país —y los 2,281,000 seres que no forman parte de la fuerza trabajadora—[23] con meridiana claridad podemos concluir que *la inmensa mayoría de los puertorriqueños tiene disponible el domingo para disfrutarlo de acuerdo con sus intereses y preferencias, lo cual es congruente con los propósitos primarios y secundarios de la ley, tales como descanso, unidad familiar, etc.*

*Tercero*, no cabe debilitar el fundamento racional de la ley partiendo del supuesto de que las actividades del sector

---

[20] Departamento del Trabajo y Recursos Humanos, Informe Estadístico, Vol. 8, Núm. 5, pág. 28.

[21] Departamento del Trabajo y Recursos Humanos, *Empleo y Desempleo en Puerto Rico*, abril 1988, Tabla 5, pág. 6.

[22] Al presente puede haber variado. Para 1987, la tasa de desempleo fue estimada en un 17.7 por ciento. Junta de Planificación de Puerto Rico, Informe Económico al Gobernador, 1987, pág. XI-13.

[23] Este dato lo obtenemos al restar el grupo trabajador para el año fiscal de 1987 del total de la población (3,294,000 habitantes) para el mismo año. Íd., pág. XI-1.

industrial son más agotadoras que las de venta de comestibles al detal. No hay en autos suficiente evidencia en qué apoyar esa conclusión. La proposición nos remite más bien a sus propósitos. Aun así, no es necesario determinar si esa hipótesis es correcta. Como argumento, nos parece que su valor persuasivo se agota si nos limitamos a definir el descanso como la mera recuperación de fuerzas físicas. Por el contrario, si concebimos el descanso como algo más que el reposo muscular —que trasciende hacia el plano del mundo espiritual— deja de tener mayor importancia la diferencia en fatiga que puedan provocar esas actividades. La psicología moderna se orienta hacia la búsqueda del reposo, no sólo físico sino espiritual, como esparcimiento que sirve para aliviar y atenuar las tensiones de la vida citadina.

*Cuarto*, la exención de las actividades industriales de la cobertura de la ley tuvo otras justificaciones de interés público. Muchas respondieron a un plan integral inspirado en promover el desarrollo industrial y fortalecer la economía. Así, la Ley Núm. 250 de 9 de mayo de 1950 eximió a las "fábricas de azúcar y alcohol, talleres para la reparación de maquinarias de centrales de azúcar, fábricas de empacar, enlatar y refrigerar frutas y vegetales, tahonas de café, fábricas de cemento, de envases de cristal, papel y productos de cerámica, industria de textiles y cualquie[r] otra industria establecida o que se estableciere en lo sucesivo que, a juicio del Comisionado del Trabajo, *por razón de su proceso industrial, necesite operar en forma continua*". 1950 Leyes de Puerto Rico 657.

Más tarde, la Ley Núm. 78 de 13 de junio de 1953 dispensó a todas las empresas *industriales* y se reconoció que las restricciones de la ley estaban afectando negativamente el programa de industrialización que venía desarrollándose. Los objetivos de esta legislación pueden entenderse cabalmente si se ubican en el contexto histórico apropiado. Según el Sr. Teodoro Moscoso, uno de los principales arquitectos

del fecundo proceso de industrialización de Puerto Rico, el programa tuvo dos (2) fases. "La primera, de 1942 a 1950, más o menos, era una fase de fábricas constru[i]das y operadas por el Gobierno (cementos, botellas, calzado, etcétera), emprendida primordialmente como un medio de demostrar al capital privado la factibilidad de una provechosa empresa industrial en la isla." G.K. Lewis, *Puerto Rico: libertad y poder en el Caribe*, Río Piedras, Ed. Edil, 1970, págs. 229–230.

Bajo esta estrategia económica gubernamental es natural que se quisieran eliminar todas las trabas jurídicas que pudieran frustrar su feliz realización. Los frutos no se hicieron esperar. Así, para "el año 1953 el programa gubernamental de ayuda e incentivos conocido bajo el nombre de *Operación Manos a la Obra* había atraído a la isla más de 300 plantas manufactureras; más de 25,000 nuevos empleos se agregaron a la lista de pagos insulares; y el ingreso anual neto *per cápita* se había elevado de 122 dólares en 1940 a unos 426 dólares trece años después. Hacia 1957 la industria había desplazado a la agricultura del primer lugar como fuente de ingreso de la economía; por el año 1958 el total de nuevas fábricas establecidas había llegado a 500, y a más de 600 dos años más tarde, proveyendo en conjunto 45,900 nuevos empleos . . .". Lewis, *op. cit.*, págs. 226–227.

*Quinto*, otras excepciones tienen razones válidas que las respaldan. Así, los hoteles y aeropuertos son puntales de la industria turística del país que por su naturaleza operan de manera continua. Por esta misma razón se eximen los establecimientos comerciales que operan en las zonas turísticas.

Los propósitos recreativos y de unidad familiar justifican la exención de los teatros, los cafés, los restaurantes, los hipódromos, las gasolineras, los depósitos de hielo y los lugares de diversión. Las lavanderías comerciales que funcionan con monedas (*laundromats*) y los establecimientos comerciales operados por sus propios dueños, esposas o hijos,

encuentran apoyo en el hecho de que no tienen empleados. Algunas excepciones responden a razones de salud o servicios de emergencia, tales como las farmacias, las agencias funerarias y los establecimientos comerciales que venden bombillas, baterías, linternas, tapones, fusibles, etc.

Los mercados públicos, incluso los que se dedican a la venta de frutas y legumbres, los puestos de carne o leche y las panaderías, por la naturaleza de sus productos y la demanda de los mismos a base de su frescura, justifican un horario de trabajo más flexible.

Por último, en cuanto a los fines que animaron al legislador a excluir a los bancos del alcance de la ley, reconocemos que existen serias discrepancias. Ello se debe, en gran medida, al carácter ambiguo de la Exposición de Motivos(24) del

---

(24) Su Exposición de Motivos dispone:

"El propósito del proyecto de referencia es permitirle a los bancos y demás instituciones financieras realizar trabajos dentro de sus respectivos locales, a puertas cerradas al público, después de las horas determinadas para el cierre de establecimientos comerciales e industriales por el Artículo 553 de nuestro Código Penal. *Es por demás conocido que todos los bancos e instituciones financieras tienen la imperiosa necesidad de cuadrar sus operaciones diariamente.* Este cuadre de operaciones se realiza después de las horas en que el banco está abierto al público y, a menudo, surgen diferencias que requieren trabajar después de las seis de la tarde a fin de llegar al cuadre de dichas operaciones. Si no se les permite a los bancos trabajar durante esas horas en que no estarían abiertos al público, *entorpecería grandemente el desenvolvimiento de sus relaciones con el público con el consiguiente detrimento para las operaciones bancarias en general.* Lo que se persigue con el proyecto es que los bancos puedan trabajar *a puertas cerradas* después de las seis de la tarde y estar exentos de la obligación de *pagar tiempo extra* por el mero hecho de que se podría considerar este trabajo como trabajo realizado en horas en que el establecimiento deba permanecer cerrado al público tal y como lo requiere la Ley 379 de 1948. Entendemos que el interés cuasi-público que tienen las funciones de los bancos y establecimientos financieros es más que suficiente para justificar la aprobación de este proyecto. Naturalmente, estas instituciones pagarían tiempo extra por horas trabajadas en exceso de ocho (8) al día, etc. Bajo la ley en vigor (Ley 379, *supra*), cualquier empleado que se viese obligado a trabajar después de las 6 de la tarde tendría derecho a que se le pagasen esas horas a tiempo doble aunque no hubiesen trabajado ocho (8) horas durante el día. Este gravamen *es el que se desea evitar.*" (Énfasis suplido.) 15 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 3, pág. 1261 (1962).

P. del S. 366, más tarde Ley Núm. 103 de 26 de junio de 1962, que hizo viable la exclusión. La cuestión permanece en la penumbra. De hecho, dicha exposición de motivos nunca llegó a ser parte integral de la ley, pues se aprobó una enmienda para eliminarla. Del propio debate no se desprende razón alguna para esa eliminación. Ello nos mueve a suponer que *no* había un claro consenso sobre los propósitos de la exclusión o, al menos, algunas dudas sobre su legitimidad.

Unos aducen que la razón primordial para excluir a los bancos fue permitirles realizar los procesos de contabilidad fuera de horas de trabajo y así mejorar el servicio a la comunidad. Otros sugieren que el propósito real fue permitirles trabajar en las horas proscritas y estar exentos de pagar tiempo extra. Bajo cualesquiera razones, la Legislatura optó por ejercer una determinación inspirada en la naturaleza peculiar de la industria bancaria. *Si se justifica o no el que los bancos no tengan que pagar tiempo doble los domingos y días feriados, no es asunto que corresponde al tribunal determinar en ausencia de un reclamo de sus empleados.*

Los objetivos particulares expuestos de cada una de las excepciones disipan las supuestas inconexiones legislativas del estatuto. No es el número de excepciones, sino si están o no justificadas lo que puede anular la ley. Bajo el escrutinio racional se mantiene su constitucionalidad.(25) *City of War-*

---

(25) A manera de ilustración, veamos cómo se han enfrentado otras jurisdicciones a planteamientos constitucionales como los que aquí nos ocupan. En la esfera federal, en *McGowan v. Maryland*, 366 U.S. 420 (1961), el Tribunal Supremo de Estados Unidos sostuvo la validez de una ley de cierre de establecimientos comerciales parecida a la nuestra. Esa visión la reiteró en *Two Guys v. McGinley*, 366 U.S. 582 (1961).

Otros tribunales estatales han rubricado la validez constitucional utilizando el escrutinio racional. Entre los casos más notorios están: *Harry's Hardware, Inc. v. Parsons*, 410 So. 2d 735 (La. 1982); *Com. v. Franklin Fruit Co., Inc.*, 446 N.E.2d 63 (Mass. 1983); *Ex parte Robbins*, 661 S.W.2d 740 (Tex. 1983); *Rothe v. S-N-Go Stores, Inc.*, 308 N.W.2d 872 (N.D. 1981). Para una relación completa de la jurisprudencia norteamericana, a favor o en contra, consúltese Anotación, *Va-*

*wick v. Almac's, Inc.*, 442 A.2d 1265 (R.I. 1982). En último análisis, el enfoque *cuantitativo de excepciones* se reduce a una cuestión de semántica susceptible de ser superado mediante la técnica legislativa de dirigir la prohibición a los establecimientos que no están exentos. Propulsar su nulidad, al decir del Juez Presidente Señor Pons Núñez, a base de "una mirada realista hacia el futuro" (opinión disidente, pág. 809) —bajo el supuesto de que el Legislador tendrá que atemperar su aplicación "creando nuevas excepciones" (íd.)— no es fundamento válido disponible en el repertorio de criterios jurídico-constitucionales. Ese enfoque atenta contra la norma elemental preceptiva de que los tribunales estamos impedidos de especular y, a *destiempo*, pronunciarnos en contra de una ley.

Con una visión futurista, no podemos a priori enclaustrar prematuramente la facultad inherente de los cuerpos legislativos para modificar en el mañana ésta o cualesquiera otras leyes. Después de todo, esa es una prerrogativa inherente de la Asamblea Legislativa y constituye la *esencia* de la regla de deferencia judicial apuntalada en la doctrina de la separación de poderes. No cabe, pues, la hipérbole de caracterizar como *obstinación* o *artificialidad* (opinión disidente, págs. 808–809)

---

*lidity, Construction, and Effect of "Sunday Closing" or "Blue" Laws—Modern Status*, 10 A.L.R.4th 246 (1981).

Ahora bien, para fines decisorios no es suficiente inventariar la jurisprudencia que ha sostenido o invalidado estatutos análogos. Es necesario distinguir las similitudes y las diferencias, ya que tales decisiones varían considerablemente.

Así, por ejemplo, en *Home Depot, Inc. v. State of La.*, 589 F. Supp. 1258 (E.D. La. 1984); *Caldor's, Inc. v. Bedding Barn, Inc.*, 417 A.2d 343 (Conn. 1979); *People v. Abrahams*, 353 N.E.2d 574 (N.Y. 1976); *Rutledge v. Gaylord's, Inc.*, 213 S.E.2d 626 (Ga. 1975); *Spartan's Industries, Inc. v. Oklahoma City*, 498 P.2d 399 (Okla. 1972), los estatutos impugnados, contrario al nuestro, tienen como único el singular propósito de conceder un día de descanso común. Otras leyes se declararon inconstitucionales por vaguedad. *People v. Fay's Drug Company of Fairmount*, 326 N.Y.S.2d 311 (1971); *Skaggs Drug Centers, Inc. v. Ashley*, 484 P.2d 723 (Utah 1971); *State v. Target Stores, Inc.*, 156 N.W.2d 908 (Minn. 1968).

los pasados y presentes esfuerzos legislativos tendentes a actualizar la Ley de Cierre a la realidad puertorriqueña y así conciliar los intereses económicos, sociales y comunitarios en *perenne conflicto*. En materia de interpretación constitucional carecemos del encanto de la magia y del hechizo esférico de la consabida bola de cristal.

## VII

Corresponde a la Asamblea Legislativa auscultar la opinión pública y evaluar los distintos planteamientos de los sectores interesados —industriales, comerciantes, obreros, consumidores y otros— para luego determinar si su alegado anacronismo relativo requiere derogar total o parcialmente determinado estatuto. *Pueblo v. Saldaña*, 69 D.P.R. 711, 716 (1949); *McCormick v. Marrero, Juez*, 64 D.P.R. 260, 267 (1944); *M. Taboada & Co. v. Rivera Martínez, Comisionado*, 51 D.P.R. 253, 258–273 (1937). También si su vigencia es saludable o contraproducente en términos económicos, desempleo y otros aspectos sociales mencionados por el ilustrado juez sentenciador, tales como la deserción escolar y la criminalidad.

"Es bien sabido que, en el ejercicio del poder de razón de estado, la legislatura tiene una amplia facultad para la reglamentación de carácter económico sujeta únicamente a las limitaciones impuestas por la garantía del debido procedimiento de ley. *E.L.A.* v. *Márquez*, 93 D.P.R. 393 (1966); *A. Roig, Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342, 357 (1954). Estas limitaciones s[ó]lo requieren que la reglamentación no sea irrazonable, arbitraria o caprichosa y que el medio elegido tenga una relación real y sustancial con el objetivo que se persigue. *Morales* v. *Lizarribar*, 100 D.P.R. 717 (1972); *A. Roig, Sucrs.*, supra; *Central San Vicente* v. *Junta Azucarera*, 78 D.P.R. 799 (1955)." *Marina Ind., Inc. v. Brown Boveri Corp.*, supra, pág. 80.

744

La Ley de Cierre es un estatuto eminentemente de reglamentación económico-social. No incide fatalmente en derechos fundamentales. No existe razón alguna de peso para que nos apartemos de la sabia postura de deferencia al juicio legislativo.(26) Su adjudicación no es equiparable a los valores

---

(26) Aunque no nos enfrentamos a una situación en que está directamente en controversia la relación entre la Iglesia y el Estado, ciertos señalamientos nos obligan a manifestarnos sucintamente al margen.

El origen de la ley, apuntalado en un interés de promover el principio religioso de descanso obligatorio dominical, es una visión contemporáneamente superada.

El Art. II, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 262, consagra la libertad de culto y prohíbe el establecimiento de una religión oficial. Postula, a su vez, que la relación ideal entre la Iglesia y el Estado subsista en dos (2) esferas de acción separadas. *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172 (1979); *Academia San Jorge v. J.R.T.*, 110 D.P.R. 193 (1980); *Surinach v. Pesquera de Busquets*, 604 F.2d 73 (1er Cir. 1979); *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974). Disposiciones similares las encontramos en la Primera Enmienda de la Constitución de EE. UU. Ni antes ni ahora la Ley de Cierre choca contra tales disposiciones constitucionales. El hecho de que históricamente grupos religiosos se hayan identificado con el estatuto no es razón para concluir que éste promueva o adelante fines religiosos.

Reconocemos que su aprobación ocurrió en un momento en que todavía no se habían deslindado adecuadamente los papeles de la Iglesia y el Estado. *Cf.* M.M. Díaz Alonso, *An Approach to Church and State Relations in Puerto Rico*, Washington, D.C., Univ. Microfilms International, 1972; C. Campo Lacasa, *Historia de la Iglesia en Puerto Rico*, San Juan, Instituto de Cultura Puertorriqueña, 1977; S. Silva Gotay, *La Iglesia Católica en el proceso político de la americanización de Puerto Rico*, 1898-1930 (1), Año 1, Núm. 1 Rev. Historia 1 (1985). Tampoco dudamos que las instituciones religiosas hayan influido casi todas las esferas de la vida social puertorriqueña. No obstante, como ya se ha demostrado, la Ley de Cierre persigue propósitos seculares.

En ocasión de examinar leyes similares a las nuestras —las llamadas "Sunday Closing Laws"— el Tribunal Supremo de Estados Unidos invariablemente ha sostenido que no violan las disposiciones de la Primera Enmienda. *McGowan v. Maryland*, supra; *Gallagher v. Crown Kosher Super Market*, 366 U.S. 17 (1961); *Braunfeld v. Brown*, 366 U.S. 617 (1961); *Two Guys v. McGinley*, supra; Nota, *State Sunday Laws and the Religious Guarantees of the Federal Constitution*, 73 Harv. L. Rev. 739 (1960); Comentario, *A New Look at Sunday Closing Legislation*, 45 Neb. L. Rev. 775 (1966). Dicho foro ha resuelto que está dentro del poder de razón de estado proveer un día de descanso uniforme, y que este propósito es secular y no religioso, aunque el día seleccionado sea domingo.

Sobre el particular algunos prestigiosos comentaristas han apuntado:

"El mismo Tribunal ha interpretado el requisito de propósito secular básicamente de esta manera. Por ejemplo, el hecho que las leyes de cierre dominical han

invocados en *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 278 (1978) (derecho a la intimidad), y en *Ocasio v. Díaz*, supra (igualdad absoluta de los hijos por razón de nacimiento). La preeminencia y jerarquía superior de esos dos (2) derechos

---

tenido sus orígenes en un significado religioso para muchos, no ha llevado al Tribunal a concluir que dichas leyes no cumplen con el requisito de propósito secular. Por el contrario, el Tribunal en *McGowan v. Maryland* expuso que: 'El efecto actual de la mayoría de estas leyes es el proveer un día uniforme de descanso a todos los ciudadanos; el hecho que este día sea domingo, un día de significado particular para las sectas cristianas dominantes, no impide que el Estado logre sus metas seculares.'" (Citas ómitidas y traducción nuestra.) L.H. Tribe, *American Constitutional Law*, Nueva York, The Foundation Press, 1988, págs. 1205–1206.

· · · · · · · ·

"Las leyes de cierre dominical aparecen actualmente de alguna manera en todos los estados y estas leyes han tenido el apoyo de asociaciones laborales y mercantiles como medidas encaminadas a promover la salud y el bienestar de los que laboran en los comercios. Programas modernos de legislación aparentan estar diseñados a asegurar un día uniforme de descanso y actividad no comercial. Sin duda esto hacía que la asistencia a servicios religiosos fuese más fácil para los trabajadores pertenecientes a las sectas cristianas mayoritarias. Sin embargo, dado el propósito secular de la ley, esto ha sido visto sólo como un efecto que resulta coincidir con ciertas creencias religiosas y no constituye un verdadero apoyo a esas religiones." (Traducción nuestra.) J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, 2da ed., Minnesota, West Publishing Co., 1983, pág. 1069.

En el caso ante nos, aunque se sugiere, no se imputa acción estadual en violación a la libertad de culto o de la cláusula que prohíbe el establecimiento oficial de una iglesia. Tampoco —bajo la tercera acepción de la cláusula de separación— que promueva o adelante doctrinas religiosas. Sabido es que "[l]as zonas de acción de estos dos poderes [Iglesia y Estado] suelen entremezclarse. Muchos actos del Estado pueden repercutir en la otra zona, pero ello no entraña su nulidad si se justifican en términos seculares". *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172, 177 (1979).

Es comprensible que para algunos subsista la duda de que la Ley de Cierre —en su origen producto de una mentalidad religiosa— se mantenga con ese fin. Para quienes enmarcan la cuestión en ese ámbito estrecho no habrán argumentos en contrario. Sin embargo, si se reflexiona profundamente puede percibirse que por razones históricas muchas actividades modernas de origen religioso han evolucionado hasta alcanzar el ámbito secular. A manera de ejemplo en la idiosincracia del pueblo, podemos mencionar las *fiestas patronales* puertorriqueñas. Ciertamente, a pesar de su indiscutible génesis religiosa, hoy día son fiestas populares en las que participan creyentes de todas las denominaciones, como no creyentes. El Estado, por medio de los gobiernos municipales, son los principales auspiciadores de esta tradición.

constitucionales no compara con el reclamo económico de Pueblo International, Inc. y otros supermercados interesados exclusivamente en incrementar sus ganancias a expensas de otros derechos individuales, familiares y comunitarios. De "nada vale el conocimiento sin amor. No basta conocer lo verdadero, sino que hace falta quererlo. Además de la ciencia, además de la filosofía, se necesita la caridad. Las construcciones científicas son estériles y a veces incluso perjudiciales, *si no las sostiene la conciencia de los valores supremos, a cuyo servicio deben estar la vida y la obra de los hombres de ciencia.* La actividad del jurista se vuelve vana logomaquia o juego fútil de conceptos si, preocupándose únicamente por un extrínseco, aunque hábil, tecnicismo, pierde de vista el fin esencial que le ha sido asignado: *la realización del bien en la forma del derecho* . . . . Las más eruditas construcciones jurídicas deben ser rectificadas en todo o en parte, cuando no correspondan a tal fin, en el que el derecho se encuentra realmente con la moral y con ella se sublima". (Énfasis suplido.) G. Del Vecchio, *Aspectos y Problemas del Derecho*, Madrid, Ed. Epesa, 1967, págs. 284–285.

## VIII

Solamente si remitimos a la Asamblea Legislativa y al Ejecutivo la cuestión, actuamos en armonía con ese papel y aquel que nos ha conferido la propia Constitución. Intervenir con esta legislación socioeconómica —que no viola el debido procedimiento de ley, la igual protección de las leyes ni afecta derechos fundamentales— implicaría darle la espalda al principio de división de poderes que rige nuestra vida democrática. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958), y su progenie.

De prevalecer la teoría de Pueblo International, Inc. y los otros establecimientos, es claro que al Estado se le haría muy difícil descargar su encomienda de velar por el interés público. Después de todo, prácticamente cualquier regla-

mentación económica puede incidir directa o indirectamente, de algún modo, en las ganancias de un negocio e inclusive en el trabajo de infinidades de personas. Basta mencionar las leyes de salario mínimo, ambientales, fiscales y toda la legislación protectora del trabajo. Esos efectos negativos, per se, no son vindicables constitucionalmente. Ello hubiera abierto una caja de Pandora de contenido "lochneriano".

La situación se hubiese tornado de grave a crítica. De subsistir el enfoque del tribunal de instancia, difícilmente la Asamblea Legislativa podría remediar el *estado de indefensión* en que hubiera quedado la clase trabajadora. La alternativa de legislar para exigir a las empresas y establecimientos comerciales que el trabajo los domingos y días feriados fuera voluntario, a base de la exclusiva opción del obrero, sería un mito. Igualmente, sería *una utopía* ordenar el pago a base de una compensación *doble* por horas trabajadas durante esos días dentro de una jornada semanal regular de cuarenta (40) horas. La razón es sencilla. Si resolviéramos que el Estado no puede constitucionalmente ordenar el cierre de tales empresas y establecimientos durante esos días, no podría exigir por ley o por decreto salarial que su prestación fuera por determinación *voluntaria* del obrero. Menos, el fijar una compensación doble. Después de todo, para todos los fines esa conclusión de inconstitucionalidad lógicamente implicaría que *no son días diferentes*. Y si no lo son, ¿cómo entonces reconocerle al obrero esa opción y justificarse la paga extraordinaria si no es precisamente a base de la premisa implícita de que esos días son distintos y, como tales, susceptibles constitucionalmente de un esquema legislativo especial? No cabe negar esa facultad constitucional para luego de sus escombros rescatarla.

## IX

A modo de epílogo reproducimos el siguiente pensamiento: "Todos los siglos hablan de la justicia, y siempre la

invocaremos. Hoy tal vez ha llegado a ser una palabra desgastada por el mal uso hecho de ella. *En realidad no todos la contemplamos de idéntica manera.* El filósofo y el moralista ven la justicia abstracta. El hombre, sea abogado, sea político, *ha tratado de identificarla con el interés individual de su propia clase*, de su propia nación. Para el jurista la *justicia* es una realidad concreta. *Es la síntesis de la vida real. Es una entidad heterogénea compuesta, como el hombre, de materia y espíritu, de oportunidad y de moral, que no se excluyen, sino que se equilibran, de razón y utilidad, de pasado y futuro, de tradición y renovación, que coexisten al igual que en la máquina coexisten freno y motor.*" (Énfasis suplido.) B. Biondi, *La ciencia del Derecho como arte de lo justo*, 9 Anales de la Academia Matritense 323, 352 (1957).

Un estudioso de la materia concluye, con atinada claridad, que en "sus aspectos socio-económico y jurídico, la Ley de Cierre afecta muchos sectores de la comunidad *simultáneamente*. La voz de éstos se ha dejado oir en varias formas y foros. *Cada sector tiende a sobreponer sus intereses a los intereses de los demás*, aunque las opiniones no son, característicamente, unánimes y hay sectores que reclaman buscar el interés de los demás —sin que tampoco sea característica la unanimidad— en las posturas que asumen". (Énfasis suplido.) M.A. Ramírez Pérez, *Una visión laboral del impacto de cambios en la Ley de Cierre sobre el empleo*, 5 Rev. Cs. Comerciales 29.

Esa falta de unanimidad o de mayoría absoluta ha quedado manifestada en el *empate* producido en el seno de este Tribunal. Si habrá de continuar en el futuro, lo desconocemos. Sin embargo, desde la psicodinámica judicial, estamos persuadidos de que el fenómeno histórico, cultural, económico, social, laboral y legal que resume las complejidades de la Ley de Cierre podemos expresarlo del siguiente modo: para el economista, un indicador en su hoja de ganancias y pérdidas; para ciertas grandes cadenas de supermer-

cados y comercios, una rémora en su afán de acaparar el mercado; para algunos estudiantes empleados a tiempo parcial y transitorio, unas horas más de ingreso suplementario; para el pequeño e intermedio comerciante, una protección contra el imperio capitalista; para el trabajador, un merecido descanso; para el consumidor, un estatuto obsoleto que afecta la conveniencia de un día adicional para comprar; para el sociólogo, la identidad colectiva; para el sacerdote o ministro, un día de oración; para la familia, una fuente de unidad; para el pueblo puertorriqueño, la preservación de un día común impregnado de aire y sabor diferente.

Al pasar este balance, nos percatamos de lo peligroso y superficial que resulta asumir una posición fundada exclusivamente en uno de esos intereses. Una conclusión sí es clara y aflora como verdad indiscutible: *aquellos empresarios y consumidores que se oponen a la Ley de Cierre y la tachan de inconstitucional y arcaica son los que regularmente no se verán precisados a renunciar su disfrute ni a trabajar los domingos y días feriados.*

La sabiduría, la valoración y el equilibrio de estos intereses en conflicto —ausente una lesión atendible en la dimensión constitucional— corresponden a los Poderes Legislativo y Ejecutivo. No compete enjuiciarlos al Poder Judicial, cuya lupa en esta compleja materia no tiene el diámetro suficiente para conciliar y canalizar el pluralismo de los sectores que nutren la opinión pública. Por la naturaleza socioeconómica y valores subyacentes de la Ley de Cierre, afortunadamente ha prevalecido otra vez su constitucionalidad. Otro curso decisorio hubiese tenido desoladoras consecuencias en nuestro cuerpo doctrinario constitucional; más aún, se hubiese erigido a costa del sufrimiento de los más débiles: *los trabajadores.*

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Debido a la naturaleza misma de la función que realizan los tribunales de justicia, las decisiones que éstos emiten de ordinario resultan ser del agrado de una de las partes y del desagrado de la otra. Ello no se puede evitar ya que, dado el carácter adversativo de los procedimientos judiciales, una de las dos partes envueltas en el litigio resulta victoriosa sobre la otra.

Nos encontramos, sin embargo, ante una situación bien particular. Las decisiones que se emiten en casos como el presente afectan no sólo a las partes demandantes y demandadas que directamente están envueltas en los mismos, sino que también a la ciudadanía en general. Es por ello que esta clase de casos suelen calificarse como de "interés público".

Dicha situación garantiza que la decisión que emitamos en el presente caso, *sea ésta cual fuere*, será objeto de alabanzas por ciertos sectores de nuestra sociedad y de críticas por otros. Ello, sin embargo, no puede tener el efecto de confundirnos en cuanto a la posición y función de los integrantes de este Tribunal dentro del sistema democrático de gobierno en que laboramos, la cual consiste en tratar de hacer la mejor justicia de la que los seres humanos son capaces mediante la interpretación objetiva, serena y jurídicamente correcta de la Constitución, y las leyes, del Estado Libre Asociado de Puerto Rico. No debe perderse de vista que este Tribunal, *no obstante tener que ser sumamente consciente de las realidades y adelantos del mundo que lo rodea,* no actúa dentro de los parámetros de un concurso de popularidad y simpatía.

El asunto ante nuestra consideración *parece ser* altamente complicado; *no lo es*. Llana y sencillamente debemos resolver si una ley aprobada por nuestra Asamblea Legisla-

tiva, *la cual reglamenta o afecta unos intereses de natura-
leza económico-social,* es o no constitucional; ello a la luz de
unos criterios sabiamente establecidos por una abundante y
jurídicamente correcta jurisprudencia.

Somos del criterio que, dentro de nuestro sistema demo-
crático de gobierno, no es prerrogativa de este Tribunal de-
terminar la constitucionalidad de una ley exclusivamente a
base de criterios de conveniencia o de actualidad y signifi-
cado dentro de un contexto histórico determinado. Si una ley
en particular, constitucionalmente válida en todos sus as-
pectos, llega a resultar obsoleta o anacrónica por el mero
pasar de los años, no es función de este Tribunal el derogarla
*mediante una forzada interpretación de nuestro derecho.*
No podemos pasar por alto lo preceptuado por el Art. 5 de
nuestro Código Civil, 31 L.P.R.A. sec. 5, a los efectos de que
las "leyes *sólo se derogan* por otras leyes posteriores; y *no*
prevalecerá contra su observancia el desuso, la costumbre, o
la práctica en contrario". (Énfasis suplido.)

La derogación de leyes, por éstas resultar obsoletas, es
función exclusiva de la Asamblea Legislativa de Puerto Rico.
Dicho cuerpo es el que cuenta con los recursos y mecanismos
adecuados y necesarios para llevar a cabo una evaluación ra-
zonable de dicha situación. No estamos autorizados por la
Constitución, ni estamos capacitados, para realizar esa fun-
ción, la cual, repetimos, es una puramente legislativa.

## I

Tradicionalmente se ha reconocido —tanto en la jurisdic-
ción federal como en la nuestra— que no existe prohibición
constitucional alguna que impida al Poder Legislativo apro-
bar legislación que tenga el efecto de establecer "clasifica-
ciones", esto es, diferencias según las cuales se pueda tratar
a un grupo de personas de un modo diferente al que se trata
a otras. De hecho, la historia referente a la cláusula constitu-
cional sobre la igual protección de las leyes es una de desi-

gualdad. *La función judicial en esta clase de situaciones se limita a determinar si la clasificación legislativa establecida es constitucionalmente permisible.* A esos efectos, los tribunales federales han elaborado tres criterios o escrutinios, a saber: el mínimo o tradicional, el estricto y el intermedio. Por nuestra parte, como es sabido, hemos adoptado y aplicado únicamente los dos primeros.

La *correcta* aplicación de los principios o normas jurisprudenciales que tradicionalmente se han utilizado y aplicado en casos como el presente en nuestra jurisdicción[1] —*precedentes que venimos obligados a respetar so pena de trastocar todo nuestro sistema de análisis constitucional en esta clase de situaciones*— arroja el resultado incuestionable de que la ley aquí en controversia, la llamada Ley de Cierre, es constitucional. El poder del Estado para válidamente reglamentar esta situación ha sido reconocido por el Tribunal, *en forma unánime*, en tres ocasiones distintas, la primera de ellas hace más de setenta años. Véanse: *El Pueblo v. García & García*, 22 D.P.R. 817 (1915); *García v. Municipio de Humacao*, 57 D.P.R. 532 (1940); *Grand Union Co. v. Giménez Muñoz, Srio. de Justicia*, Sentencia de fecha 30 de junio de 1982. No hay duda que el resultado de dichas decisiones ha afectado adversamente, y de manera directa, a unos poderosos intereses económicos. Debido a ello, y dada la nueva configuración del Tribunal, no sorprende que se haya intentado, una vez más, lograr la erradicación de la Ley de Cierre por la vía judicial, al obviamente no haber tenido éxito las gestiones a esos efectos en la Asamblea Legislativa de Puerto Rico.

Un somero examen de las disposiciones de la Ley de Cierre revela que *la misma establece una clasificación de natu-*

---

[1] *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984); *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *León Rosario v. Torres*, 109 D.P.R. 804 (1980); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975).

*raleza económico-social*. En vista de ello, no hay que extenderse mucho para poder concluir correctamente que la constitucionalidad de esta clase de leyes se tiene que determinar a base del llamado "escrutinio tradicional o mínimo". S.H. Bice, *Standards of Judicial Review Under the Equal Protection and Due Process Clauses*, 50 S. Cal. L. Rev. 689 (1977); G. Gunther, *Individual Rights in Constitutional Law, Cases and Materials*, 3ra ed., Nueva York, Ed. Foundation Press, 1981. Al así *reafirmarlo*, en *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 538 (1984), expresamos que al amparo de dicho escrutinio

> . . . una clasificación legislativa no debe ser declarada inválida a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado. Bajo este criterio se ha resuelto que es constitucional una ley *siempre que pueda concebirse razonablemente una situación de hechos que justifique la clasificación*, teniendo el peso de la prueba aquel que alega la inconstitucionalidad de la legislación en controversia. (Énfasis suplido.)

Resulta obvio que la Ley de Cierre, a la luz de este escrutinio, es constitucional. *Dicha ley obedece a un interés válido y legítimo del Estado de proveer un día uniforme de descanso que promueva, entre otras cosas, el acercamiento a Dios, la unidad familiar y la salud del trabajador.*

## II

La opinión disidente infructuosamente intenta sostener que en esta situación en particular es de aplicación el llamado "escrutinio intermedio". Como es de todos conocido, dicho escrutinio surgió en la jurisdicción federal ante la necesidad de proveer un método adecuado para proteger *unos intereses importantes no cubiertos expresamente por la Constitución federal*. Aun cuando la Corte Suprema de Estados Unidos nunca ha provisto una explicación coherente de las características que promueven el uso del escrutinio inter-

medio, L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1614, en sus decisiones dicho Tribunal lo ha utilizado repetidamente en casos de clasificaciones *por razón de sexo, origen, nacimiento* y otras que tienen que ver con características que, aparte de estar fuera del control del individuo, no guardan relación alguna con la habilidad individual para participar en o contribuir a la sociedad. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

A la luz de lo antes expuesto, resulta meridianamente claro el porqué el "escrutinio intermedio" nunca ha sido utilizado por este Tribunal. *Clara y sencillamente no ha habido necesidad de ello en nuestra jurisdicción.* Los "intereses" que se pretenden proteger en la jurisdicción federal por medio de la utilización del "escrutinio intermedio" gozan en Puerto Rico *de rango constitucional y categoría de derechos fundamentales*. En consecuencia, en situaciones en que los referidos derechos se ven afectados por alguna ley en particular, el criterio que se utiliza en nuestra jurisdicción es el "escrutinio estricto". *Vélez v. Srio. de Justicia*, ante, pág. 538 n. 2; *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972).

## III

La posición que asume la opinión disidente emitida resulta ser una jurídicamente errónea y peligrosa. En la misma se acepta —realmente no queda otra alternativa— que en lo referente al alegado menoscabo de los intereses *de los dueños* de los establecimientos comerciales demandantes el escrutinio a utilizarse lo es necesariamente el "mínimo o tradicional". Se acepta, en adición, que distinto a la situación contemplada en el caso de *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414 (1985) —donde se intentaba *privar totalmente* al demandante de ejercer su profesión de jinete— en el pre-

sente caso *meramente se trata de la reglamentación de unas horas de trabajo de los empleados* de dichos establecimientos comerciales. Como consecuencia de ello, se ven los Señores Jueces disidentes obligados a aceptar que el "interés" de los empleados que se ve afectado por la Ley de Cierre *no* es uno "fundamental".

Se sostiene, sin embargo, que la reglamentación por parte del Gobierno de las condiciones de trabajo de estos empleados afecta un "interés *importante* relacionado con el trabajo, *como son las horas y los salarios*". (Énfasis suplido.) Opinión disidente, pág. 797. A base de ello, se intenta *importar* de la jurisdicción federal la utilización del "escrutinio intermedio".

Ello es totalmente erróneo. Como expresáramos anteriormente, el "escrutinio intermedio" ha sido y es utilizado en la jurisdicción federal con el propósito de proteger unos intereses importantes —casos de clasificaciones por razón de *sexo, origen* y *nacimiento*— que no están cubiertos *expresamente* en la Constitución federal. Nos parece a nosotros que la reglamentación de horarios de trabajo que resulta en la mera merma de unos ingresos de unas personas no se equipara a clasificaciones por razón de sexo, origen y nacimiento; esto es, esta situación si bien tiene importancia, no goza de la jerarquía de los intereses que se han intentado proteger en la jurisdicción federal por medio de la utilización del escrutinio intermedio, intereses que, como hemos dicho, gozan en nuestra jurisdicción de la categoría de "derechos fundamentales".

La posición que asume la minoría es, en adición, una altamente peligrosa. A nuestra manera de ver las cosas, adoptar la posición de la minoría tendría la consecuencia nefasta de obstaculizar la acción gubernamental referente a la reglamentación de realidades de naturaleza económica y social en Puerto Rico, por cuanto causaría que cualquier legislación o clasificación relacionada con horas y condiciones de trabajo

que pueda resultar en *la merma* de salarios y beneficios de los trabajadores tendría que ser sometida a un escrutinio más severo, lo que podría causar la paralización total de nuestro sistema económico.

Ello es así por cuanto, en primer lugar, bajo el criterio del *escrutinio intermedio* la legislación impugnada *no goza de la presunción de constitucionalidad* y, en segundo lugar, el Estado viene en la obligación de probar la existencia de *un interés público importante* y de demostrar una *relación sustancial* entre el propósito legislativo —el cual tiene que ser expreso— y la ley en controversia. J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, 2da ed., Minnesota, West Publishing Co., 1983, pág. 593. Dicha situación, repetimos, tendría el efecto de hacer sumamente difícil, si no imposible, la función legislativa en este campo. De hecho, no habría razón válida alguna para no aplicar el escrutinio intermedio a otras leyes vigentes que reglamentan horas y salarios y condiciones de trabajo. Entendemos que la aplicación del referido escrutinio de inmediato arrojaría dudas sobre la constitucionalidad, entre otras, de leyes tales como la Ley de Salario Mínimo de Puerto Rico, Ley Núm. 8 de 5 de abril de 1941 (29 L.P.R.A. sec. 245 *et seq.*), y la Ley sobre Horas y Días de Trabajo, Ley Núm. 379 de 15 de mayo de 1948 (29 L.P.R.A. secs. 271–288).

Somos del criterio que los Señores Jueces disidentes, en su afán incomprensible de declarar inconstitucional la Ley de Cierre, realmente no se han percatado de las consecuencias desastrosas que tendría para Puerto Rico la posición que sostienen.

## IV

Resulta, cuando menos, curioso el intento de los Señores Jueces disidentes de "amedrentarnos" al considerar ellos necesario "advertirnos" que al negarnos a adoptar el "escrutinio intermedio" nos hemos situado en un posible curso de

colisión con los tribunales federales por cuanto en dicha jurisdicción sí se utiliza dicho escrutinio. Aparte del hecho —ya explicado a la saciedad— de que en las situaciones en que los tribunales federales utilizan el escrutinio intermedio en esta jurisdicción se utiliza el "estricto", debe señalarse el hecho de que en la *única ocasión* en que el Tribunal Supremo de Estados Unidos se ha expresado sobre la constitucionalidad de un *estatuto similar* a nuestra Ley de Cierre, el Supremo federal utilizó —al igual que nosotros— el "escrutinio mínimo", por cuanto correctamente entendió que los derechos afectados por la ley en controversia eran de "naturaleza económica". *McGowan v. Maryland*, 366 U.S. 420 (1961).

Estamos seguros que la posición sensata y jurídicamente correcta que asumiera el Tribunal Supremo federal en el citado caso de *McGowan v. Maryland*, ante, hace más de veinticinco años —precedente obligatorio para los tribunales federales de menor jerarquía— será reafirmada por dicho Alto Foro de enfrentarse nuevamente a una situación similar.

Cabe un último comentario en torno a las desacertadas expresiones contenidas en la opinión disidente, referente las mismas a la naturaleza de la división en la votación de los miembros de este Tribunal en el presente caso. La distinción que se intenta hacer es completamente improcedente y carece de todo fundamento jurídico válido. Pretende establecerse una diferencia a base de los conceptos de "meramente dividido" e "igualmente dividido". No existe razón jurídica válida alguna para esa distinción. La doctrina establecida por este Tribunal, siguiendo el precepto constitucional del Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, es a los efectos de que, para declarar una ley inconstitucional, hará falta el voto mayoritario del número total de sus miembros. Esto es, en caso de un empate a nivel de este Tribunal, el decreto de inconstitucionalidad de una ley por parte de un tribunal

inferior no puede prevalecer. Aparte del hecho de que la juridicidad del planteamiento esgrimido en la opinión disidente es, repetimos, altamente cuestionable, por lo que resulta verdaderamente penoso que dicho argumento se perpetúe en las Decisiones de Puerto Rico; el mismo puede causar confusión y una percepción errónea del Derecho aun entre los miembros de la profesión legal; ello constituye un intento fallido y, hasta cierto punto, lastimoso de responsabilizar a otros por las fallas y el fracaso en persuadir y obtener una mayoría para la posición minoritaria errónea que sostienen.

Por las razones antes expresadas es que concurro con el resultado a que se llega en la sentencia mayoritaria emitida, la cual sostiene la constitucionalidad de la Ley de Cierre.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Debido a la naturaleza e importancia de la controversia ante nuestra consideración, hemos decidido expresar nuestra posición mediante este voto concurrente. Aunque reconocemos que la Ley de Cierre parte fundamentalmente de una teoría económica que no comparten algunos sectores comerciales y que, además, muchos consumidores prefieren la conveniencia de comprar durante las horas prohibidas por el estatuto, también somos conscientes de que un numeroso grupo de puertorriqueños endosa sus propósitos y se beneficia de su protección. No nos debe sorprender que las discrepancias legítimas sobre esta ley se reflejen en el Tribunal al examinar su validez constitucional por cuarta vez en este siglo. *El Pueblo v. García & García*, 22 D.P.R. 817 (1915); *García v. Municipio de Humacao*, 57 D.P.R. 532 (1940); *Grand Union Co. v. Giménez Muñoz, Srio. de Justicia*, Sentencia de 30 de junio de 1982.

# I

Al evaluar la controversia presente, es conveniente examinar la experiencia histórica del Tribunal Supremo federal y así evitar utilizar conceptos constitucionales para anular legislación de antigua estirpe simplemente porque discrepemos de la teoría económica que motiva e informa la intervención legislativa.[1] En su famosa opinión disidente, en *Lochner v. New York*, 198 U.S. 45, 75–76 (1905), el Juez Holmes advirtió los peligros de este curso decisorio:

> . . . una Constitución no está proyectada para expresar una particular teoría económica, bien sea de paternalismo y relación orgánica del ciudadano con el Estado o de *laissez faire*. Está hecha para personas de ideas fundamentalmente distintas, y el accidente de hallar ciertas opiniones naturales y familiares o novedosas y hasta chocantes no debe determinar nuestra decisión en torno a si los estatutos que las encarnan están en conflicto con la Constitución . . . . (Traducción nuestra.)

Es por ello que no nos es posible suscribir los criterios expresados en la opinión disidente del Juez Presidente, en la medida que se invoca la cláusula de igual protección de las leyes y se pretende aplicar por primera vez el escrutinio intermedio en el análisis de una legislación económico-social. Mientras ayer los comercios afectados apoyaban su campaña en la libertad contractual del obrero y en la indebida intervención estatal con la propiedad privada, hoy esas empresas reclaman el derecho de unos estudiantes universitarios a trabajar el domingo. Independientemente del nombre que se le quiera dar a este curso de acción, lo que pretenden estas

---

[1] No es éste un caso de interpretación estatutaria destinada a proteger derechos claramente reconocidos por la Constitución del Estado Libre Asociado o por leyes remediales aprobadas por la Asamblea Legislativa con el propósito de garantizar la intención de los autores de nuestra Constitución. *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193 (1988).

entidades es revivir el fantasma de *Lochner v. New York*, supra.

Los valores e intereses en controversia, la ausencia de un reclamo genuino de derechos fundamentales por parte de los supermercados Pueblo y los demandantes y apelados individuales, así como la deferencia que merece la Asamblea Legislativa cuando dirime los conflictos entre diversos sectores del país mediante legislación de carácter socioeconómico, aconsejan prudencialmente una autolimitación al intervenir en asuntos que corresponden más al proceso político que al judicial.[2]

"Por ser las Asambleas Legislativas de los Estados democráticos los cuerpos donde maduran y toman forma las fuerzas sociales latentes u operantes, y donde sólo es posible definir con la necesaria precisión la mayor parte de los elementos que componen y constituyen el llamado fin o interés público, las opciones del legislador en este campo son amplias, siempre y cuando éste se mueva dentro del marco de la Constitución." *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 607–608 (1988). También hemos reconocido "que la doctrina de separación de poderes requiere que los tribunales seamos, si bien vigilantes del cumplimiento con las normas constitucionales, cautelosos cuando se trata de definir el ámbito de un poder frente a otro". Íd., pág. 608.

Declinamos la invitación que nos hacen las empresas afectadas para que revoquemos esta norma tradicional de revisión judicial de legislación socioeconómica. Lo contrario implicaría ignorar la historia tanto del Tribunal Supremo fe-

---

[2] El Prof. John Hart Ely, en su conocida *Democracy and Distrust: A Theory of Judicial Review*, Massachusetts, Harvard University Press, 1980, págs. 4–5, describió el fenómeno de la revisión judicial en los términos siguientes:

"Thus the central function, and it is at the same time the central problem of judicial review: a body that is not elected or otherwise politically responsible in any significant way is telling the people's elected representatives that they cannot govern as they'd like."

deral como la de esta Curia. La vigencia de esta norma es evidente en este caso. Luego de dos (2) años de un profundo análisis de esta controversia de gran trascendencia para todo el país, mediante votación igualmente dividida revocamos el decreto de inconstitucionalidad del Tribunal Superior, Sala de San Juan. Los votos escritos emitidos por los integrantes de este Tribunal reflejan la complejidad de la controversia y la riqueza del debate intelectual que muestran las excelentes comparecencias del Procurador General de Puerto Rico y los supermercados Pueblo.

Con estas notas introductorias, examinemos el origen y el desarrollo de la Ley de Cierre y de legislaciones similares.

## II

Los precedentes históricos de tan compleja materia son antiquísimos. La observancia del domingo y la correspondiente prohibición del trabajo y del comercio en este día anteceden, incluso, al ideario religioso cristiano. Ya el emperador Constantino, en los albores de la civilización occidental, prohibió por edictos el trabajo "en el día venerable del sol". (Traducción nuestra.) *McGowan v. Maryland*, 366 U.S. 420, 470 (1961). Esta tradición, posteriormente atemperada por el sentimiento cristiano, pasó a los merovingios, sajones y luego a los reyes ingleses de los siglos 13 y 14. El período histórico colonial norteamericano recoge esta legislación de claro matiz religioso. J.A. Robilliard, *"No Crime on Sunday?"*, 1980 Crim. L. Rev. 496 (1980); Comentario, *A Critical History of Connecticut Sunday Closing Legislation Since 1955*, 12 Conn. L. Rev. 539 (1980); N.J. Dilloff, *Never on Sunday: The Blue Laws Controversy*, 39 Md. L. Rev. 679 (1980).

Nuestro derecho histórico cuenta igualmente con remotos precedentes. Las Leyes 7ª y 8ª, Tít. I, Lib. I de la *Novísima Recopilación de las Leyes de España*, Madrid, Ed. Boletín Oficial del Estado, 1976, T. I, pág. 3, ordenaban que se santificara "el día del domingo, que no se labre ni se

hagan labores algunas, ni se tengan las tiendas abiertas, y que las justicias del Reino no disimulen trabajar en público los días de fiesta en que no está dispensado poderlo hacer, salvo el caso de ser necesario al tiempo de la recolección de frutos, en el cual deberán pedir al párroco la licencia correspondiente a nombre del vecindario . . .". M. Martínez Alcubilla, *Diccionario de la Administración Española*, 4ta ed., Madrid, 1886, T. IV, pág. 121 *et seq.*

No obstante, en los antiguos Códigos españoles; Fuero Juzgo; Fuero Real; Las Partidas; Ordenamiento de Alcalá, y Nueva Recopilación, no se regula el descanso dominical con el matiz claramente penal que luego adoptaran los ordenamientos contemporáneos. Tampoco la legislación penal española en vigencia al verificarse el cambio de soberanía en el 1898 aborda directamente la materia.[3] El Código Penal español de 1870 —hecho extensivo a Cuba y a Puerto Rico por decreto del Gobierno español de 23 de mayo de 1879— no brinda un sustrato histórico o jurídico a la actual Ley de Cierre. Durante un corto período de tiempo, sólo órdenes militares de limitado alcance tocaron el tema del cierre dominical en la isla. Véase *Laws, Ordinances, Decrees, and Military Orders Having The Force of Law, Effective in Porto Rico, May 1, 1900*, Washington Government Printing Office, 1909, Parte 4, pág. 2479.

La génesis penal del estatuto parte de los trabajos de la Comisión Codificadora de 1901. En su plan y enfoque, dicho primer código es en realidad una copia literal del Código Penal de California de 1873 y de otras leyes norteamericanas. L. Muñoz Morales, *Compendio de legislación puertorriqueña y sus precedentes*, Río Piedras, Junta Editora de la

---

[3] El calendario laboral, la prohibición del trabajo en los días festivos y las exclusiones y excepciones al descanso dominical están regulados minuciosamente hoy en España por decretos y por leyes de claro matiz laboral. Véanse: VII *Aranzadi, Nuevo Diccionario de Legislación* 839–848 (1976), y Aranzadi, *supra*, V Apéndice 1975–1985, págs. 1272–1273 (1987).

U.P.R., 1948, pág. 121; Informe sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por el Comité Laboral, septiembre de 1974, pág. 16.

Sin caer en extremas hipótesis pesimistas sobre un posible deterioro social, fruto de la apertura dominical, ni en un enfoque costumbrista de la actual sociedad puertorriqueña, la investigación histórica, tan elementalmente esquematizada en los párrafos que anteceden, demuestra que por diversos motivos desde el principio de siglo el legislador puertorriqueño ha creído necesario reglamentar la apertura y el cierre de los establecimientos comerciales.

No es un secreto para nadie que a través de la historia nuestra legislación dominical fue perdiendo su primer acento religioso. La evolución jurisprudencial así lo demuestra. Véanse: *El Pueblo v. García & García*, supra; *García v. Municipio de Humacao*, supra; *Sierra Com. v. Tribl. de Distrito*, 74 D.P.R. 89 (1952); *Srio. del Trabajo v. Grand Union de P.R.*, 93 D.P.R. 720 (1966). Simultáneamente con el cambio gradual en el enfoque —de uno primordialmente religioso a otro de índole más secular— se transformó el espíritu del conflicto. Actualmente la jurisprudencia ha desembocado en un análisis de las cláusulas del debido proceso de ley y de la igual protección de las leyes. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; Emda. XIV, Sec. 1, Const. E.U., L.P.R.A., Tomo 1; Comentario, *Validity, Construction, and Effect of "Sunday Closing" or "Blue" Laws—Modern Status*, 10 A.L.R.4th 230 (1981).

Este estatuto, tal y como hoy lo conocemos, representa un producto sociológico de incesante y ajustada adecuación a las vivencias de un Puerto Rico que, aunque deseoso de preservar sus costumbres, se encuentra inevitablemente conmovido por las transformaciones ocurridas en el orden económico durante las últimas décadas. Actualmente el énfasis recae en los conceptos de *descanso mínimo semanal, recreación, entretenimiento* y, en fin, en arraigadas costumbres

que observan los puertorriqueños de todos los sectores sociales. *Esta realidad en ocasiones es más cierta en la práctica que en los textos legales. No hay que recurrir a las estadísticas para concluir lo obvio.* Miles de familias puertorriqueñas aprovechan este período de descanso común para disfrutar de las playas, merendar en los parques, visitar a sus amigos y parientes, acudir a los servicios religiosos, participar en actividades atléticas y recreativas, escuchar la música de su predilección o dialogar sobre los últimos desarrollos ocurridos en la vida pública. Un vistazo a nuestro ordenamiento público global demuestra que el Legislador le reconoce al domingo cualidades de festejo oficial y colectivo que lo distinguen. Art. 387 del Código Político, 1 L.P.R.A. sec. 71. Ante esta realidad, la función judicial debe atemperarse, sin claudicar, de modo que logre una mayor comprensión de las necesidades y fenómenos que animan el proceso legislativo.

Situados en este terreno, sólo resta analizar si el Tribunal Superior, Sala de San Juan, incurrió en error al resolver que la Ley de Cierre, Art. 553 del Código Penal de 1937 (33 L.P.R.A. sec. 2201), es inconstitucional.

### III

En una justa perspectiva, la Ley de Cierre no es más que un estatuto que reglamenta el horario de funcionamiento de determinadas actividades económicas y permite a la fuerza laboral puertorriqueña disfrutar de unos períodos de descanso común luego de las horas de trabajo. Ampliado en sus contornos el enfoque, se trata de una ley con propósitos económicos y sociales que tiene el efecto de limitar el uso de la propiedad de los establecimientos comerciales y proteger al trabajador de prácticas laborales abusivas.

De entrada, una lectura desapasionada de los excelentes alegatos de las partes, las extensas opiniones de los compañeros Jueces y el estudio del derecho vigente nos convencen que la Ley de Cierre no afecta de forma impermisible el de-

recho de los codemandantes y apelados —trabajadores— a seleccionar de forma libre su ocupación. Con candidez ejemplar, la propia opinión disidente acepta esta premisa. Tampoco interfiere con el derecho de los demandantes y apelados a negociar colectivamente.

Bajo la teoría propuesta en el disenso, prácticamente cualquier reglamentación económica que afecte la remuneración de un empleado estaría sujeta a un ataque de índole constitucional. Pensemos en las leyes de salario mínimo, leyes fiscales, ambientales, etc. ¿Podría reclamar su derecho al trabajo aquella persona que vea su jornada de trabajo mermada o, incluso, su empleo perdido por los efectos económicos de determinada ley?

Ante este tipo de legislación, que regula la actividad económica y social, los tribunales actúan con deferencia a las determinaciones de la Rama Legislativa. A estos efectos se ha elaborado un escrutinio que, sin constituir una abdicación de nuestra función constitucional, garantiza el debido respeto al proceso político. Cuando se trata de la evaluación constitucional de estatutos que, como el presente, imponen limitaciones al uso de la propiedad o establecen clasificaciones por razones económicas, el diseño legislativo viene acompañado de una presunción de racionalidad que sólo puede ser refutada por prueba clara de arbitrariedad e irrazonabilidad. *Salas v. Municipio de Moca*, 119 D.P.R. 625 (1987); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984); L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1443 *et seq.*; R.C. Farrell, *Equal Protection: Overinclusive Classifications and Individual Rights*, 41 Ark. L. Rev. 1 (1988). En otras palabras, en caso de legislación de tipo económico o social el análisis tradicional, tanto bajo la cláusula de igual protección de las leyes como bajo la de debido proceso de ley, sólo requiere que la clasificación no sea arbitraria y que la misma guarde

un nexo racional con algún propósito gubernamental legítimo. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *Vélez v. Srio. de Justicia*, supra, pág. 538; R. Rotunda, J. Nowak y N. Young, *Treatise on Constitutional Law, Substance and Procedure*, 2da ed., Minnesota, West Publishing Co., 1984, Secs. 18.3 y 18.42–18.46; Tribe, *op. cit.*, Sec. 16-2. Véanse, también: J. Tussman y J. Ten Broek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 363 (1949); G. Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1971). Bajo este tipo de escrutinio hemos reconocido que el Estado tiene amplia facultad para clasificar por razones económicas y sociales, siempre que dichas clasificaciones no estén fundadas en criterios ilegítimos o sean arbitrarias de su faz o en su aplicación. *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980); *Coca-Cola Bottling Co. v. Srio. de Hacienda*, 112 D.P.R. 707 (1982).

Desde esta perspectiva jurídica, la Ley de Cierre cumple con todos los requisitos de la igual protección de las leyes. Un estudio de los documentos y testimonios relativos a los trabajos de preparación de la Ley Núm. 100 de 4 de junio de 1983 —última enmienda formal a la Ley de Cierre— arroja valiosa información de necesaria incidencia sobre el análisis constitucional de tan controversial legislación. El historial de esta enmienda, aprobado después de nuestra decisión en 1982, revela que la Asamblea Legislativa evaluó las distintas posiciones en conflicto y formuló unos cambios para lograr un equilibrio legítimo de los intereses de todos los sectores encontrados.

El análisis de los documentos y el debate originado en torno al P. de la C. 678, que se convirtió en la Ley Núm. 100, *supra,* es incompatible con las nociones de arbitrariedad e irrazonabilidad que la opinión disidente trata de comunicar. No nos impresiona el argumento de que las numerosas en-

miendas que ha sufrido la ley han dado paso a un diseño caprichoso. En ocasiones, así opera el proceso legislativo al elaborar fórmulas que reflejan el consenso social y protegen derechos adquiridos por los ciudadanos a través de varios siglos. En asuntos tan complejos no podemos esperar que la Asamblea Legislativa actúe con precisión matemática. A menudo, los problemas que se intentan solucionar con legislación como ésta son de índole práctica y requieren legislación de consenso. Véase *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911).

La Asamblea Legislativa en esta última ocasión partió de una premisa realista: "Reconocemos que las enmiendas propuestas no satisfacen los diversos criterios expresados en las vistas públicas celebradas para escuchar a la ciudadanía respecto de la problemática generada por el debate que ha tenido lugar en nuestra comunidad en torno de esta cuestión". Informe Comisión de lo Jurídico del Senado, previo estudio y consideración del P. de la C. 678, de 14 de abril de 1983, pág. 2.

De acuerdo con el Informe Conjunto de las Comisiones de Comercio e Industria, de lo Jurídico Penal y de Asuntos del Consumidor de 5 de abril de 1983, la Legislatura entendió necesario:

... mantener los comercios sujetos a la Ley de Cierre cerrados durante el domingo y disponer un horario más flexible para estos establecimientos durante ciertos días de la semana que permita que el consumidor realice sus compras durante un periodo más prolongado. Después de ponderar los argumentos presentados ante estas Comisiones, existe el convencimiento de que si se liberaliza la ley en forma desmedida, los grandes establecimientos podrán beneficiarse como resultado de un aumento en sus operaciones. Por otro lado, entendemos que para los comercios pequeños y medianos el horario extendido aumentará el costo de operación, particularmente en los renglones de nómina, electricidad y seguridad. Con toda probabilidad este aumento en el costo de operación no guardará

proporción con el aumento en ventas produciéndose un balance negativo y su posible desaparición.

De producirse estos efectos adversos, ello producirá un aumento en precios para el consumidor lo que agravará la situación de muchas familias puertorriqueñas, y en especial, la de aquellas más necesitadas.

Por las consideraciones anteriores, se recomienda extender el horario de venta al público de los establecimientos comerciales hasta las 8:00 P.M. de lunes a sábado y mantener el horario del viernes hasta las 9:00 P.M. y el cierre de los establecimientos durante el día domingo y los otros días de fiesta legal. Íd., págs. 7–8.

Dicho historial revela igualmente que la determinación fue el producto del arbitraje juicioso de todos los intereses económicos y sociales en pugna. Entre las entidades que comparecieron a deponer figuran: el Arzobispado de San Juan de la Iglesia Católica, Apostólica y Romana; el Concilio Evangélico de Puerto Rico; la Asociación de Industriales de Puerto Rico; la cadena de supermercados Pueblo; representantes de consumidores y de la fuerza trabajadora; grupos profesionales, así como colegios, y varios representantes (secretarios) de Departamentos y Agencias del Gobierno. Informe de la Comisión de lo Jurídico del Senado, *supra*, pág. 4.

Vuestras comisiones cursaron invitación a deponer al público en general, a los representantes de las agencias gubernamentales concernidas en la materia, a todos los niveles del sector comercial, al sector industrial, a grupos de consumidores y a todos los representantes de las distintas iglesias. Estas Comisiones han tenido el beneficio de los testimonios orales y las comparecencias escritas de todos estos deponentes quienes pudieron expresar sus puntos de vista[,] someter estudios, resultados de encuestas de opinión pública y otros documentos tanto en las audiencias que tuvieron lugar en el Capitolio como en las que se celebraron en otros puntos de la Isla. Íd., pág. 6.

Cediendo a las sugerencias del sector comercial, la Asamblea Legislativa extendió a dos (2) horas el período de tiempo en que los establecimientos pueden realizar trabajos luego de cerrados al público. Por último, la Legislatura entendió necesario autorizar la apertura de los comercios situados en las zonas turísticas, "a fin de promover esa industria que es baluarte fundamental de nuestro desarrollo económico". Informe de la Comisión de lo Jurídico del Senado, *supra*, pág. 3.

El debate legislativo es igualmente ilustrativo. Es precisamente la introducción de este "elemento liberalizador", así como la determinación de "flexibilizar la ley", lo que propició una fórmula legislativa de consenso. Al mismo tiempo dicho cuerpo, lejos de mostrarse insensible a los cambios en los patrones comunitarios, dejó abiertas las puertas para ejercer en un futuro sus prerrogativas legislativas de ser necesario. XXXVII Diario de Sesiones de la Asamblea Legislativa (Senado), Núm. 38, pág. 3197 (1983).

Las expresiones en el hemiciclo fueron de diversa índole. Algunos Legisladores realzaron, más que los criterios económicos del estatuto, aquellos relacionados con la "unidad", "tradición", "valores" y "conservación de un clima donde se pueda[n] mantener, enriquecer nuestras tradiciones y nuestra cultura". Diario de Sesiones, *supra*, pág. 3193. Otros miembros interesados en los aspectos puramente relacionados con la reglamentación económica orientaron el debate en esas áreas. Íd., pág. 3187.

El Senador señor Rivera Ortiz describió el proceso que culminó con la aprobación del P. de la C. 678 de la forma siguiente:

> Esto es una medida, señor Presidente, que nace esencialmente de la problemática que ha surgido con relación a la Ley de Cierre en Puerto Rico, en el transcurso de los últimos meses. Debo decirle que de iniciativa legislativa en la Cámara de Representantes se radicó un Proyecto el 16 de noviembre

de [1982], por el compañero Jarabo, que este proyecto que estamos considerando, Proyecto de la Cámara 678 y que después el 18 de enero de [1983], viene de Administración un Proyecto que es básicamente el mismo, prácticamente copiado. . . .

[¿]Qué es lo que pretende esta legislación? Señor Presidente, esta legislación sencillamente lo que inserta [son] unas enmiendas, básicamente tres, una que permite que los establecimientos comerciales puedan estar abiertos de lunes a sábado hasta las nueve de la noche (9:00 p.m.). Esto le daría una oportunidad adicional a los consumidores, especialmente a los consumidores que tienen trabajo todo el día, de que por la noche, en horas de más tranquilidad puedan ellos concurrir a los diferentes negocios para comprar sus alimentos o cualquier otra mercancía que estimen conveniente.

. . . . . . . .

Y esencialmente, tal y como había señalado el compañero Mickey Miranda, se sostiene a través de esta legislación, mantener el domingo como un día de asueto y de dedicación a aquellos valores espirituales más elevados que pueda tener nuestra gente . . . . ME PARECE QUE ES UN PUNTO INTERMEDIO, REALMENTE ENTRE L[O] QUE QUERÍAN UNOS Y QUERÍAN OTROS. (Mayúsculas nuestras.) Diario de Sesiones, *supra*, págs. 3199–3201.

No hace falta escudriñar mucho más el pensamiento del legislador. No se puede imputar a la Legislatura en este caso falta de previsión. Actuó abiertamente y tomó posición razonable en un asunto ampliamente debatido en ese cuerpo. Es innegable que la Ley de Cierre persigue propósitos más amplios que el de meramente garantizar un día de descanso colectivo. De acuerdo con los informes de comisiones antes examinados, la Legislatura tuvo también como finalidad —equivocadamente o no— lograr cierto equilibrio económico en beneficio del pequeño y mediano comerciante. Cada una de las excepciones del estatuto está justificada por razones de interés público. La conclusión que se impone es que los demandantes y apelados no rebatieron la presunción de constitucionalidad de la Ley de Cierre.

A pesar de la ventaja que podrían obtener muchos consumidores a corto plazo con la fórmula adjudicativa propuesta por la opinión disidente, no puedo endosar la utilización del derecho al trabajo para favorecer la posición patronal. Este curso decisorio sería injusto para los trabajadores que perderán la protección de la ley y podría constituir el principio y gérmen de la eliminación de otras leyes sociales que le han servido bien al país.

Aunque aceptamos que el derecho al trabajo tiene una importancia singular en nuestro ordenamiento constitucional y que hay ciertos intereses que podrían justificar la aplicación del escrutinio intermedio,(4) la solución de justicia al problema identificado por la opinión disidente no es la total derogación de los beneficios concedidos a los trabajadores por esta legislación. Todo lo contrario, si la ley contiene unas excepciones que son arbitrarias, lo que procede en estricto derecho es que las invalidemos y ampliemos el alcance de la ley para proteger a más trabajadores. Lo más justo para la clase trabajadora sería extender la protección del estatuto para que así más obreros puedan disfrutar de un período de descanso común junto a sus familias.

Sin embargo, es la Asamblea Legislativa el foro apropiado para dilucidar estos conflictos y nuevamente actualizar la Ley de Cierre a la luz de la experiencia reciente. Nuestra decisión no impide que dicho cuerpo, en su próxima sesión ordinaria, atienda los reclamos de los supermercados y los consumidores relacionados con esta controversial legislación.

---

(4) Véanse: F.I. Michelman, *On Protecting the Poor Through the Fourteenth Amendment*, 83 Harv. L. Rev. 7 (1969); J. Rawls, *A Theory of Justice*, Massachusetts, Belknap Press of Harv. Univ. Press, 1971.

—O—

Opinión disidente emitida por el Juez Presidente Señor Pons Núñez, a la cual se unen los Jueces Asociados Señores Ortiz y Alonso Alonso.

La demandante y apelada en el caso de autos, Pueblo International, Inc. (en adelante Pueblo), es una corporación dedicada al expendio de comestibles, productos del hogar y otros artículos al por menor. Comparece en este caso por sí y en representación de aquellos establecimientos comerciales de ventas al por menor igualmente situados. En virtud de ello, solicitó que fuera certificada su acción como una de clase al amparo de la Regla 20 de Procedimiento Civil, 32 L.P.R.A. Ap. III, a lo cual accedió el tribunal sentenciador. También figuran como demandantes seis (6) empleados de esa corporación en su carácter personal.[1] Como interventores en apoyo de la posición de los demandantes y apelados han comparecido ISAACAR, Inc., corporación dedicada a la venta de productos al por menor (supermercado), y la Liga de Mujeres Votantes, Inc., en calidad de *amicus curiae*.

Estas personas y entidades favorecen que el estatuto conocido como Ley de Cierre, 33 L.P.R.A. secs. 2201–2203, sea declarado inconstitucional, toda vez que alegan que les infringe sus derechos bajo la Constitución del Estado Libre Asociado de Puerto Rico y la de Estados Unidos, al privarles

---

[1] Aunque la Ley de Cierre, por ser de carácter penal, a quienes directamente afecta es a los establecimientos comerciales contra los cuales únicamente se pueda aplicar la misma, la participación de estos trabajadores en el pleito como demandantes es procedente, puesto que ellos resultan también directamente afectados por la implantación de esta ley contra las empresas para las que trabajan. Igualmente, resultan adversa y directamente afectados los trabajadores representados por Pueblo International, Inc. (en adelante Pueblo), aunque la ley no se aplique directamente a ellos. En cuanto a dichos empleados, sus intereses accionables en este caso coinciden con los de Pueblo. Véanse: *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

de la igual protección de las leyes y del debido proceso de ley. A los fines de alcanzar este objetivo, presentaron recurso de *injunction* permanente y sentencia declaratoria en el Tribunal Superior, Sala de San Juan, así como un *injunction* preliminar y entredicho provisional como remedios interlocutorios.

Figuran como demandados en el caso el Hon. Héctor Rivera Cruz, Secretario de Justicia; el Lcdo. Carlos J. López Feliciano, Superintendente de la Policía, y el Lcdo. Federico Cedó Alzamora, Director de la Oficina de Asuntos Monopolísticos del Departamento de Justicia. Como interventores para favorecer la vigencia y constitucionalidad de la ley se unieron a los demandados la Asociación de Mayoristas, Importadores y Detallistas de Alimentos de Puerto Rico, Inc. (M.I.D.A.), el Centro Unido de Detallistas de Puerto Rico y el Comité Pro Ley de Cierre, en representación de empleados de varios centros comerciales del área metropolitana. Este último solicitó que su intervención fuera certificada como una acción de clase en la que se acumularan todos los trabajadores puertorriqueños que favorezcan la Ley de Cierre. En esta ocasión, el tribunal declinó acoger tal pedido por considerar que no se cumplía con los requisitos de la Regla 20 de Procedimiento Civil, *supra*.

Mediante estipulación de las partes, se acordó que tanto la vista del entredicho provisional ·como la del *injunction* preliminar se convertirían en el juicio en su fondo. Este procedimiento se prolongó por espacio de dos (2) semanas. El 25 de junio de 1986, el Hon. Abner Limardo, Juez Superior, emitió una sentencia que declaraba inconstitucional la Ley de Cierre por infringir el derecho de los demandantes a la igual protección de las leyes y al debido proceso de ley. En cuanto a los trabajadores demandantes, determinó que la misma violentaba su derecho al trabajo, según reconocido en *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414 (1985), y en *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791 (1973). En conse-

cuencia, procedió a declarar con lugar el *injunction* permanente que prohibía a los demandados la ejecución de la ley y del Reglamento sobre Competencia Justa promulgado al amparo de la legislación monopolística.

De esa sentencia es que han recurrido los demandados ante este Tribunal mediante apelación, toda vez que alegan que el caso entraña una cuestión constitucional substancial.

## I

Los hechos inmediatos[2] que dieron lugar a este pleito se configuran a partir de 25 de septiembre de 1985, cuando el Tribunal Superior, Sala de San Juan, determinó en *Pueblo v. Giménez Muñoz* —Civil Núm. 80-6454 (908)— que no existía mandato de ley suficiente que obligara al demandado (Pueblo) al cierre de sus establecimientos, puesto que el Estado no había promulgado aún el reglamento para designar zonas turísticas requerido por la Ley Núm. 100 de 4 de junio de 1983.[3] Dicha sentencia advino final y firme sin que se hubiera aprobado el reglamento.

El 9 de marzo de 1986 miembros de la Policía de Puerto Rico y del Negociado de Investigaciones Especiales del Departamento de Justicia irrumpieron en diecinueve (19) de los treinta y cuatro (34) supermercados del demandante, tomaron fotos, interrogaron gerentes y amenazaron con "emplazar" a Pueblo por abrir los domingos. Posteriormente, el 25 de marzo de 1986, aparecieron en la prensa del país declaraciones de representantes del Departamento de Justicia a los efectos de que en lo sucesivo habrían de poner en vigor la Ley de Cierre. A las 6:30 P.M. de ese mismo día, el Secretario

---

[2] Desde 1979 varios establecimientos comerciales cubiertos por la Ley de Cierre habían comenzado a abrir los domingos. El período comprendido desde esa fecha hasta el presente se ha caracterizado por diversos litigios en los que se impugnó la constitucionalidad de dicha ley.

[3] La Ley Núm. 100 de 4 de junio de 1983 exime a los establecimientos comerciales situados en dichas zonas de las disposiciones de la Ley de Cierre.

de Justicia, a través de dos (2) de sus abogados, entregó a Pueblo una comunicación oficial en la que informaba lo ya declarado a la prensa. Al mismo tiempo le apercibía de que debía mantener cerrados sus establecimientos en los días y en las horas prohibidas por la ley. Igual comunicación cursó a la interventora ISAACAR, Inc.

El domingo siguiente a este incidente, Pueblo mantuvo cerrados sus supermercados al público. Sin embargo, el 2 de abril de 1986 acudió nuevamente al Tribunal Superior, Sala de San Juan, para solicitar, al amparo de la Regla 56 de Procedimiento Civil, 32 L.P.R.A. Ap. III, sobre remedios provisionales, que se hiciera efectiva la Sentencia de 25 de septiembre de 1985 y se ordenara a los demandados abstenerse de aplicarles la Ley de Cierre. El tribunal de instancia, al día siguiente, 3 de abril de 1986, sin la celebración de vista previa, declaró con lugar el pedido y reiteró lo decidido en la Sentencia de 25 de septiembre.

Inconforme el Estado con esta determinación, acudió ante este Tribunal mediante *certiorari* (CE-86-209) para solicitar que se dejara sin efecto la aludida orden. El 25 de abril de 1986 expedimos el auto y dejamos sin efecto la orden con instrucciones de que, previa la celebración de vista y oídas todas las partes, se pronunciare entonces el Tribunal como en derecho procediera.

En cumplimiento de lo ordenado por este Tribunal el 25 de abril de 1986 y superado un incidente de recusación promovida por el Secretario de Justicia contra el Juez que presidía el caso, Hon. Guillermo Arbona Lago,[4] emitió el Tribunal a quo una resolución el 21 de mayo de 1986 que puso fin a esta controversia. En ella se decidió que, dado que no podía ser ejecutada en esa fecha la Sentencia de 25 de septiembre de 1986, debido a que se había promulgado ya el reglamento

---

[4] Esa recusación fue desestimada y el caso fue devuelto a la Sala del Juez Hon. Guillermo Arbona Lago.

el 17 de abril de 1986, se desestimarían todas las alegaciones y escritos presentados en el caso sin perjuicio de que pudieran ser presentadas o formuladas en cualquier otra causa ante un tribunal con jurisdicción y competencia. El 23 de mayo de 1986 se presentó ante el Tribunal Superior, Sala de San Juan, el caso que ahora nos ocupa.

Al emitir su sentencia el 25 de junio de 1986 el Tribunal a quo descansó, entre otras, en las conclusiones de hecho siguientes:

1. Pueblo emplea 4,500 empleados, 4,000 de los cuales se desempeñan en las tiendas. De esos 4,000, el 70% —unos 2,800— son jóvenes estudiantes universitarios y de escuela superior de toda la isla, empleados a tarea parcial en sus diferentes tiendas. Del total indicado de jóvenes trabajadores, no menos del 80%, es decir, unos 2,240 estudiantes, trabajan los domingos. La inmensa mayoría sólo trabaja este día o entre viernes y domingo.

2. Otros competidores de Pueblo, como Supermercados Amigo, de 1,588 empleados, 1,019 —64%— son jóvenes estudiantes a tiempo parcial. En los Supermercados Grande este grupo representa el 60%.

3. Los empleados regulares de Pueblo trabajan un horario de 40 horas semanales durante 5 días de la semana.

4. Por disposición del convenio colectivo vigente, el personal que labora los domingos recibe paga a tiempo doble.

5. El cierre dominical representa la pérdida de sus empleos para 1,320 estudiantes universitarios que trabajan únicamente los domingos; esto es, el 88% del total de este grupo de empleados. Para el resto de los jóvenes que trabajan otros días a la semana significa una reducción de la mitad de sus salarios.

6. La vigencia de la Ley de Cierre representa para el agregado de empleados que laboran los domingos en establecimientos no exentos de la ley, la pérdida de $90 millones al

año. Los mismos calculadores de ingresos indican que esa cifra representará, a su vez, una pérdida directa en jornales para la economía de Puerto Rico de unos $190.1 millones al año. El impacto descrito tiene también consecuencias sobre la tasa de desempleo que, entre los jóvenes de 16 a 24, alcanza el 45% del total de la fuerza obrera que no está trabajando.

7. El mantener cerrados sus establecimientos al público los domingos representa para Pueblo, en particular, una pérdida neta en ventas al año de $600,000. En vista de eso se vería obligada a despedir unos 400 empleados a través de sus distintas tiendas.(5)

8. De la fuerza laboral total de Puerto Rico compuesta de 758,000 personas, 663,500, es decir, el 87.5% está exenta de los efectos de la Ley de Cierre. Sólo 94,500 personas, o el 12.5%, están cubiertos por ella. En ese 87.5% no se consideró el incremento que pueda surgir con la creación de nuevas zonas turísticas.

9. Con miras a establecer un posible impacto sobre la competencia entre grandes y pequeños comerciantes, se pasó prueba acerca del gran número de quiebras durante los años de 1978 a 1983. La prueba, sin embargo, demostró que entre esos años hubo un incremento en las quiebras, tanto de negocios exentos como de los no exentos de la ley. No se puede concluir que sean atribuibles las mismas a la competencia mercantil derivada de la apertura dominical en violación a la Ley de Cierre. Éstas tuvieron lugar, no sólo en negocios de comestibles, sino en todas las ramas del comercio. Se debieron principalmente a la difícil situación económica por la que atravesó Puerto Rico en ese tiempo, en el que

---

(5) Esta cantidad puede reducirse de prevalecer la Ley de Cierre, puesto que parte de la clientela se desplazaría a los demás días de la semana. Sin embargo, de las determinaciones de hecho surge que por distintas razones, entre ellas la alta incidencia criminal y las preferencias de las amas de casa de permanecer durante las noches en el hogar, podría limitarse ese desplazamiento.

ocurrió la caída más abrupta de la economía desde el período de la postguerra, particularmente entre 1980 a 1982. Entre otros factores que contribuyeron con singular importancia en esas quiebras están el cambio de cupones de alimentos a cheques por el programa federal de asistencia pública para el caso de los negocios de venta al detal de comestibles y la gran flexibilización de la nueva Ley de Quiebras que hizo posible el incremento en la radicación de peticiones de quiebras.[6]

## II

La Ley de Cierre es un estatuto de larga historia en Puerto Rico. Fue aprobada el 10 de febrero de 1902 y entró en vigor el 1ro de marzo de ese mismo año. Por disposición de la ley que proveía la compilación, la reordenación y la publicación de los códigos y de otras leyes de 1ro de marzo de 1902, los artículos de la Ley de Cierre fueron incorporados al Código Penal que recién se aprobaba[7] y así ha permanecido hasta el presente.

El propósito de esta legislación, según surge del Art. 1 de la Ley Núm. 78, Exposición de Motivos de la enmienda de 13 de junio de 1953, fue "conceder, mediante el cierre a ciertas horas en días laborales, domingos y días de fiestas legales, un descanso necesario a los hombres y mujeres que laboraban en establecimientos comerciales e industriales del país durante una época en que las jornadas de trabajo excedían

---

[6] Hemos resuelto consistentemente que no alteraremos las conclusiones que sobre los hechos hiciera el tribunal sentenciador, salvo circunstancias extraordinarias, tales como error manifiesto en la apreciación de la prueba o cuando hay fundamento en los autos para concluir que el tribunal actuó movido por pasión, prejuicio o parcialidad. *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9, 19 (1982); *Torres Pérez v. Colón García*, 105 D.P.R. 616, 624 (1977); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 946 (1975).

[7] *Compilación de los estatutos revisados y códigos de Puerto Rico* de 11 de marzo de 1913, San Juan, Ed. Secretaría de P.R., 1913, pág. 994 n. 1.

de ocho horas al día y no percibían los empleados de esos establecimientos compensación alguna por horas extraordinarias". 1953 Leyes de Puerto Rico 269, 271. Véanse: *Vélez v. Municipio de Toa Baja*, 109 D.P.R. 369, 377 (1980); Op. Sec. Just. Núm. 1955–4.

A medida que ha transcurrido el tiempo, esta ley ha sido objeto de numerosas enmiendas (24 en total) dirigidas en su gran mayoría a excluir de su aplicación una enorme cantidad de establecimientos. Al presente contiene alrededor de cuarenta (40) excepciones, algunas de las cuales son sumamente amplias. Véanse, por ejemplo, las excepciones de los incisos (10), (13) y (14) de 33 L.P.R.A. sec. 2201.[8] Esa tendencia de exclusión, a su vez, contribuye a que el 87.5% de la fuerza laboral puertorriqueña esté fuera del alcance de esta ley y que sólo alrededor de un 12.5% quede sujeta a la misma. Determinaciones de hecho del Tribunal a quo, pág. 18.[9] Esta

---

[8] Estas excepciones disponen lo siguiente:

"(10) Los establecimientos que tuvieren que realizar trabajos urgentes o necesarios para evitar peligro o considerables pérdidas de dinero y que hubieren obtenido el correspondiente permiso de acuerdo con lo que disponen l[a]s secs. 289 y 290 del Título 29.

. . . . . . . . .

"(13) Los establecimientos comerciales que por naturaleza de su actividad principal necesitan mantener unos sistemas de operación continua.

. . . . . . . . .

"(14) Los establecimientos comerciales que se hallan ubicados en la zona turística del Viejo San Juan, o en cualesquiera otras zonas así designadas por la Junta de Planificación o por la autoridad u organismo competente, según los criterios que para la designación de zonas turísticas han sido establecidos por las leyes vigentes, dedicados predominantemente a la venta de artículos o servicios de interés turístico, según así los defina por Reglamento el Departamento de Comercio, disponiéndose que si cualquier disposición de esta ley o su aplicación fuese declarada nula o inconstitucional, tal determinación no afectará las otras disposiciones de las secs. 2201 y 2202 de este título." 33 L.P.R.A. sec. 2201(10), (13) y (14).

[9] Es pertinente considerar el porcentaje de empleados obligados por esta ley, a fin de examinar su justificación y razonabilidad, puesto que *dos (2) de los tres (3) propósitos atribuidos por los demandados a la misma se refieren a los trabajadores.*

última cifra podría ser incluso menor, como más adelante indicaremos.

A través de sus muchos años de vigencia, la constitucionalidad de este estatuto ha sido impugnada ante este Tribunal en tres (3) ocasiones. En todas ellas hemos sostenido su validez.[10] Es de rigor mencionar que en Estados Unidos la validez constitucional de legislaciones similares a la nuestra también ha sido sostenida por varios tribunales estatales mediante el uso de un escrutinio deferencial o racional. Véanse, por ejemplo: *Harry's Hardware, Inc. v. Parsons*, 410 So. 2d 735 (La. 1982); *Com. v. Franklin Fruit Co., Inc.*, 446 N.E.2d 63 (Mass. 1983); *Rothe v. S-N-Go Stores, Inc.*, 308 N.W.2d 872 (N.D. 1981); *Ex parte Robbins*, 661 S.W.2d 740 (Tex. 1983). Igualmente, el Tribunal Supremo de EE.UU., en *McGowan v. Maryland*, 366 U.S. 420 (1961), tuvo ocasión de examinar la constitucionalidad de una ley parecida del estado de Maryland que había sido impugnada bajo la Constitución federal. El más Alto Foro estadounidense decretó su constitucionalidad bajo el escrutinio tradicional, puesto que consideró que los derechos invocados eran de naturaleza económica. Se esgrimió en este caso, además, un planteamiento de separación de Iglesia y Estado que no prosperó.

No obstante lo señalado, aun con posterioridad al caso de *McGowan v. Maryland*, supra, numerosos tribunales de

---

(10) *El Pueblo v. García & García*, 22 D.P.R. 817 (1915); *García v. Municipio de Humacao*, 57 D.P.R. 532 (1940), y *Grand Union Co. v. Giménez Muñoz, Srio. de Justicia*, Sentencia de 30 de junio de 1982. Cabe señalar que, dado que este último caso se resolvió por sentencia, no constituye precedente y, por tanto, no nos obliga. *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74 (1987). Los dos primeros casos tampoco nos obligan, puesto que no estuvieron planteados en los mismos los fundamentos constitucionales que el caso en cuestión presenta y, además, responden a circunstancias sociales, históricas y económicas distintas, lo cual nos permite reexaminar la validez constitucional de esta ley en las circunstancias presentes. Véanse: *Am. Railroad Co. v. Comisión Industrial*, 61 D.P.R. 314, 326 (1943); *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692, 696–697 (1979); R. Kelso, *Studying Law: An Introduction*, Minnesota, Ed. West Publishing Co., 1984, págs. 82–99.

EE.UU. estatales han declarado inconstitucionales, bajo distintos escrutinios constitucionales, legislaciones de cierre como la que nos ocupa. Véanse por ejemplo, entre otros: *State v. Ludlow Supermarkets, Inc.*, 448 A.2d 791 (Vt. 1982); *State v. Shop and Save Food Markets, Inc.*, 415 A.2d 235 (Vt. 1980); *Caldor's, Inc. v. Bedding Barn, Inc.*, 417 A.2d 343 (Conn. 1979); *Kroger Co. v. O'Hara Township*, 366 A.2d 254 (Pa. 1976); *Twin Fair Distributors Corp. v. Cosgrove*, 380 N.Y.S.2d 933 (N.Y. 1976); *Piggly-Wiggly of Jacksonville v. Jacksonville*, 336 So. 2d 1078 (Ala. 1976); *Rutledge v. Gaylord's, Inc.*, 213 S.E.2d 626 (Ga. 1975); *Millikan v. Jensen*, 281 N.E.2d 401 (Ill. App. 1972); *State v. Greenwood*, 187 S.E.2d 8 (N.C. 1972); *Spartan's Industries, Inc. v. Oklahoma City*, 498 P.2d 399 (Okl. 1972); *Skaggs Drug Centers, Inc. v. Ashley*, 484 P.2d 723 (Utah 1971); *Dunbar v. Hoffman*, 468 P.2d 742 (Colo. 1970); *West v. Winnsboro*, 211 So. 2d 665 (La. 1968).

Respecto a nuestra ley es importante notar que a tan sólo unos años del último pronunciamiento de este Tribunal en *Grand Union Co. v. Giménez Muñoz, Srio. de Justicia*, Sentencia de 30 de junio de 1982, ésta ha vuelto a ser objeto de controversia pública, al extremo de que hoy se ocupa nuevamente nuestra atención con un planteamiento similar. De ahí que resulta absolutamente necesario poner fin a este dilema, el cual incide adversamente en el bienestar económico y social de Puerto Rico.

## III

Aducen los demandantes apelados e interventores que esta ley violenta su derecho constitucional a un debido proceso de ley, en vista de que les impide, sin razonable justificación, el pleno disfrute de la propiedad y menoscaba la libertad de hacer negocios en los días y horas que estimen convenientes. También señalan que conculca su derecho a la igual protección de las leyes, puesto que la actividad que a ellos

prohíbe, a otras personas y entidades comerciales igualmente situadas se les permite, lo cual bajo nuestro ordenamiento constitucional constituye una clasificación arbitraria e injustificada.

Por su parte, los trabajadores demandantes y apelados arguyen que esta ley vulnera su derecho al trabajo, esto es, "a devengar ingresos y a tener una vida justa y decente", según ha sido interpretado por nuestra jurisprudencia. *Amy v. Adm. Deporte Hípico*, supra, pág. 421. Véase *Ortiz Cruz v. Junta Hípica*, supra. Sostienen ellos que la ejecución de esta ley habrá de limitar los horarios de trabajo en los establecimientos para los cuales trabajan, provocando una merma significativa en sus salarios, sobre todo considerando que en los convenios colectivos se puede disponer paga doble para los trabajadores que laboran los domingos, como se dispone en el contrato existente entre Pueblo y sus empleados para cuando se labora los domingos. Plantean, además, que dicha ley lesiona su derecho a la igual protección de las leyes y al debido proceso de ley, en vista de que limita su libertad para trabajar cuando lo estimen necesario o conveniente, afecta su interés propietario al reducir sus ingresos y establece diferencias impermisibles entre los trabajadores cubiertos y los no cubiertos por ella. A tenor con los planteamientos constitucionales antes expuestos, procede determinar el método de análisis apropiado a fin de enjuiciar la constitucionalidad de esta legislación.

El Tribunal Supremo norteamericano con el transcurso del tiempo se ha enfrentado a la necesidad de elaborar distintos métodos de análisis constitucional de estatutos sobre el fundamento del debido proceso de ley y de la igual protección de las leyes a la luz de las circunstancias imperantes en cada tiempo. Así, por ejemplo, en las primeras décadas de este siglo se visualizó la cláusula del debido proceso de ley de las Emdas. V y XIV de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, como un instrumento útil para frenar las

nuevas corrientes liberales en el ámbito económico que intentaban romper los rígidos moldes del liberalismo clásico. A tono con estas realidades se le aplicó a esta cláusula un significado y alcance propio de los valores e intereses predominantes en la sociedad norteamericana de entonces y se adoptó un modelo de análisis constitucional armónico con las mismas. Es bueno señalar que esta acción de corte conservador tuvo el efecto de ampliar los fundamentos doctrinales que harían de la Constitución un instrumento dinámico, flexible y pragmático. Ello precisamente ha permitido que en relación con estas cláusulas se puedan desarrollar y adoptar distintas acepciones y modelos de análisis conforme las circunstancias imperantes de la época en las que han sido interpretadas. Esto, a su vez, fue y sigue siendo un factor clave en la historia y en el desarrollo del pueblo norteamericano.

Para el momento histórico al cual nos referimos, el Tribunal Supremo de Estados Unidos previó en el término "libertad" del debido proceso de ley una fuente en sí misma de nuevos derechos, dando paso a lo que se conoce como el "debido proceso de ley sustantivo".[11] De esa interpretación nace la libertad de contratación, mediante la cual se mediatizaron los esfuerzos gubernamentales progresistas de las primeras décadas de este siglo tendientes a introducir nuevas reformas y derechos, particularmente en el ámbito laboral. Esta doctrina alcanza su plena efectividad y configuración en el caso de *Lochner v. New York*, 198 U.S. 45 (1905), donde se eleva la libertad de contratación a derecho fundamental. En virtud de ello, se requería que el Estado estableciera un interés de superior jerarquía para que pudiera prevalecer

---

[11] A base de esta doctrina se reconoce que, además de los derechos expresamente señalados en la Constitución, existen otros derechos implícitos que emanan del concepto de libertad del debido proceso de ley. *Lochner v. New York*, 198 U.S. 45 (1905). Véanse, además: *Williamson v. Lee Optical Co.*, 348 U.S. 483 (1955); *Ferguson v. Skrupa*, 372 U.S. 726 (1963).

784

frente a este derecho. Al mismo tiempo tenía que demostrar una relación real y sustancial entre la ley y el propósito que ésta perseguía. Ello provocó que la casi totalidad de la legislación económica y social de la época sucumbiera constitucionalmente, deteniéndose así legislaciones de avanzada en beneficio de las masas trabajadoras.(12) Este período se conoció como la era *Lochner*. L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 567. Sin embargo, la debacle económica que sufrió la nación al final de la década de 1920 y los años '30 obligó al Gobierno a redoblar esfuerzos e impulsar una agresiva y urgente renovación de su política económica, y asumir un rol más destacado o intervencionista en los asuntos económicos del país.

No obstante lo anterior, son bien conocidos los serios inconvenientes a los que se enfrentó la política del Nuevo Trato del Presidente Roosevelt, que recogía esas reformas, debido a la obstinada actitud del Tribunal Supremo federal de aplicar a esa legislación el más riguroso análisis en protección de la libertad de contratación. Ello precipitó la histórica confrontación entre el poder ejecutivo y el judicial, en la que el Presidente amenazó incluso con trastocar la composición del Alto Foro, mediante lo que se conoció como el "Presidential Court Packing Plan". Tribe, *op. cit.*, pág. 580. Parte de estos incidentes fue el cambio en la postura de tendencia conservadora del Juez Roberts hacia el bloque liberal. Véase, además, B.F. Wright, *The Growth of American Constitutional Law*, Boston, Ed. Houghton Mifflin, 1942, págs. 180–241. Estos acontecimientos, unidos a la presión que desde la década de

---

(12) A modo de excepción, sólo algunas legislaciones lograban validarse, especialmente las hechas en favor de la mujer trabajadora. Véanse, por ejemplo: *Muller v. Oregon*, 208 U.S. 412 (1908); *McLean v. Arkansas*, 211 U.S. 539 (1909); *Stettler v. O'Hara*, 243 U.S. 629 (1916); *Bunting v. Oregon*, 243 U.S. 426 (1917). Refiérase, además, a H.W. Biklé, *Judicial Determination of Questions of Fact Affecting the Constitutional Validity of Legislative Action*, 38 Harv. L. Rev. 6 (1924).

los años '20 habían desatado varios grupos, particularmente los obreros, hicieron propicio que se produjera un cambio en el modelo de análisis constitucional de la legislación promovida por el Nuevo Trato. Ello provocó que volvieran a tomar dimensiones distintas las cláusulas que nos ocupan. Este nuevo modelo de revisión judicial se plasma en el caso de *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937). A partir del mismo, y gracias a la flexibilidad que ofrecía la Constitución federal, el Poder Judicial confirió gran deferencia a la política económica y social confeccionada por la Rama Legislativa, lo cual representó un cambio radical de enfoque en el análisis constitucional de las leyes bajo el debido proceso de ley y la igual protección de las leyes. Véase G. Gunther, *Individual Rights in Constitutional Law, Cases and Materials*, 3ra ed., Nueva York, Ed. Foundation Press, 1981, págs. 153–154. Desde entonces, a la luz del debido proceso de ley, la legislación se presume constitucional. En consecuencia, el que cuestione su validez viene obligado a establecer: (1) que el estatuto es irrazonable y arbitrario; (2) que no existe un propósito legítimo que lo justifique, y (3) que hay ausencia de nexo racional entre la ley y el propósito que persigue. Sobre el origen de este escrutinio, véanse: *Buck v. Bell*, 274 U.S. 200, 208 (1927), opinión disidente del Juez Holmes; *McGowan v. Maryland*, supra; *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

Este escrutinio parece estar moviéndose en la actualidad hacia un esquema de mayor rigor en el análisis de los propósitos legislativos por parte de los tribunales. Ello responde a la crítica fundada, de la cual ha sido objeto este modelo, en el sentido de que el mismo constituye en la práctica una abdicación del Poder Judicial. En esa dirección, el profesor Gunther, al aludir a los cambios que está experimentando dicho modelo de análisis, lo describe como "un escrutinio mínimo

en teoría y virtualmente ninguno de hecho".(13) Bajo este nuevo enfoque, se aboga por un propósito u objetivo gubernamental real y no especulativo o deducido a posteriori como fruto de la imaginación de los abogados que lo defienden. *Marina Ind. Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983). En *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 180 (1980), el Juez Stevens, en su opinión concurrente, endosa esta nueva corriente jurisprudencial al expresar lo siguiente:

> . . . El Juez Brennan correctamente señala que si el análisis del propósito legislativo requiriese solamente una lectura del texto de la disposición estatutaria impugnada, y si cualquier "base concebible" para una clasificación arbitraria pudiera repeler un ataque constitucional al estatuto, la revisión judicial constituiría un mero reconocimiento tautológico del hecho de que el Congreso hizo lo que tenía que hacer . . . . (Traducción nuestra.)

Más adelante, gracias a un mayor activismo judicial del Tribunal Supremo de Estados Unidos, se gestó un nuevo escrutinio consistente en que cuando el estatuto o acción gubernamental afecta derechos fundamentales, la ley se presume inconstitucional, transfiriéndose al Estado el peso de la prueba. Éste viene entonces obligado a establecer que: (1) posee un interés gubernamental apremiante, (2) no existe un medio menos oneroso para lograr el fin u objetivo que la ley persigue, y (3) el medio seleccionado guarda una estrecha relación con el propósito legislativo. Este análisis responde al creciente interés de proteger los derechos políticos y a las minorías. Nace esta doctrina en el caso de *United States v. Carolene Products Co.*, 304 U.S. 144 esc. 4 (1937), opinión emitida por el Juez Stone. Véanse: Tribe, *op. cit.*, pág. 450; Gunther, *op. cit.*, pág. 154. Este es el modelo conocido como "escrutinio estricto".

---

(13) G. Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1971).

El método de análisis bajo la igual protección de las leyes es fundamentalmente el mismo. La diferencia estriba en el tipo de acción gubernamental impugnado. Mientras que bajo el debido proceso de ley se examina el poder de reglamentación del soberano, en la igual protección de las leyes se enfoca la facultad del Estado para establecer clasificaciones o diferencias entre individuos igualmente situados. Sin embargo, reiteradamente se ha dicho que la igual protección de las leyes no prohíbe al Estado establecer diferencias entre ciudadanos y conferirles un trato distinto. Lo que esta disposición prohíbe es un trato desigual injustificado. *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Allied Stores of Ohio v. Bowers*, 358 U.S. 522 (1959). De ahí que, ante todo, la clasificación tiene que ser razonable y no arbitraria o caprichosa.

Con miras a examinar precisamente la razonabilidad del estatuto o acción gubernamental y determinar hasta dónde debe extenderse la clasificación, se han desarrollado dos (2) instrumentos de análisis que describen las clasificaciones conocidas en inglés como *overinclusive* (sobreabarcadora) y *underinclusive* (subabarcadora). La primera se refiere a clasificaciones en las que se incluyen tanto a personas que están igualmente situadas frente a la norma como las que no lo están; esto es, se extiende a individuos o entidades que por sus características particulares no deberían estar incluidas en dicha clasificación. En cambio, en la subabarcadora, la clasificación deja fuera a personas que, en función de sus características o situación particular, deberían estar incluidas en la misma. Bajo esta categoría, tanto los incluidos como los excluidos están igualmente situados respecto a la norma. Tribe, *op. cit.*, págs. 1446–1450.

Empero, no siempre que se dan estas situaciones las clasificaciones son inherentemente inconstitucionales, particularmente cuando se trata de la subabarcadora. Corresponderá examinar la justificación del Estado frente a los intere-

ses individuales afectados para ponderar su razonabilidad. Por motivo de lo anterior es que precisamente se han elaborado los distintos escrutinios a fin de enjuiciar la validez constitucional de esas clasificaciones.

Al igual que en el debido proceso de ley, cuando se trate de materia económico-social el Poder Judicial deberá concederle gran deferencia a los otros poderes, bien por el conocimiento especializado (*expertise*) que algunas agencias del ejecutivo poseen en esas materias, como por la metodología o recursos con que cuenta o puede contar la Rama Legislativa. El estatuto se presume constitucional, correspondiendo el peso de la prueba a quien cuestiona su validez. Será suficiente que el Estado posea un interés legítimo y que el propósito que se persiga guarde una relación razonable con la ley. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975); *Marina Ind., Inc. v. Brown Boveri Corp.*, supra; *Williams v. Vermont*, 472 U.S. 14 (1985). Este propósito, sin embargo, no tiene que estar articulado ni expresado en la ley. La doctrina sólo exige que pueda identificarse un propósito concebible, esto es, cualquier situación de hechos que concebiblemente justifiquen el estatuto. *M. & B.S., Inc. v. Depto. de Agricultura*, supra; *Vélez v. Srio. de Justicia*, supra. Naturalmente, según hemos dicho, la clasificación tendrá que ser razonable y no arbitraria.

Por otra parte, cuando la clasificación afecte derechos fundamentales o sea inherentemente sospechosa, el escrutinio a emplearse será el estricto. En *Frontiero v. Richardson*, 411 U.S. 677 (1973), se dijo que eran inherentemente sospechosas las clasificaciones de personas cuyas características son altamente visibles, inmutables y determinadas exclusivamente por el nacimiento, y que generalmente no guarda relación con la habilidad para ejecutar una tarea o contribuir a la sociedad. Véase, además, *Zachry International v. Tribunal Superior*, supra, págs. 281–282. Entre ellas se encuentran las clasificaciones por raza, color y ori-

gen nacional. *Brown v. Board of Education*, 347 U.S. 483 (1954); *Ambach v. Norwick*, 441 U.S. 68 (1979). En Puerto Rico este escrutinio se ha aplicado, además, a las clasificaciones por motivo de nacimiento, sexo, origen o condición social e ideas políticas o religiosas; esto es, derechos que emanan del Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. *Zachry International v. Tribunal Superior*, supra; *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972). Bajo este escrutinio, la ley se presume inconstitucional, correspondiendo el peso de la prueba al Estado. Para que una clasificación de este tipo pueda prevalecer, el Estado tendrá que: (1) poseer un interés apremiante; (2) establecer que la medida es necesaria; (3) no existen medios menos onerosos disponibles, y (4) hay una estrecha relación entre la ley y el propósito legislativo. El tribunal podrá también urgar acerca de otros propósitos probables de la ley, además de los expuestos en el estatuto, a los fines de auscultar si detrás de los propósitos expresos se esconden objetivos constitucionalmente impermisibles. Véanse, respecto a este escrutinio: *Loving v. Virginia*, 388 U.S. 1 (1966); *Brown v. Board of Education*, supra; *Zachry International v. Tribunal Superior*, supra; *León Rosario v. Torres*, 109 D.P.R. 804 (1980).

Por último, en la esfera federal se ha reconocido un tercer escrutinio conocido como "intermedio", el cual es utilizado cuando se está frente a "intereses individuales importantes, aunque no sean necesariamente fundamentales, y [se usan] criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos". *León Rosario v. Torres*, supra, pág. 814. Este escrutinio encuentra su génesis en el caso de *Reed v. Reed*, 404 U.S. 71 (1971), en el cual se planteaba un problema de discrimen por razón de sexo. El tribunal evita resolverlo bajo los criterios del escrutinio estricto, pero tampoco acude a los del tradicional. De esa manera se comienzan a sentar las bases de lo que luego sería el escrutinio intermedio. *Craig v. Boren*, 429 U.S. 190 (1976); *León Rosario v.*

*Torres*, supra; *Zachry International v. Tribunal Superior*, supra. Esta postura respondía al hecho de los cambios sociales producidos en la sociedad norteamericana en las últimas décadas, que confería a la igualdad por sexo mayor preeminencia y reclamaba un método de análisis más riguroso cuando se establecieran diferencias sobre este fundamento. Probablemente, en vista de que este valor va adquiriendo cada día mayor relevancia e importancia social, se hará necesario eventualmente el uso del escrutinio estricto en lugar del intermedio, como ha ocurrido en Puerto Rico. Véase *Frontiero v. Richardson*, supra, el cual da visos de cambios en esta dirección. Refiérase, también, a *Zachry International v. Tribunal Superior*, supra, pág. 278 esc. 11. Bajo este escrutinio desaparece la presunción de constitucionalidad de la ley. Sin embargo, la clasificación puede ser permisible si se demuestra la existencia de un interés público *importante* y si existe una relación *sustancial* entre la ley y el propósito legislativo. J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, 2da ed., Minnesota, Ed. West Publishing Co., 1983, pág. 593; Tribe, *op. cit.*, págs. 1082–1089. Bajo este análisis, no basta con establecer cualquier propósito concebible, como ocurre con el tradicional, sino que el mismo tendrá que ser expreso en vista de la importancia de los intereses involucrados. Además, al igual que en el estricto, podrán los tribunales explorar si existen otros propósitos impermisibles ocultos en el estatuto más allá de los expuestos expresamente por el legislador. *Reed v. Reed*, supra. En Estados Unidos este escrutinio ha sido aplicado a situaciones como discrimen por sexo, *Reed v. Reed*, supra; *Craig v. Boren*, supra; por nacimiento, *Trimble v. Gordon*, 430 U.S. 762 (1977); *Lalli v. Lalli*, 439 U.S. 259 (1978); derechos de los padres solteros sobre sus hijos, *Stanley v. Illinois*, 405 U.S. 645 (1972); *Caban v. Mohammed*, 441 U.S. 380 (1979). Nota, *Equal Protection and the "Middle Tier": The*

*Impact on Women and Illegitimates*, 54 Notre Dame L. Rev. 303 (1978).

En Puerto Rico el escrutinio intermedio jamás ha sido empleado. Nótese que en Estados Unidos se ha aplicado a situaciones que en Puerto Rico han requerido el uso del escrutinio estricto por involucrar derechos fundamentales bajo nuestro contexto constitucional. *Zachry International v. Tribunal Superior*, supra; *Wackenhut Corp. v. Rodríguez Aponte*, supra.

El resultado neto hasta ahora es que este Tribunal, al no adoptar en la práctica el escrutinio intermedio, ha colocado al Tribunal General de Justicia de Puerto Rico en posición de no poder utilizar el mismo en el análisis de la validez constitucional de los estatutos del país, mientras que la validez de esos mismos estatutos puede ser juzgada por las cortes federales (de Distrito, de Apelaciones y Suprema) bajo ese escrutinio que en realidad nos negamos a adoptar en nuestra jurisdicción. Es insostenible que este Tribunal mantenga esa situación por más tiempo. La paradoja se profundiza cuando consideramos que nuestro sistema judicial es de jurisdicción general, mientras el federal es de jurisdicción limitada. Es tiempo de actuar.

Para una visión más amplia del desarrollo histórico de los escrutinios comentados, refiérase además a: P. Bradley, *Developments in the Law—Equal Protection*, 82 Harv. L. Rev. 1065 (1969); *Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667, 676 (1978), opinión disidente del Juez Presidente Señor Trías Monge.

Cabe, por último, referirnos al hecho de que, aunque con relación al debido proceso de ley no existe un tipo de análisis intermedio, como ocurre bajo la igual protección de las leyes, no hay nada que contraindique que en circunstancias en las que se afecten derechos o intereses individuales importantes no fundamentales, en cuyo caso ni procede el análisis laxo ni estricto, se utilice el intermedio. Asimismo, al igual que pue-

den catalogarse algunas clasificaciones como sensitivas, también pueden calificarse así algunas reglamentaciones o acciones gubernamentales. Ello puede ameritar, igualmente, el uso de un escrutinio intermedio bajo esta cláusula constitucional.

No empece el fuerte arraigo del modelo de análisis constitucional bajo las disposiciones que nos ocupan, según ha sido expuesto en su trayectoria histórica, se advierten señales que apuntan hacia la deseabilidad de un nuevo modelo de criterios más amplios y flexibles. Ha sido objeto de críticas por tratadistas y jueces la pretensión de dividir diáfanamente los casos bajo la igual protección de las leyes en dos o tres categorías con el propósito de aplicarles escrutinios más laxos o rigurosos. Ello, además de ser difícil de lograr como cuestión de hecho, puede resultar inoficioso en la práctica. El Juez Marshall, en el caso de *San Antonio School District v. Rodriguez*, 411 U.S. 1 (1973), expresó sobre el particular lo siguiente:

> To begin, I must once more voice my disagreement with the Court's rigidified approach to equal protection analysis. See *Dandridge v. Williams*, 397 U.S. 471, 519–521 (1970) (dissenting opinion); *Richardson v. Belcher*, 404 U.S. 78, 90 (1971) (dissenting opinion). The Court apparently seeks to establish today that equal protection cases fall into one of two neat categories which dictate the appropriate standard of review— strict scrutiny or mere rationality. But this Court's decisions in the field of equal protection defy such easy categorization. A principled reading of what this Court has done reveals that it has applied a spectrum of standards in reviewing discrimination allegedly violative of the Equal Protection Clause. This spectrum clearly comprehends variations in the degree of care with which the Court will scrutinize particular classifications, depending, I believe, on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn. I find in fact that many of the Court's recent decisions embody the very sort of reasoned ap-

proach to equal protection analysis for which I previously argued—that is, an approach in which "concentration [is] placed upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification." *Dandridge v. Williams*, supra, at 520–521 (dissenting opinion). *San Antonio District v. Rodriguez*, supra, págs. 98–99, opinión disidente del Juez Marshall.

El entonces Juez Presidente de este Tribunal, Señor José Trías Monge, identificó como fundamento de estas críticas el carácter unitario de la cláusula de la igual protección de las leyes. *Hermina González v. Srio. del Trabajo*, supra, pág. 676, opinión disidente. Igual impresión surge del caso de *Craig v. Boren*, supra, pág. 212, opinión concurrente del Juez Stevens. Esta nueva tendencia enfatiza la necesidad de un balance de intereses, de sopesar derechos en pugna, más que encajonar hechos dentro de determinada clasificación y aplicarles distintos criterios de análisis. Con referencia al mismo expresó, además, el Juez Trías Monge:

> Lo que ocurre es que a menudo hay que sopesar derechos, resolver pugnas de valores, establecer que unos tienen que ceder ante otros en situaciones determinadas. Desde este punto de vista, los criterios discutidos representan un atrecho, una taquigrafía jurídica, una forma de establecer el necesario equilibrio de intereses. El peligro consiste en olvidar que tal es la naturaleza de los referidos criterios y que su uso no nos releva de la obligación de identificar y conciliar los intereses en conflicto y articular las razones para la solución escogida. *Hermina González v. Srio. del Trabajo*, supra, pág. 680.

En *Zachry International v. Tribunal Superior*, supra, pág. 279, este Tribunal reconoció la necesidad de balancear intereses al examinar la validez de las leyes cuando expresó: "Una pieza legislativa debe sostenerse o anularse en orden a la dimensión, sustancialidad y realidad de los principios comunitarios e individuales envueltos y los problemas sociales

que intenta corregir." Obsérvese que en este mismo caso la determinación acerca de qué tipo de escrutinio correspondía aplicarse al discrimen por sexo se fundamentó precisamente en consideraciones de balance de intereses. Véase *Zachry International v. Tribunal Superior*, supra, pág. 279, primer párrafo. Lo mismo ha hecho este Tribunal en otros casos al juzgar la constitucionalidad de algunas leyes o actuaciones administrativas. Véanse, *v.g.: Santiago de Hernández v. Tribunal Superior*, 102 D.P.R. 642, 645 (1974); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 275, 277 (1978); *Ramos v. Srio. de Comercio*, 112 D.P.R. 514, 518–520 (1982); *Hermina González v. Srio del Trabajo*, supra, págs. 675–676.

La utilización de este modelo, sin embargo, no implica necesariamente el abandono de los escrutinios comentados previamente. Son perfectamente armonizables y hasta complementarios. En este sentido, el balance de intereses podría aportar los criterios básicos para determinar o seleccionar el escrutinio apropiado para la consideración del caso de que se trate. Una vez hecha esa determinación, el examen de la validez de los estatutos o actuaciones administrativas puede seguir los criterios correspondientes del escrutinio seleccionado.

La interpretación de las cláusulas constitucionales que nos ocupan y los modelos de análisis a utilizarse son cuestiones dinámicas, que varían o deben variar conforme cambian los valores, intereses sociales y la realidad en que se desenvuelve la sociedad. Debemos tener presente que los escrutinios no son camisas de fuerza, sino guías para el análisis, y que con ellos no se pretende ahogar la conciencia y el juicio del juzgador. Nosotros somos los llamados a hacer el análisis y a exponer los criterios. Al así hacerlo, en relación con nuestra Constitución, no necesitamos el aval de que lo que hagamos lo hayan hecho o pensado otros anteriormente. Después de todo, tenemos capacidad propia para pensar, analizar, crear y pasar juicio conforme a nuestra propia rea-

lidad y circunstancias. Tenemos que cuidarnos de que so color de no parecer que respaldamos a *Lochner v. New York*, supra, caigamos en la contradicción de hacer lo que le inspiró: perpetuar nociones y visiones de la realidad económica y social que no tienen vigencia y que resultan ser anacronismos históricos. Como bien señala Tribe, para abandonar la doctrina de *Lochner v. New York*, supra, no es necesario abdicar el Poder Judicial a favor del proceso político; es siempre más fácil predicar la deferencia por razones institucionales que pasar juicio substantivo. Tribe, *op. cit.*, págs. 579–586. Cuidémonos, pues, de la paradoja de que el "antilochnerismo" no se convierta en realidad en un "neolochnerismo" que abrogue el desarrollo histórico, social y económico de Puerto Rico.

## IV

En vista de lo anterior, nos toca ahora determinar cuál es el escrutinio adecuado para resolver el planteamiento de inconstitucionalidad de la ley que nos ocupa. En primer término, cabe destacar que, según hemos señalado, esta ley afecta intereses propietarios y libertarios (en el ámbito económico), tanto de los dueños de establecimientos como de los trabajadores.

Respecto al menoscabo de los intereses de los dueños de establecimientos, el escrutinio más adecuado es el tradicional. Es una sabia y reiterada doctrina jurisprudencial que, tanto reglamentaciones como clasificaciones que afecten intereses propietarios y hasta libertarios en materia económica, se analicen a la luz de este escrutinio. *Marina Ind., Inc. v. Brown Boveri Corp.*, supra; *Vélez v. Srio. de Justicia*, supra; *E.L.A. v. Márquez*, 93 D.P.R. 393, 402 (1966); *U.S. Brewers Assoc. v. Srio. de Hacienda*, 109 D.P.R. 456 (1980). El beneficio económico, que es el interés verdaderamente afectado de estos propietarios, no puede catalogarse como derecho fundamental ni tampoco conlleva clasificaciones sos-

pechosas o sensitivas que ameriten un escrutinio distinto al tradicional.

Ahora bien, respecto a los trabajadores demandantes y apelados, éstos sostienen que, dado que el trabajo es un derecho fundamental y la implantación de esta ley les menoscaba ese derecho, el escrutinio a utilizarse debe ser el estricto. Frente a tal alegación procede consignar, en primer término, que no todo derecho de rango constitucional es fundamental. En nuestra Constitución, como en la federal, existen derechos a los cuales se reconoce mayor jerarquía y prominencia que a otros. Así, por ejemplo, el derecho a la vida reconocido en el Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, goza de mayor jerarquía que el derecho al disfrute de la propiedad reconocido en ese mismo inciso. Lo mismo ocurre con el derecho a no ser discriminado por razón de raza o color, frente al derecho a que no se menoscaben obligaciones contractuales. De igual manera, no tiene igual rango constitucional el derecho a la huelga que el derecho a la intimidad. Véanse, por ejemplo: *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975); *Mari Bras v. Casañas*, 96 D.P.R. 15 (1968). Igualmente, no todos los derechos o intereses relacionados con el trabajo, que emanan especialmente del Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, pueden catalogarse de derechos fundamentales.

No cabe duda que los intereses afectados de los trabajadores demandantes y apelados están protegidos constitucionalmente. Sin embargo, cabe preguntarnos si los mismos deben catalogarse como fundamentales. La más sensata apreciación es que no. No puede colocarse en igual jerarquía la pérdida de horas de trabajo y salarios, que son los intereses realmente afectados en este caso, con la pérdida de un empleo regular en su totalidad, sobre todo cuando ese es el único trabajo para el cual se está adiestrado como ocurrió, por ejemplo, en *Amy v. Adm. Deporte Hípico*, supra; *Ortiz Cruz v. Junta Hípica*, supra, y *Arroyo v. Rattan Specialties*,

*Inc.*, 117 D.P.R. 35 (1986). Sin embargo, ello no niega que en este caso resulte afectado un interés importante relacionado con el trabajo, como son las horas y los salarios.

Por otro lado, la consideración del rango constitucional de un derecho exige balancear intereses y sopesar prioridades. Por un lado debe atenderse la preeminencia o importancia del valor constitucionalmente protegido, según las circunstancias sociales prevalecientes, y por el otro la deferencia que amerita reconocerse a los poderes públicos en su función legislativa o ejecutiva, particularmente en el descargo de su poder de razón de estado. No debe olvidarse que en todo proceso de revisión judicial está siempre presente una cuestión de separación de poderes, por lo que la función judicial debe ejercitarse con la mayor prudencia con miras a mantener el debido equilibrio y armonía entre las distintas ramas del Gobierno. Ello, sobre todo, cuando se trata de materia económica y social.

Respecto al criterio de la preeminencia y valorización social del derecho o interés afectado, deben los tribunales estar atentos al hecho de que ello es algo dinámico y particular. El grado de estima que en un momento histórico dado la sociedad o el pueblo le confiera a un derecho o garantía puede variar con el transcurso del tiempo. Igualmente, puede cambiar esta apreciación de una cultura a otra. Cada sociedad tiene su propio esquema valorativo o jerarquía de prioridades conforme a su historia y a su cultura. De ahí que, por ejemplo, en la sociedad norteamericana de principios de siglo la igualdad por motivos de raza o color parecía un valor de menor importancia. En la actualidad, sin embargo, ha ascendido en su esquema valorativo al extremo de tornarse en uno de los más importantes derechos y aspiraciones de esa sociedad. Distinto ha ocurrido con los derechos económicos que gozan hoy de menor prominencia y jerarquía que antaño.

En cuanto al nivel de deferencia que merezcan los poderes políticos, ello dependerá fundamentalmente del cono-

cimiento especializado (*expertise*) o metodología de funcionamiento que posean en el campo para el cual legislen o actúen y, particularmente, la relación de éstos con la salud, la seguridad y el bienestar general de la comunidad; esto es, con el poder de razón de estado. *Bordas & Co., v. Srio. de Agricultura*, 87 D.P.R. 534 (1963); *Luce & Co., v. Junta Salario Mínimo*, 62 D.P.R. 452 (1943). Precisamente, a estos poderes se les confiere generalmente gran deferencia en materia económica y social por la pericia o los recursos con los que de ordinario cuentan en los asuntos relacionados con este campo. Téngase en mente que a estos cuerpos les es posible consultar expertos, celebrar vistas públicas, realizar estudios, entre otras cosas, todo lo cual les hace más capaces e idóneos que el Poder Judicial para actuar sobre el particular. Al mismo tiempo, son campos estrechamente vinculados al poder de razón de estado, en lo que tradicionalmente se le ha reconocido, como apuntamos anteriormente, conocimiento especializado, mejor metodología y, por ende, mucha deferencia. *Texaco Inc. v. Srio. de Obras Públicas*, 85 D.P.R. 712 (1962); *Bordas & Co. v. Srio. de Agricultura*, supra; *Luce & Co., v. Junta Salario Mínimo*, supra.

Este aspecto de la deferencia *vis-à-vis* la jerarquía valorativa socialmente conferida al derecho o interés afectado, deben ser los criterios rectores en la consideración de qué rango o prioridad amerita reconocer a los distintos derechos constitucionales. Una vez resuelto esto, procede aplicar el escrutinio más apropiado para la solución del caso.

Si bien es cierto que a partir de *West Coast Hotel Co. v. Parrish*, supra, se ha venido utilizando el escrutinio tradicional para evaluar legislación de corte laboral, ello no impide que debido a los cambios en los valores e intereses sociales y al momento histórico que vivimos, podamos examinar a través de un escrutinio distinto legislación que afecte una dinámica tan vital para la sociedad como es el trabajo. Téngase presente que no hay nada que impida que sigamos en

Puerto Rico un modelo distinto al norteamericano en aten-
ción a nuestra particular situación social y cultural, y la he-
chura liberal de nuestra Constitución, siempre que ello no
restrinja los derechos reconocidos bajo la Constitución fede-
ral. En *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 226–
227 (1987), expresamos que, "[c]on la profusa experiencia
constitucional de Estados Unidos hemos construido las pro-
tecciones mínimas de los derechos fundamentales. Sin em-
bargo, con nuestra Carta de Derechos podemos ir más lejos
en la defensa de los derechos humanos. Véase J. Trías
Monge, *Historia Constitucional de Puerto Rico*, Río Pie-
dras, Ed. Universitaria, 1980, Vol. III, págs. 169–170. Nues-
tra Constitución reconoce y concede unos derechos funda-
mentales con una visión más abarcadora y protectora que la
Constitución de Estados Unidos. Al interpretar sus con-
tornos, debemos garantizar su vigorosidad y relevancia a los
problemas socioeconómicos y políticos de nuestro tiempo".
(Escolio omitido.)[14]

En Puerto Rico, los asuntos relacionados con el trabajo, y
el trabajo en sí mismo, son actividades que gozan de la ma-
yor estima, respeto y valorización social. Este valor ha sido
recogido en nuestra Ley Suprema en el Art. II, Sec. 16, *su-
pra.*[15] También ha sido refrendado por nuestra jurispru-
dencia que, aunque escasa, es clara en cuanto al reconoci-
miento del trabajo como derecho que emana explícita o im-

---

[14] Véanse, *e.g.*: *Pueblo v. Rovira Ramos*, 116 D.P.R. 945, 955 (1986), opinión
concurrente del Juez Asociado Señor Rebollo López; *E.L.A. v. Coca Cola Bott.
Co.*, 115 D.P.R. 197, 205 (1984); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978).

[15] Esta sección dispone:
"Se reconoce el derecho de todo trabajador a escoger libremente su ocupa-
ción y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mí-
nimo razonable, a protección contra riesgos para su salud o integridad personal
en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de
trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compen-
sación extraordinaria que nunca será menor de una vez y media el tipo de salario
ordinario, según se disponga por ley." Art. II, Sec. 16, Const. E.L.A., L.P.R.A.,
Tomo 1, ed. 1982, pág. 327.

plícitamente de la misma Constitución, ya sea a través del citado Art. II, Sec. 16, como del concepto "vida" del Art. II, Sec. 7, Const. E.L.A., *supra. Amy v. Adm. Deporte Hípico*, supra; *Ortiz Cruz v. Junta Hípica*, supra; *Arroyo v. Rattan Specialties, Inc.*, supra. En *Amy v. Adm. Deporte Hípico*, supra, particularmente se amplía el marco conceptual de este derecho al expresar que "[e]l derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. Véanse: Constitución de Estados Unidos de América, Emda. Art. IX; Constitución del Estado Libre Asociado, Art. II, Sec. 19; *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791, 794–795 (1973). 4 Diario de Sesiones, *supra*, págs. 2530–2532, 2539–2543, 2575–2577. En efecto, la Convención Constituyente tuvo muy presente expandir el alcance del concepto 'vida' como derecho inalienable del hombre". *Amy v. Adm. Deporte Hípico*, supra, pág. 421.

No cabe duda que la dinámica laboral en general ha emergido en las últimas décadas como un valor de la más alta estima social en Puerto Rico. Ello se evidencia, además, por la alta prioridad que tiene este interés en las esferas gubernamentales, en la propia política pública, en la abundante legislación y en las propias decisiones de este Tribunal. En fin, es una actividad de innegable proyección y aprecio en nuestro pueblo.[16] Sin embargo, al mismo tiempo la legisla-

---

[16] Es ésta una situación diametralmente opuesta a la prevaleciente en la década de los años '30, cuando se desarrolló el modelo de análisis constitucional actual, el cual le impone a los tribunales el deber de intervenir mínimamente en la protección de este interés por la gran deferencia reconocida al Poder Legislativo. Afortunadamente, debido a las fuerzas económicas de la época y a las nuevas

ción relacionada con el trabajo es una en la que los tribunales deben concederle gran deferencia al Poder Ejecutivo y Legislativo, tanto por su conocimiento especializado o metodología, como por su estrecha vinculación con la salud en su sentido amplio y el bienestar de la comunidad. Se impone, por tanto, la necesidad de reconocer y salvaguardar la capacidad de esos poderes de actuar sobre el particular.(17) En ánimo de lograr el más justo balance entre estos dos (2) criterios, acogemos el interés individual afectado *en este caso* como uno importante, pero no fundamental.(18) De igual manera, las reglamentaciones o clasificaciones creadas o esta-

teorías económicas adoptadas por el Estado (*v.gr.* política del Nuevo Trato), resultaron favorecidos los trabajadores en términos generales por esta postura judicial. Sin embargo, lo ideal en nuestro tiempo es que se adopte frente a este importante interés una actitud más vigilante por parte de los tribunales en defensa del mismo.

(17) De lo aquí expuesto se desprende que con el escrutinio que acogemos en este caso no se pretende abrogar o limitar en forma alguna la capacidad de la Asamblea Legislativa de legislar sobre esta materia. Ello no ocurriría ni siquiera con el escrutinio estricto. Lo que implica nuestra postura es sólo un verdadero y real examen constitucional de esta importante legislación.

(18) Esta posición está fundada en el análisis expuesto en la pág. 796 de nuestro disenso, en cuanto a la prelación o jerarquía de los distintos derechos constitucionales, lo que incluye los propios derechos dimanantes del Art. II, Sec. 16, Const. E.L.A., *supra*. Hemos optado por aplicar en cada caso el escrutinio que el mismo amerite, a la luz del interés particular afectado, en lugar de acoger la rígida idea de que la única situación en el ámbito laboral que podría justificar un escrutinio distinto al tradicional es aquella en que se afectan intereses al grado de *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414 (1985), u *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791 (1973). En ese error de limitada visión se ha incurrido en ambas opiniones concurrentes al descartar el "reclamo genuino" de unos trabajadores con plena capacidad para comparecer en este caso, los cuales han establecido en el tribunal de instancia que con la imposición de esta ley sufrirán una merma sustancial en sus ingresos, en algunos casos de hasta el 50%. Nótese que no se trata de meros ingresos suplementarios como se señala en una opinión concurrente. El hecho de que el interés afectado de estos trabajadores no sea igual al de *Amy v. Adm. Deporte Hípico*, supra, no justifica desoírlos totalmente y tratar sus demandas o reclamos de la misma manera que los de Pueblo, que sólo pueden consistir en la pérdida de "unas monedas extras". Aquí se afecta un interés *importante* de estos trabajadores demandantes y apelados, el cual amerita atenderse como justamente corresponde. Lo que para Pueblo pueden ser unas monedas, para los trabajadores resulta una parte muy sustancial de sus ingresos.

blecidas en relación con el trabajo o los trabajadores, *al grado que ocurren en el caso de autos*, deben considerarse como sensitivas, pero no sospechosas, en atención precisamente a la importancia que, como hemos señalado, este Tribunal ha adscrito al interés afectado. Adviértase que se enfatiza en el hecho de que el interés afectado *en este caso* amerita clasificarse como importante, pero no fundamental. No se pretende extender ese calificativo a cualquier otro interés afectado dentro de la amplia dinámica laboral, algunos de los cuales podrían justificar el uso de un escrutinio distinto tal como ocurrió en *Amy v. Adm. Deporte Hípico*, supra. En función de lo anterior, procede analizar la legislación impugnada mediante el escrutinio intermedio. De esta manera se reconoce el carácter preeminente del interés aquí afectado y, a la vez, se le confiere a los demás poderes la debida deferencia, la cual es menos que la reconocida bajo el escrutinio tradicional pero más que la reconocida en el estricto. Por otra parte, dado el gran interés público que permea la cuestión laboral, no cabe duda que la legislación en beneficio del trabajador[19] habrá de tolerar fácilmente el escrutinio intermedio, al tiempo que contaremos con mejores criterios para examinar legislación que pueda perjudicarlo.

Aplicado este escrutinio a los hechos de este caso, arribamos a la inescapable conclusión de que la Ley de Cierre ha perdido relación sustancial con los propósitos expresos que inspiraron su aprobación y, en consecuencia, el interés del Estado ha dejado de ser importante y, por tanto, incapaz de prevalecer frente a los importantes intereses afectados en cuanto a los trabajadores demandantes y apelados.[20] Como

---

[19] Como, por ejemplo, las leyes y los decretos mandatorios de salario mínimo, las horas y los días de trabajo, el pago de horas extras, la seguridad en el empleo, etc.

[20] Somos conscientes de que también del lado de los demandados y apelantes hay trabajadores. No obstante, consideramos que su legítimo interés de

ya se dijo, la Asamblea Legislativa ha expresado, *ex post facto*, que la Ley de Cierre perseguía el propósito de conceder, "mediante el cierre a ciertas horas en días laborables, domingos y días de fiestas legales, un descanso necesario a los hombres y mujeres que laboraban en establecimientos comerciales e industriales del país durante una época en que las jornadas de trabajo excedían de ocho horas al día y no percibían los empleados de esos establecimientos compensación alguna por horas extraordinarias". Exposición de Motivos de la Ley Núm. 78 de 13 de junio de 1953 (1953 Leyes de Puerto Rico 267, 271). Véanse: *Vélez v. Municipio de Toa Baja*, supra; Op. Sec. Just. Núm. 1955–4.

Ciertamente, previo a 1941 éste pudo haber sido un propósito o interés gubernamental importante.(21) Sin embargo, a partir de esta fecha se aprueba un amplio programa legislativo para atender este mismo propósito en relación con toda la fuerza trabajadora del país, lo que provoca que el interés perseguido por la Ley de Cierre pierda relación sustancial, importancia y virtualidad, puesto que el mal que intentaba remediar ha sido atendido por otras leyes más específicas y modernas, incluso el propósito consignado en la exposición de motivos de la enmienda de 13 de junio de 1953 al que antes aludimos. Adviértase que esa legislación no contiene excepciones y es de aplicación general. Si se derogara hoy la Ley de Cierre, los establecimientos cubiertos por ella

---

poder compartir un día de descanso común con otros miembros de su familia no puede prevalecer sobre el supremo interés de los trabajadores demandantes y apelados de obtener su sustento o "ganarse la vida", aun cuando los primeros puedan ser mayoría. Nuestro ordenamiento constitucional no tolera definir los derechos sobre el fundamento de proteger los intereses de la mayoría. Por el contrario, la Constitución sirve de control a las mayorías, en protección de los derechos de las minorías.

(21) Debe señalarse, no obstante, que es curioso que en esa expresión, *ex post facto*, de propósito se guarde silencio sobre el trabajador agrícola explotado que trabajaba bajo condiciones infrahumanas y que constituía la mayoría de la fuerza trabajadora del país. Continúa al día de hoy ese trabajador excluido de las diposiciones de la Ley de Cierre.

se regirían, al igual que todos los otros, por las disposiciones laborales aludidas, las cuales atienden la situación adecuada y uniformemente. 29 L.P.R.A. sec. 295. Entre estas legislaciones se encuentra la Ley de Salario Mínimo de Puerto Rico, Ley Núm. 8 de 5 de abril de 1941 (29 L.P.R.A. ant. sec. 211–241), a través de la cual se facultó a la Junta de Salario Mínimo a aprobar decretos mandatorios que habrían de regir "con carácter de ley". *Mendoza v. Junta Salario Mínimo*, 74 D.P.R. 742, 750 (1953). Dicha Junta aprobó el Decreto Mandatorio Núm. 8 de 26 de marzo de 1945 que reconoce, entre otras cosas, el derecho a un (1) día de descanso por cada seis (6) de trabajo. Sec. 36 de la Ley de Salario Mínimo de Puerto Rico, 29 L.P.R.A. sec. 246k(b); Sec. 1 de la Ley Núm. 289 de 9 de abril de 1946 (29 L.P.R.A. sec. 295). Además, nuestra legislación laboral provee compensación extraordinaria para los casos en que se trabaje en exceso de la jornada legal diaria (ocho (8) horas), semanal (que varía) y cuando se trabaje el séptimo día. Véanse: Sec. 4 de la Ley Núm. 289, *supra*, 29 L.P.R.A. sec. 298; Ley Núm. 379 de 15 de mayo de 1948 (29 L.P.R.A. secs. 273(c) y (d), 274, 276 y 277).

Este estado de derecho, plasmado por las mencionadas legislaciones, no exige que el día y las horas de descanso sean necesariamente domingo o a partir de determinado horario, por lo que crea medios menos onerosos para lograr el mismo fin que persigue la Ley de Cierre. La rigidez en cuanto a días y a horas de descanso que impone la misma a un segmento pequeño de la fuerza trabajadora no tiene justificación cognoscible ni fin sustancial ni racional percibible que la justifique frente a la norma que la legislación laboral vigente ha adoptado para la vasta mayoría de la fuerza trabajadora. Eso hace de esta ley un instrumento irrazonable y hasta arbitrario, que no tolera el escrutinio intermedio bajo el debido proceso de ley y de la igual protección de las leyes.

Aunque ni de la propia Ley de Cierre ni de su historial legislativo surge otro propósito legislativo expreso, los demandados y apelantes le atribuyen propósitos concebibles adicionales con miras a salvar su constitucionalidad bajo el escrutinio tradicional. Sin embargo, deberá recordarse que, a tenor con el escrutinio adoptado en el caso de autos, no puede sostenerse la validez de una ley a base de cualquier situación de hechos que concebiblemente justifiquen el estatuto. *Vélez v. Srio. de Justicia*, supra, pág. 538; *M. & B.S., Inc. v. Depto. de Agricultura*, supra, págs. 332–333. De modo que, ni el propósito alegadamente concebible de descanso común[22] ni el de proteger al pequeño comerciante,[23] señalados por los demandados y apelantes, son adecuados, por legítimos que puedan ser en abstracto, para poder sostener· la constitucionalidad de esta ley bajo el análisis intermedio.

No obstante, aun confiriéndoles el calificativo de "propósitos expresos", los mismos son incapaces de sostener la constitucionalidad de la ley bajo el escrutinio intermedio, en vista de la arbitrariedad y vaguedad que caracterizan ambos propósitos. Dichos objetivos, lejos de sostener la ley, adelantan su abrogación. En cuanto al descanso común, la propia

---

[22] El hecho de que la ley haya establecido días y horas de descanso uniformes no implica necesariamente que su propósito fuera establecer períodos de descanso común. Ello más bien respondía a las circunstancias de la época, que hacían de este medio el único disponible dentro del esquema constitucional prevaleciente, para lograr el objetivo social y laboral ya comentado. *Lochner v. New York*, supra; *Vélez v. Municipio de Toà Baja*, 109 D.P.R. 369 (1980).

[23] El supuesto propósito de balancear la competencia tampoco surge expresamente de la ley. A través de los largos años de historia de este estatuto, en tan sólo una ocasión se hizo referencia al mismo en el informe de una Comisión Conjunta de la Cámara de Representantes sobre el P. de la C. 678, el cual se convirtió luego en la Ley Núm. 100 de 24 de junio de 1983. Sin embargo, en ningún momento la ley recoge ese propósito. Más aún, la enmienda iba dirigida a ampliar las excepciones de la Ley de Cierre para liberar de su aplicación una enorme cantidad de establecimientos ubicados en las zonas turísticas, lo cual es contrario al propósito aducido, puesto que la misma ampliaba la competencia en lugar de restringirla.

ley al incorporar tan elevado número de excepciones lo ha desvirtuado categóricamente, pues estimula más de lo que restringe el trabajo en los períodos dispuestos por el estatuto. Se recordará que sólo el 12.5% de los trabajadores, sin excluir los que pudieran quedar exentos con la creación de nuevas zonas turísticas, entre otros factores adicionales (véase *infra*), están aún cubiertos por esta ley. Para el resto, el 87.5%, no hay descanso común *como cuestión de derecho*. Bajo esta realidad del Puerto Rico de hoy, resulta difícil atribuir vigencia al alegado propósito legislativo. El descanso uniforme obligatorio para menos de un 12.5% es claramente arbitrario.[24] La irrazonabilidad e insustanciabilidad de este propósito no quedan subsanadas por el hecho de que algunos patronos discrecionalmente hayan decidido o puedan decidir conceder a sus empleados o a parte de ellos como días u horas de descanso los mismos que dispone esta ley, aun cuando ello pueda resultar en que una parte considerable de la población descanse en esos momentos. Entre los patronos aludidos se encuentran los Gobiernos federal y estatal, los municipios, las corporaciones públicas y varios establecimientos o empresas exentas que conceden a parte de su plantilla los períodos libres dispuestos en el estatuto, a pesar de mantenerse ellas en operación. En todos esos casos la determinación de quiénes descansan y el día específico de descanso radica en la discreción del patrono y en la determinación que puedan tener los empleados en cuanto al día en particular en que habrán de descansar. Lo anterior, unido al alto número de desempleados y a los más de dos (2) millones de personas del total de la población puertorriqueña que están

---

(24) El hecho de que el Estado no venga obligado a atacar un problema en su totalidad no quiere decir que puede atacarlo de manera tan parcial como ocurre en esta ley, sin que se demostrara falta de recursos o capacidad para hacerlo de manera más amplia y general.

fuera de la fuerza laboral,([25]) entre otros, puede redundar en que, *de manera independiente a esta ley*, la mayoría de los puertorriqueños tengan disponible para descansar los días y las horas cubiertas por el referido estatuto. De lo dicho también se desprende que esta legislación tiene como consecuencia imponer una jornada de trabajo para días en que la mayoría de los puertorriqueños tampoco laboran. Ahora bien, el criterio de razonabilidad y sustancialidad que venimos llamados a considerar judicialmente es a cuántos, dentro de la fuerza laboral puertorriqueña, obliga la ley al descanso común y qué fin importante justifica un trato distinto entre los trabajadores cubiertos y los no cubiertos por la ley. No se adelanta objetivo importante alguno tratando legislativamente a éstos en forma distinta.

Lo anterior pone de manifiesto, primero, la patente arbitrariedad del estatuto, el cual obliga realmente a una alarmante minoría —muy probablemente menor del 12.5% de la fuerza trabajadora puertorriqueña— y deja a la completa discreción y arbitrio del patrono y a la determinación de los empleados el día de descanso que habrá de disfrutar al 87.5% restante; segundo, que no existe una relación sustancial entre el descanso común y la ley, puesto que dicho estatuto no es la razón ni causa del descanso generalizado en domingo y en otros días u horas en Puerto Rico; tercero, resulta injustificado privar rígidamente a un grupo de ciudadanos de trabajar en ese tiempo, lo cual podría ser de urgente necesidad para muchos,([26]) cuando la inmensa mayoría tiene derecho a

---

([25]) Se estimó en el tribunal de instancia que la fuerza laboral puertorriqueña es de alrededor de 758,000 trabajadores. Determinaciones de hecho del Tribunal Superior, pág. 18.

([26]) Principalmente los jóvenes que, como es sabido, es el grupo poblacional más desventajado en cuanto a las oportunidades de empleo. Entre éstos está el grueso de los estudiantes para quienes el trabajo dominical es esencial en la obtención de los ingresos necesarios para su subsistencia, particularmente para aquéllos cuyos padres no pueden subvencionarles económicamente.

esa alternativa y, como cuestión de hecho, tal opción no altera significativamente el patrón de descanso acostumbrado en el país.

Por último, un somero examen del historial del estatuto en cuestión nos permite anticipar lógica y razonablemente que ese reducido porcentaje de trabajadores, que aún están cobijados por la ley, habrá de continuar decreciendo con el transcurso del tiempo. El aludido historial refleja un patrón de enmiendas frecuentes que traen como secuela cada vez más y más excepciones a medida que la ley se enfrenta a los nuevos tiempos, que la economía se diversifica, que surgen nuevos tipos de actividad económica o comercial y que cambian los hábitos y las costumbres. No cabe duda que ese patrón responde al mejor deseo de intentar acoplar la ley a las nuevas realidades sociales y económicas.

Con ese propósito en mente comenzó el legislador por exceptuar, por ejemplo, los garajes, los mercados públicos, los restaurantes, los cafés, los hoteles, los casinos, los salones de billar, los mataderos, las vaquerías y las funerarias. También tuvo que agregar a esa lista las empresas de utilidad pública o cuasi públicas, los teatros, los hipódromos, las farmacias, los negocios que operen dentro de los aeropuertos y los hoteles. Más adelante se vio precisado a añadir los establecimientos que necesiten realizar trabajos urgentes o necesarios para evitar peligros o considerables pérdidas de dinero, los bancos, las lavanderías o *laundromats*, los establecimientos que por la naturaleza de su actividad necesitan mantener unos sistemas de operación continua y, más reciente aún, los negocios o las empresas que operan en las zonas turísticas, entre muchas otras excepciones que menciona la ley. Como puede observarse, el legislador se ha obstinado en tratar de mantener con vida este estatuto artificialmente, cediendo ante las fuerzas que claman por su derogación, mediante el mecanismo de la excepción. Más tarde tendrá que exceptuar los supermercados, los cuales mantienen un in-

tenso cabildeo para que también a ellos se les excluya, y luego tal vez los establecimientos que vendan ropa o vestidos. También podrá imponerse la necesidad de excluir otros negocios o empresas económicas de nueva aparición, como por ejemplo los *video clubs* y muchos otros que vienen de la mano con los nuevos descubrimientos científicos y tecnológicos, sobre todo en un tiempo en que la actividad creadora del hombre se intensifica, se diversifica y, unida a la máquina, es generadora de profundas y rápidas transformaciones. A medida que los cambios sociales y económicos continúen riñendo con el estatuto, el legislador, a base del historial reseñado, habrá de intentar atemperarlos creando nuevas excepciones y haciendo cada vez más arbitraria e irrazonable su aplicación y su vigencia.

Como una conclusión lógica, tenemos que preguntarnos: ¿a quiénes finalmente habrá de obligar esta ley? Quizás a unos pocos establecimientos comerciales y sólo a un 10, 8 ó tal vez 5 por ciento de la fuerza laboral. ¿Acaso tenemos que llegar a lo ocurrido, por ejemplo, en el estado de Vermont en el que el 90% de los establecimientos estaban excluidos de la ley? *State v. Shop and Save Food Markets, Inc.*, supra. La realidad es que una mirada realista hacia el futuro, incluso al futuro inmediato, nos obliga a reconocer que la situación de este estatuto no va ni puede mejorar en cuanto a su esquema y a su aplicación limitada. Por el contrario, la lógica y la razón nos indican que ese repertorio de excepciones habrá de ampliarse. Entonces, ¿hasta cuándo tenemos que esperar para convencernos de que este estatuto es anacrónico? Que más allá de los buenos propósitos que pudieron inspirarle en otros tiempos, el propio estatuto los ha abandonado teniendo que ceder ante otros imperativos, mejores o peores que los primeros, pero que los nuevos tiempos imponen. Ese precisamente ha sido el destino del supuesto propósito del descanso común, el cual con el transcurso del tiempo ha quedado

confinado al pasado e inconexo con el propio esquema estatutario vigente en el país.

Adiviértase, además, que el estatuto en cuestión se adoptó cuando nuestra sociedad era predominantemente rural y la población alcanzaba apenas un millón (1,000,000) de habitantes.[27] Hoy Puerto Rico es una sociedad urbana con una población que se ha triplicado a alrededor de tres millones trescientos mil (3,300,000) habitantes.[28] Si consideramos las facilidades recreativas con que contamos hoy para la población que tenemos, lo más contraindicado sería un día común de descanso para toda la población. Ello acarrearía mayores congestiones y hacinamiento, que fomentarían los males sociales en las vías públicas y en los lugares de recreación activa y pasiva que tienen como fin legítimo proveer esparcimiento y solaz a la ciudadanía.

De igual manera, tampoco es válido el alegado propósito de mantener un balance entre los grandes y los pequeños comerciantes mediante la restricción a la competencia.[29] En primer término, resulta arbitraria una ley que establece clasificaciones o restricciones siguiendo un propósito tan impreciso como el que nos ocupa. No existe en la ley ni en su historial criterios claros para definir o catalogar a los pequeños o grandes comercios. Ello obliga a tener que especular sobre el significado de tales conceptos. Así, por ejemplo, ¿es pequeño el que tiene un volumen de venta de $50,000 anuales o el que vende sobre $100,000?, o ¿será más bien el

---

[27] Report of the Governor of Porto Rico to the Secretary of War, 1910, pág. 5.

[28] Informe Anual de Estadísticas Vitales de 1985, Departamento de Salud de Puerto Rico.

[29] Nótese que la propia ley parece indicar una trayectoria de apertura a la competencia más que a restringirla, dado que la tendencia es a liberar cada día más establecimientos de las restricciones de la ley. Obsérvese que las últimas dos (2) enmiendas (excepciones 13 y 14) particularmente, pueden representar válvulas que permitan el escape de numerosos establecimientos hoy cubiertos, lo cual lejos de restringir, amplía la competencia.

que no emplea a personas fuera del grupo familiar? Pero, ¿qué tal si sólo emplea a familiares, pero tiene un volumen de venta de sobre $200,000?, y ¿cómo se cataloga si tiene ventas de $50,000 pero emplea una o más personas fuera de la familia?

Cabe señalar que es improcedente utilizar como argumento para defender este alegado propósito, o como criterio para definirlo, la excepción dispuesta en la ley referente a los establecimientos operados por sus propios dueños, cónyuges e hijos.(30) Es sabido que esta histórica excepción *sólo cubre algunas horas* y responde a que esta categoría de negocios no emplea obreros como tal, que era a quienes pretendía proteger en sus orígenes esta ley. Por ello, tal excepción no implica ni pretende aportar criterio impertinente a esos propósitos. No obstante, en el extremo poco probable de que así fuera, el mismo sería subabarcador por cuanto excluye arbitraria e irrazonablemente de tal definición establecimientos que, por su volumen de negocios, deberían ser considerados como pequeños, aun cuando empleen alguna persona fuera del núcleo familiar. Adviértase que el que un comerciante sea soltero o casado, sin hijos o con pocos o muchos hijos, no determina el tamaño de su negocio.

Adicionalmente, en vista de la incertidumbre, vaguedad e imprecisión que injerta en el estatuto el propósito de protección al pequeño comerciante, el mismo, además de ser arbitrario, es incapaz de sostener un estatuto penal como el que nos ocupa en virtud del principio de legalidad. Este principio exige claridad, certeza y pormenorización en el mandato legal. Las leyes penales deben dar aviso adecuado a aquellas personas a quienes se dirige de la conducta que se interesa

---

(30) Como cuestión de hecho, esta limitada excepción también milita en contra del alegado propósito de lograr que la familia descanse junta, pues lo que persigue es lo contrario: permitir que la familia trabaje parte del período de descanso dispuesto por la ley.

proscribir. En *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 145–146 (1973), citando de *Grayned v. City of Rockford*, 408 U.S. 104 (1972), sostuvimos:

"Es un principio básico del debido procedimiento que una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. Las leyes imprecisas violentan diversos valores importantes. Primero, porque asumimos que el hombre es libre para elegir entre la conducta legal e ilegal, insistimos que las leyes den a la persona de ordinaria inteligencia una oportunidad razonable para saber qué está prohibido, de modo que pueda actuar en concordancia con ese conocimiento. Las leyes imprecisas pueden engañar al inocente al no proveer un aviso adecuado. Segundo, si ha de prevenirse la aplicación arbitraria y discriminatoria, las leyes deben proveer normas claras para aquellos que las aplican. Una ley vaga delega, de modo no permisible, cuestiones básicas de política a policías, jueces y jurados para ser resueltas sobre bases subjetivas y *ad hoc*, con los consiguientes peligros de aplicación arbitraria y discriminatoria. Tercero, pero relacionado, cuando un estatuto impreciso 'empalma con áreas sensitivas de las libertades básicas garantizadas por la Primera Enmienda' 'opera para inhibir el ejercicio de [esas] libertades'. Los significados inciertos inevitablemente llevan a los ciudadanos a 'permanecer mucho más lejos de la zona ilegal' . . . que si las fronteras de las áreas prohibidas estuviesen claramente demarcadas". (Citas omitidas.)

El mandato de ley tiene que ser preciso, de manera que una persona de inteligencia común pueda entenderlo sin tener que especular o adivinar sobre el ámbito y la naturaleza del mismo. *Pueblo v. Tribunal Superior*, 98 D.P.R. 750 (1970); *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972). Véase, además, D. Nevares-Muñiz, *Derecho Penal Puertorriqueño*, Puerto Rico, Ramallo Bros. Printing, 1983, págs. 90–93.

De lo dicho cabe preguntarnos cómo puede saber una persona común si es o no pequeño comerciante cuando la ley ni menciona ese concepto ni tampoco en su historial se apor-

tan elementos claros para definirlo. Eso dejaría al arbitrio de las fuerzas coactivas del Estado y del propio comerciante adoptar el calificativo que se interese sobre el particular, asumiendo el comerciante el riesgo de ser procesado criminalmente en caso de que su determinación de abrir su establecimiento conflija con el criterio ad hoc de dichas fuerzas coactivas. Eso es constitucionalmente impermisible y, por tanto, un propósito concebido con tan graves defectos no puede ser legítimo ni razonable para sostener ninguna ley, principalmente una penal.

Por todo lo anterior, los alegados propósitos aludidos, aun considerados como objetivos expresos de este estatuto, no satisfacen los criterios del escrutinio intermedio toda vez que son esencialmente arbitrarios, vagos e imprecisos y que no guardan relación sustancial con la ley.

## V

Lo aquí expuesto no significa que a la Asamblea Legislativa le esté constitucionalmente vedado reglamentar el comercio o el trabajo. Lo que señalamos es la inconstitucionalidad de este estatuto en particular, lo cual es evidente, al considerarlo integralmente frente a la realidad social y económica y al universo mayor del ordenamiento legal vigente. Cualquier estatuto admite excepciones si éstas no son caprichosas o arbitrarias.(31) Sin embargo, cuando las mismas su-

---

(31) Obsérvese que las excepciones que contiene la Ley de Cierre crean clasificaciones notablemente incongruentes y arbitrarias, tales como: la de los bancos que excluye, por ejemplo, a las financieras; la de los establecimientos que venden carnes con relación a los que venden arroz u otros comestibles básicos para la dieta puertorriqueña; la excepción de los negocios operados por sus propios dueños, que no se extiende a las barberías, aun cuando éstas puedan ser operadas por sus propietarios, 33 L.P.R.A. sec. 2204, e incluso la distinción que se establece entre las propias barberías a base del área donde están situadas, exceptuándose a las rurales y no así a las urbanas. Además, por qué se permite operar un hipódromo o una licorería atendida por su dueño, cuyos efectos nocivos a la unidad familiar son conocidos, así como los establecimientos que venden refrescos y ta-

peran por mucho su aplicación general, esto es, cuando la ley resulta ser mucho menos abarcadora en sus excepciones, se puede convertir en un medio arbitrario para alcanzar un fin aun cuando éste puede ser legítimo y hasta loable. Se torna la ley en un instrumento oneroso y opresivo contra una minoría, el cual no puede hallar cabida en nuestro sistema jurídico constitucional, especialmente cuando resulta afectado un grupo tan sensitivo como son los trabajadores o un interés de tan alta estima como es el trabajo. Cuando un estatuto contiene tantas y tan amplias excepciones, induce a pensar que está perdiendo su contacto con el presente y con las nuevas realidades sociales, que se ha tornado anacrónico y que su vigencia, más que adelantar, puede obstaculizar intereses de mayor preeminencia y actualidad.

Nuestra sociedad ha sufrido amplias y profundas transformaciones en los hábitos familiares de consumo, de trabajo y de recreación; cambios que se extienden a toda la dinámica de la vida social puertorriqueña y que provocan precisamente que esta ley no logre una efectiva sincronización con el presente. El derecho no puede abstraerse de su contorno social. Cuando ello ocurre, se alienta el masivo incumplimiento de las leyes en menoscabo del principio del imperio de la ley. Este Tribunal, en su función de pautar el derecho y de darle contenido a las diposiciones constitucionales, debe atender a esta realidad social y actuar en armonía con ella. No debemos eludir esta responsabilidad a base del argumento de que a quien compete resolver este dilema es a la Asamblea Legislativa. Ante un planteamiento similar, respondió este Tribunal en *Figueroa Ferrer v. E.L.A.*, supra, pág. 277, que "[s]egún expresamos en *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977), la función de interpretar la Constitución es atributo indelegable de la Rama Judicial.

---

baco, y no puede hacerlo un supermercado o una ferretería, entre otros muchos ejemplos.

Es a los Tribunales que les corresponde fijar el significado de las disposiciones constitucionales envueltas aquí". Atribuirle competencia exclusiva a la Rama Legislativa en el asunto que nos ocupa, equivaldría a resolver que este Tribunal es impotente bajo la Constitución para proteger los derechos ciudadanos afectados en este caso "y que su papel no puede rebasar al del simple espectador limitado a lo sumo a lamentar el desprestigio que sufre necesariamente un sistema jurídico divorciado de la realidad a la que se supone que sirva". *Figueroa Ferrer v. E.L.A.*, supra, pág. 278.

Nótese que la propia Asamblea Legislativa reconoció la falta de efectividad y sincronización de esta ley con la realidad social y económica presente, cuando manifestó:

> Puede decirse, pues, que la legislación protectora del trabajo actualmente en vigor prácticamente hace innecesaria en ciertos extremos la vigente ley de cierre; y por el contrario, la misma está afectando con sus restricciones el programa de industrialización que viene desarrollando el gobierno de Puerto Rico en su empeño de crear mayores oportunidades de empleo para los trabajadores. Exposición de Motivos de la Ley Núm. 78 de 13 de junio de 1953 (1953 Leyes de Puerto Rico 269, 271–273.).

En términos similares se expresó el Comité Laboral del Consejo sobre la Reforma Judicial en Puerto Rico de diciembre de 1974, págs. 16–17, cuando en relación con la Ley de Cierre señaló que "esta Ley debe ser totalmente revisada y de ser necesario derogada, ya que la misma carece por completo de eficacia y virtualidad". Lo mismo opinaba el Consejo Asesor del Gobernador sobre Política Laboral, cuando en el *Report on Governmental Regulation and Its Impact on Productivity on Puerto Rico*, 1976, pág. 187, abogó por la derogación de esta ley debido, entre otras cosas, a su impacto adverso en la creación de nuevos empleos.

A modo de conclusión conviene recordar las expresiones de este Tribunal en el citado caso de *Figueroa Ferrer v. E.L.A.*, supra, pág. 278, cuando señaló:

En buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin, aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder el marco de sus atribuciones.

Son precisamente estas sabias directrices las que han guiado nuestro juicio en la opinión que hoy emitimos.

Una reflexión final. Uno de los principales deberes y responsabilidades de este Tribunal es pautar el derecho e imprimirle la mayor certeza posible, de suerte que la norma legal resulte guía eficaz para la futura conducta ciudadana y gubernamental. Ese deber y esa responsabilidad se acrecentan cuando de interpretaciones constitucionales se trata.

Hoy se revoca una sentencia válidamente emitida por el Tribunal Superior de Puerto Rico por razón de encontrarse este Tribunal dividido. Decimos "dividido" y no "igualmente dividido", pues resulta que, de un lado, los que defienden la constitucionalidad del estatuto y, por consiguiente, la revocación de la sentencia de instancia, lo hacen separadamente en opiniones particulares a las cuales no se une ningún otro juez. Mientras que, de otro lado, los que sostenemos la inconstitucionalidad del estatuto y, por ende, la confirmación de la sentencia de instancia, lo hacemos a base de unos mismos criterios y fundamentos expresados en una sola opinión en la cual coincidimos. Ante esta situación de división, la revocación se produce no a base de la norma general de que cuando un tribunal apelativo se divide en partes iguales lo que procede es confirmar la sentencia dictada por el tribunal de instancia, *Junta Insular de Elecciones v. Corte*, 63 D.P.R. 819 (1944), sino de la posición que se adoptara por este Tribunal a partir de *P.I.P. v. E.L.A.*, 109 D.P.R. 403 (1980), a los efectos de que, una vez el Tribunal adquiere jurisdicción so-

bre un asunto, todo decreto de inconstitucionalidad de un tribunal de instancia quedará revocado, a menos que una mayoría de los miembros de este Tribunal concurra con la procedencia de dicho decreto de inconstitucionalidad.

La revocación que esa posición impone en este caso ha de proyectar incertidumbre y causar perplejidad para quienes tengan que laborar bajo el estatuto en cuestión, especialmente cuando no se pueden poner de acuerdo entre sí los que sostienen su constitucionalidad y cuando en una de las opiniones se reconoce la necesidad de reformar el estatuto.

Es desafortunado que este Tribunal no haya podido en este momento descargar adecuadamente su responsabilidad de imprimir mayor certeza a la norma legal.

Por los fundamentos expuestos, decretaríamos la inconstitucionalidad de la Ley de Cierre, con sus correspondientes enmiendas, 33 L.P.R.A. secs. 2201–2203, y en consecuencia, confirmaríamos la sentencia del Tribunal Superior, Sala de San Juan.